UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

OMAR TRIPLETT,
   a/k/a The Doctor,
                              Plaintiff,

                                                 9:17-CV-656
v.                                            (MAD/TWD)


CHAD ASCH, et al.,

                              Defendants.[1]

_____

APPEARANCES:                    OF COUNSEL:

OMAR TRIPLETT
Plaintiff, *pro se*
01-A-2100
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. LETITIA JAMES               CHRISTOPHER J. HUMMEL, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

## I.    INTRODUCTION

      Plaintiff Omar Triplett, an inmate in custody of the New York State Department of

Corrections and Community Supervision ("DOCCS"), commenced this *pro se* civil rights action

---

[1] Defendants' counsel represents the proper spelling of "Ash" is "Asch" and "Kenny Paparrella" is "Kenneth Paparella." (*See* Dkt. Nos. 69, 93-1, 93-2.) The Court adopts the proper spelling and directs the Clerk to modify the docket accordingly.

under 42 U.S.C. § 1983.  (Dkt. No. 1.)  The amended complaint, as modified, is the operative

pleading.  (Dkt. Nos. 65, 66.)  Plaintiff's claims arise out of events that occurred during his

confinement at the Central New York Psychiatric Center ("CNYPC") while in custody of

DOCCS.  (*See generally* Dkt. No. 66.)  Defendants and claims remaining in the action following

initial review under 28 U.S.C. §§ 1915(e) and 1915A by the Hon. Mae A. D'Agostino, United

States District Judge, are: (1) Eighth Amendment excessive force claims against Security

Hospital Treatment Assistants ("SHTA") Chad Asch, Mark Martin, and Teryle Williams; (2)

Eighth Amendment excessive force and failure to protect claims against SHTA Supervisor

Kenneth Paparella; and (3) Fourteenth Amendment due process claims against Dr. Harold

Berkheimer, Dr. Luis Hernandez, and Executive Director Maureen Bosco.  *Id*.  (Dkt. Nos. 12,

65.)

Defendants now move for partial summary judgment, pursuant to Rule 56 of the Federal

Rules of Civil Procedure.  (Dkt. No. 93.)  Defendants seek dismissal of Plaintiff's Eighth

Amendment claims against Paparella and Fourteenth Amendment due process claims against

Berkheimer, Hernandez, and Bosco.  *Id*.  Plaintiff has filed responsive papers.  (Dkt. No. 103.)

Defendants' motion has been referred for a report and recommendation pursuant to 28 U.S.C.

§ 636(b) and Local Rule 72.3(c).  For the reasons that follow, the Court recommends that

Defendants' motion for partial summary judgment be granted in part and denied in part.

## II.     RELEVANT BACKGROUND

Plaintiff, who had diagnoses of Schizophrenia-paranoid type and antisocial personality

disorder, was transferred to CNYPC in June 2014, where Berkheimer served as his treating

psychiatrist.  (Dkt. No. 93-3 at ¶¶ 1-2.)  Shortly after arriving at CNYPC, Plaintiff was moved to

Ward 601, which, according to Plaintiff had a "famous pattern" of abusing patients.  (Dkt. No. 94 at 26-39; Dkt. 66 at ¶ 37.)

On the morning of June 19, 2014, at approximately 7:20 a.m., Plaintiff was involved in an altercation with staff, although the parties have differing accounts of what transpired.  (Dkt. Nos. 66 at ¶¶ 19-24, 94 at 26-39, 94-1 at ¶¶ 8-16.)  According to Plaintiff, a staff member informed Asch that Plaintiff was washing his clothes in the bathroom sink on the ward.  (Dkt. No. 94 at 26, 30.)  After washing his clothes, Plaintiff returned to his room without incident.  *Id*. Thereafter, he was physically assaulted by Asch after Plaintiff refused to "give him falatio" on threat of Plaintiff having his "head smashed."  (Dkt. No. 66 at ¶ 20.)  Asch punched Plaintiff and while Plaintiff was trying to defend himself from Asch's attack, Martin and Williams, "came and started viciously and violently, beating and stumping [Plaintiff] down."  *Id*.  After being "viciously and savagely" beaten for approximately two minutes, Plaintiff was strapped to a bed for an hour or two and injected with psychotropic medication that "rendered [him] hopeless and useless" and unable to communicate.  *Id*. at 24.  Plaintiff was later sent to an outside hospital for treatment of his injuries, received stitches, and was returned to CNYPC.  *Id*. at ¶ 25.

According to Defendants, however, Berkheimer observed Plaintiff become enraged after being told by staff he could not wash his underwear in the bathroom sink.  (Dkt. No. 94-1 at ¶ 8.)  As he was being returned to his room, Plaintiff physically assaulted staff and ignored directions to calm down and stop his violent behavior.  *Id*. at ¶¶ 9-10.  Berkheimer authorized staff to place Plaintiff in five-point restraints.  *Id.* at ¶ 10.  However, Plaintiff continued to struggle violently and ignore instructions to calm down.  *Id.* at ¶ 11.  Berkheimer determined Plaintiff presented a serious risk of harm to himself or others if not medicated and Plaintiff would not voluntarily take medication.  *Id.* at ¶ 12.  He thus prescribed Haldol 5 mg., Ativan 2 mg., and Benadryl 50 mg. by

3

injection to treat Plaintiff's psychiatric symptoms, calm him, and treat side effects. *Id.* at ¶ 13. He periodically checked on Plaintiff's condition and, after determining it had not improved, prescribed the same drugs to be administered a second time. *Id.* at ¶¶ 14-15.

A second incident transpired early in the morning on June 20, 2014, at approximately 1:15 a.m. (Dkt. No. 93-3 at ¶ 15.) According to Plaintiff, he spoke to Williams in the hallway on the way to or from the bathroom. (Dkt. No. 94 at 75-78.) Without any provocation, Williams attacked Plaintiff. *Id.* at 78-79. Plaintiff claims he was restrained by staff and medicated. *Id*. at 81-82. According to Defendants, facility records indicate Plaintiff assaulted Williams. (Dkt. No. 94-1 at 18.) Thereafter, Dr. Siddiqi, the on-call physician who is not a party to this action, prescribed Plaintiff Haldol 5 mg., Ativan 2 mg., and Benadryl 50 mg. over his objection. *Id.*

Plaintiff also claims security supervisor Paparella failed to supervise his workers and "knowingly and sadistically" placed Plaintiff in harm's way by returning Plaintiff to Ward 601 after the June 19, 2014, incident, which allowed the June 20, 2014, assault to occur. (Dkt. No. 66 at ¶¶ 34-36.)

Following these incidents, and pursuant to CNYPC Policy # 3.12 – Court Ordered Psychotropic Medication Over Patient's Objection ("COPM"), the facility began the process of seeking a court order authorizing medication over Plaintiff's objection. (*See* Dkt. No. 93-1 at 12-17.) Berkheimer, as Plaintiff's treating physician,[2] prepared an evaluation for Plaintiff and

---

[2]  While under Berkheimer's care from June 2014 through September 2014, Plaintiff was prescribed Risperdal to manage his psychiatric symptoms related to schizophrenia. (Dkt. No. 94-1 at ¶ 25.) Plaintiff, however, would only consent to taking a dose of 2 mg. of Risperdal, despite Berkheimer's medical opinion a much higher dose was necessary to manage Plaintiff's psychiatric symptoms. *Id.* at ¶ 26. Plaintiff also had poor compliance with taking the prescribed 2 mg. of Risperdal, and would routinely refuse to take the medication. *Id.* at ¶ 27. According to Berkheimer, Plaintiff's poor compliance with his prescription and refusal to take a higher dosage of Risperdal negatively impacted the management of his psychiatric symptoms. *Id*. at ¶ 28.

concluded treatment was in Plaintiff's best interests, Plaintiff lacked capacity to make a reasoned decision regarding treatment, and Plaintiff posed a risk of harm to himself or others if untreated. (Dkt. No. 94-1 at 53-57.)  Hernandez was assigned to conduct a second evaluation of Plaintiff as reviewing physician.  (Dkt. No. 94-2 at ¶ 10.)  Hernandez evaluated Plaintiff and also recommended that he be administered medication over objection.  *Id.* at 5-11.  After these two evaluations, the Clinical Director at CNYPC determined the facility should obtain court authorization to treat Plaintiff over his objection.  (Dkt. No. 93-3 at ¶ 40.)  Bosco, as Executive Director, reviewed and approved the Clinical Director's decision to seek a court order.  *Id.* at ¶ 41.

A hearing was held on September 18, 2014, before the Hon. Patrick F. MacRae, New York Supreme Court Justice, Oneida County.  *Id.* at ¶ 42.  Justice MacRae found that treatment over objection was in Plaintiff's best interests and granted an order authorizing treatment over objection for the duration of Plaintiff's stay at CNYPC and for twelve months after discharge. *Id.*  Plaintiff alleges Berkheimer, Hernandez, and Bosco fraudulently obtained the court order to treat him with medication over his objection.  *Id.* at ¶¶ 31, 32.

Given the foregoing, the Court liberally construed Plaintiff's claims as asserting (1) Eighth Amendment excessive force claims against Asch, Martin, Williams; (2) Eighth Amendment excessive force and failure to protect claims against Paparella; and (3) Fourteenth Amendment due process claims against Berkheimer, Hernandez, and Bosco.  As noted, Paparella, Berkheimer, Hernandez, and Bosco move for summary judgment and seek to be dismissed from this action on the following grounds: (1) Plaintiff cannot establish Eighth Amendment claims excessive force/failure to intervene or failure to protect claims against Defendant Paparella; (2) Plaintiff has failed to establish the personal involvement of Defendants

Bosco and Hernandez in the treatment of Plaintiff on June 19, 2014; (3) Plaintiff has failed to

establish the involvement of Defendants Bosco, Hernandez, and Berkheimer in the treatment of

Plaintiff on June 20, 2014; (4) Plaintiff cannot establish a due process claim against Defendant

Berkheimer with respect to the treatment of Plaintiff on June 19, 2014; (5) Plaintiff cannot

establish due process claims against Defendants Bosco, Hernandez, and Berkheimer with respect

to CNYPC's decision to obtain a court order authorizing the treatment of Plaintiff over his

objection, and treating him pursuant to said order thereafter; and (6) Defendants Bosco,

Hernandez, and Berkheimer are entitled to qualified immunity.  (Dkt. No. 93-4.)  Plaintiff

opposes the motion.  (Dkt. No. 103.)

## III.    SUMMARY JUDGMENT LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all the submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, *see*

*also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at

248).  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 55354 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

Where a party is proceeding *pro se*, the court must "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[3]

## IV.    DISCUSSION

### A.    Plaintiff's Failure to Comply with Local Rule 7.1(a)(3)

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 7.1(a)(3). Where a party has failed to respond to the movant's statement of material facts as required by Local Rule 7.1(a)(3), the facts in the

---

[3] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion. *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

As required by the Local Rules, Defendants advised Plaintiff of the consequences of failing to file a response to Defendants' Rule 7.1 Statement of Material Facts.  (Dkt. No. 93 at 2.) While Plaintiff submitted a response to Defendants' motion, he failed to do so in the manner required under Local Rule 7.1(a)(3).[4]  (Dkt. No. 103 at 2-4.)  "Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules."  *Marino v. Watts*, No. 9:12-CV-801 (NAM/DJS), 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report-recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 F. App'x 73 (2d Cir. 2019) (summary order).

Although this Circuit adheres to the view that nothing in Rule 56 imposes an obligation on a court to conduct a searching and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion, *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002), the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements

---

[4]  Local Rule 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts.  Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

regarding the submission of and response to statements of material facts on summary judgment motions, and whether to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.[5]

### B.    Eighth Amendment Excessive Force and Failure to Protect Claims

Plaintiff claims Paparella violated his Eighth Amendment rights to be free from excessive force by failing to supervise his staff despite knowing there was a pattern of "extreme abuse and assaults" on Ward 601 and returning Plaintiff to Ward 601 after the first alleged assault on June 19, 2014, thereby creating the opportunity for the second alleged assault on June 20, 2014, to occur. (Dkt. No. 66 at ¶¶ 34-36; *see also* Dkt. Nos. 12 at 8 n.7, 65 at 2, 22.) Defendants contend they are entitled to summary judgment because Plaintiff cannot establish Paparella's personal involvement or deliberate indifference. (Dkt. No. 93-4 at 3-4.)

### 1.    Legal Standards

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and internal quotation marks omitted). An Eighth Amendment excessive force claim has two components – "one subjective focusing on the defendant's motive for his

---

[5] *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met [the] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted). As to any facts not contained in Defendants' Local Rule 7.1(a)(3) Statement, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id*. (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)). The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64 (citation omitted).

To prevail on a failure to protect claim, a plaintiff must demonstrate two elements, one objective and one subjective. To satisfy the objective prong, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. That is, the deprivation "must be, in objective terms, 'sufficiently serious.'" *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

As to the second prong, "[t]o prove deliberate indifference, the plaintiff must show that the 'official [knew] of and disregard[ed] an excessive risk to inmate health or safety.'" *Celestin*

10

*v. Premo*, No. 9:12-cv-301 (GLS/RFT), 2014 WL 272443, at *5 (N.D.N.Y. Jan. 24, 2014)

(quoting *Farmer*, 511 U.S. at 837) (alterations in original).  Indeed, "[t]he official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, *and* he must also draw the inference."  *Id.*  Mere negligence by a prison official will not

suffice.  *Hayes*, 84 F.3d at 620; *Hathaway*, 37 F.3d at 66 ("Deliberate indifference requires more

than negligence, but less than conduct undertaken for the very purpose of causing harm.").

## 2.    Defendant Paparella

The law is clear that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983."  *McKinnon v. Patterson*,

568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676 ("Government officials

may not be held liable for the unconstitutional conduct of their subordinates under a theory of

respondeat superior.").  "Holding a position in a hierarchical chain of command, without more, is

insufficient to support a showing of personal involvement."  *Groves v. Davis*, No. 9:11-CV-1317

(GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at

934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not

be held liable in a § 1983 action merely because he or she held a high position of authority).

Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and

the injuries suffered."  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

In this circuit, a supervisory official is personally involved in a constitutional violation if

he or she: (1) directly participated in the violation; (2) failed to remedy that violation after

learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom

under which the violation occurred; (4) was grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[6]

Here, Plaintiff makes no claim Paparella directly participated in the alleged incidents of June 19 and June 20, 2014. The summary judgment record demonstrates Paparella was not present at CNYPC at 7:20 a.m. on June 19, the approximate time of the first incident, or at CNYPC at 1:15 a.m. on June 20, the approximate time of the second incident. (Dkt. Nos. 93-2 at ¶¶ 7, 13; 94 at 97.[7]) Thus, there is no evidence that Paparella directly participated in the alleged incidents of June 19 and June 20, 2014, and/or failed to intervene. *See Colon*, 58 F.3d at 873.

Nor is there any evidence showing that Paparella knew of, or failed to remedy, any alleged wrongdoing. *See Colon*, 58 F.3d at 873. While Plaintiff claims Ward 601 "has a "famous pattern of abusing . . . patients," (Dkt. No. 66 at ¶37), "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact" to avoid summary judgment. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). As to the June 19, 2014, incident, to the extent Plaintiff points to Paparella's responses to interrogatories as

---

[6] "*Iqbal* has . . . engendered conflict . . . about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict. *See, e.g.*, *Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal* . . . 'may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations.'" (citation omitted)). Nevertheless, district courts in this Circuit have consistently held that "[w]here the constitutional claim . . . relies on the . . . deliberate indifference standard[] of the . . . Eighth Amendment[]," *Colon* still applies. *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009); *see also Williams v. Adams*, No. 9:18-CV-1041 (BKS/TWD), 2019 WL 350215, at *7 (N.D.N.Y. Jan. 29, 2019) (collecting cases).
[7] The Court notes reference to the "July" 19 and "July" 20 incidents appear to be typographical errors. (*See, e.g.*, Dkt. No. 93-2 at ¶¶ 7, 9, 11,13, 15.)

evidence that Paparella "knew of" the "violent tendency of the sick & sadistic" SHTAs on Ward 601, the record indicates only that Paparella objected to Plaintiff's interrogatories and does not provide any evidence as to his knowledge. (Dkt. Nos. 103 at 11-12, 103-1 at 5, 12.) Moreover, Paparella states he does not recall Plaintiff ever bringing concerns to his attention concerning safety or security with staff prior to the alleged incidents at issue. (Dkt. No. 93-2 at ¶ 15.) While Plaintiff testified that he had one conversation with Paparella prior to June 19, 2014, in which he discussed issues with staff, Plaintiff conceded this conversation had nothing to do with the staff involved in the June 19 and June 20, 2014, incidents at issue. (Dkt. No. 94 at 95-96.[8])

As to the June 20, 2014, incident, Plaintiff claims Paparella, as SHTA Supervisor, was in charge of classification and movement and therefore responsible for his being returned to Ward 601 after the June 19 incident. (Dkt. No. 66 at ¶ 36.) To the contrary, Paparella has stated in his declaration that following the June 19, 2014, incident, decisions as to whether Plaintiff should have been housed in another ward or separated from certain staff members, would have been made by the patient's treatment team and the Supervising SHTAs and Chief SHTA on duty at the time of the incident, which would have been the 7:00 a.m. to 3:00 p.m. shift. (Dkt. No. 93-2 at ¶¶ 5, 9.) The record demonstrates Paparella was not on duty during this time and was not involved in the determinations made regarding whether or not Plaintiff should be transferred or separated from staff following the June 19, 2014, incident. *Id.* at ¶ 10. Further, Paparella states

---

[8]  In his opposition papers, Plaintiff further claims Paparella placed him in harm's way by failing to move and separate Plaintiff from another resident prior to an altercation between these two residents on or about June 14, 2014. (*E.g.*, Dkt. No. 103 at 7.) However, Plaintiff did not include these allegations in his complaint and raises them for the first time in his response in opposition to Defendants' motion for summary judgment. (*See generally* Dkt. No. 66.) The Court therefore declines to consider these allegations as a separate theory of liability. *See, e.g.*, *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 344 (E.D.N.Y. 2010) ("As a threshold matter, courts generally do not consider claims or completely new theories of liability asserted for the first time in opposition to summary judgment.") (collecting cases).

he does not recall Plaintiff bringing any safety concerns to his attention during the 3:00 p.m. to 11:00 p.m. shift he worked on June 19, 2014. *Id.* at ¶ 11. Moreover, Paparella states that, during this shift, he did not become aware through other means of any threats or risks to Plaintiff that would have required a reevaluation of his current situation. *Id.* In response to Defendants' motion, Plaintiff asserts Paparella "was clearly notified" of his situation and "clearly knew" Plaintiff was in harm's way. (Dkt. No. 103 at 12.) However, Plaintiff's conclusory statements that Paparella knew of his situation are insufficient to defeat summary judgment, and Plaintiff has not produced any admissible evidence supporting these contentions.[9] *See Cole*, 1999 WL 983876, at *3.

Furthermore, there is no evidence that Paparella created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of any such policy custom. Similarly, there is no evidence whatsoever supporting Plaintiff's conclusory assertions that Paparella was grossly negligent in supervising subordinates who allegedly committed the

---

[9] In his response submission, Plaintiff points to a New York Office of Mental Health ("OMH") directive on "Seclusion and Restraint" which provides that "[n]o later than the next working day following the use of seclusion or restraint . . . a senior manager shall conduct a formal debriefing." (Dkt. No. 103-1 at 15.) The "treatment team and appropriate supervisory staff, including the clinical lead," must participate in the debriefing. *Id.* However, this policy does not constitute evidence from which a reasonable jury could find Paparella knew of an excessive risk to Plaintiff. The record does not indicate whether such a debriefing occurred on June 19, 2014, or whether Paparella would be considered "appropriate supervisory staff" required to participate in any such briefing. Thus, it would be speculation and conjecture to conclude Paparella was informed of the June 19, 2014, incident that same afternoon. Moreover, this is not a situation where a particular risk to Plaintiff was longstanding or pervasive such that knowledge of the part of Paparella could be inferred. *See Farmer*, 511 U.S. at 842-43. Indeed, the second incident occurred less than 24 hours after the first. Plaintiff points to other provisions of the directive which have no bearing on the question of Paparella's knowledge. (*See* Dkt. No. 103-1 at 16-17 (providing that the "*ward psychiatrist's responsibilities*" include reviewing his or her patients' clinical records when coming on duty and that "[e]ach *facility* shall develop a mechanism" to ensure all staff "are aware of the patients' individual crisis prevention plans" (emphases added)).)

wrongful acts or exhibited deliberate indifference by failing to act on information. *See Colon*, 58 F.3d at 873.

In light of the foregoing, the Court finds that none of the *Colon* criteria apply, and there is no showing that Paparella had the necessary level of culpability to satisfy the subjective prong of Plaintiff's excessive force and failure to protect claims. Therefore, the Court finds Paparella is entitled to summary judgment and recommends granting Defendants' motion as to Paparella.

### C.    Fourteenth Amendment Due Process Claims

Plaintiff claims Defendants Berkheimer, Hernandez, and Bosco violated his Fourteenth Amendment due process rights by forcibly administering psychotropic medication against his will on June 19 and June 20, 2014. (Dkt. No. 66 at ¶¶ 30-31.) Plaintiff also claims Berkheimer and Hernandez, with the authorization of Bosco, sought and received a court order authorizing his medication over objection for one year. *Id.* at ¶ 32. Defendants contend they are entitled to summary judgment for lack of personal involvement and on the merits. (Dkt. No. 93-4 at 12-17.) Defendants further assert they are entitled to qualified immunity. *Id.* at 17-19.

#### 1.    Legal Standards

The due process clause of the Fourteenth Amendment protects the right of a competent person to refuse unwanted medical treatment. *See Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment."); *see also Washington v. Harper*, 494 U.S. 210, 221-22 (1990) (finding prisoners likewise possess this liberty interest). As recognized by the Second Circuit, New York common law protects the right of "every individual of adult years and sound mind" to "determine what shall be done with his own body and to control the course of his medical treatment." *Kulak v. City of New York*, 88 F.3d 63, 74 (2d Cir. 1996) (quoting *Rivers v.*

*Katz*, 495 N.E.2d 337, 341 (N.Y. 1986) (internal quotation marks omitted)); *see also Mills v. Rogers*, 457 U.S. 291, 300 (1982) (recognizing the due process clause of the Fourteenth Amendment protects state-created liberty interests) (citations omitted).  This right may be set aside only in "narrow circumstances," including where the patient "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution."  *Kulak*, 88 F.3d at 74.

This right to be free from unwanted medication is expressed in N.Y. Comp. Codes R. & Regs. tit. 14, § 527.8 ("Section 527.8").  Section 527.8 first states a mandatory policy that, with certain exceptions, "Patients who object to any proposed medical treatment or procedure . . . may not be treated over their objection."  N.Y. Comp. Codes R. & Regs. tit. 14, § 527.8(c).  There is an exception for emergency treatment, whereby treatment may be given over objection if the patient "is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness.  Such treatment may continue only as long as necessary to prevent dangerous behavior."  *Id.* § 527.8(c)(1).  A patient is "dangerous" if he "engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others."  *Id.* § 527.8(a)(4).

An involuntarily committed patient also may be treated over objection, even in the absence of an emergency, if authorized by a court.  *Id.* § 527.8(c)(4)(i).  Section 527.8 sets forth the procedure a facility must follow prior to seeking court authorization for treatment.  *See id.* § 527.8(c)(4).  First, the patient's treating physician must "formally evaluate whether the treatment is in the patient's best interests" and "whether the patient has the capacity to make a reasoned decision concerning the treatment."  *Id.* § 527.8(c)(4)(ii)(a).  If the treating physician so determines, the physician must inform the patient and the clinical director of his conclusions.  *Id.*

Next, the clinical director must appoint a reviewing physician to conduct a second evaluation of the patient, following the same procedures as the treating physician. *Id.* § 527.8(c)(4)(ii)(b)(1). If the patient continues to object to the treatment, the clinical director next determines on behalf of the facility whether the patient has the capacity to make a reasoned decision concerning treatment and whether the treatment is in the patient's best interests. *Id.* § 527.8(c)(4)(ii)(b)(3). If the clinical director's determination is that the patient lacks such capacity and the treatment is in the patient's best interests, the director may apply for court authorization of the treatment. *Id.*

This Circuit assess claims of substantive due process violations against professionals using the professional judgment standard outlined in *Youngberg v. Romeo*, 457 U.S. 307 (1982). *E.g.*, *Kulak*, 88 F.3d at 74 (finding the doctor's decision to medicate was "a proper exercise of his professional judgment and comported with the requirements of § 527.8(c)(1)"); *Mejía v. N.Y. City Health & Hosps. Corp.*, No. 16-cv-9706, 2018 WL 3442977, at *10 (S.D.N.Y. July 17, 2018) (applying professional judgment standard to decision to medicate the plaintiff over objection pursuant to Section 527.8). Under this standard, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. Moreover, decisions made by professionals are "presumptively valid." *Id.*; *see also Lombardo v. Stone*, No. 99 CIV 4603 SAS, 2001 WL 940559, at *10 (S.D.N.Y. Aug. 20, 2001) (according the defendants' professional medical judgment a presumption of correctness).

### 2.    Claims Relating to Treatment on June 19, 2014 and June 20, 2014

Plaintiff contends Defendants Berkheimer, Hernandez, and Bosco violated his due process rights by forcibly administering psychotropic medication over his objection on June 19

and 20, 2014. (Dkt. No. 66 at ¶¶ 30-31.) Defendants argue they are entitled to summary

judgment because Hernandez and Bosco were not personally involved in Plaintiff's treatment on

either date, Berkheimer was not personally involved in Plaintiff's treatment on June 20, 2014,

and Berkheimer did not substantially depart from professional standards in administering

medication to Plaintiff over objection on June 19, 2014. (Dkt. No. 93-4 at 13-17.)

### a.    Defendant Hernandez

The Court finds no reasonable jury could find personal involvement on the part of

Hernandez in the treatment of Plaintiff on either June 19, 2014, or June 20, 2014. In his

declaration, Hernandez states he was not involved in the decision to treat Plaintiff over his

objection after either incident at issue. (Dkt. No. 94-2 at ¶¶ 5-9.) Further, Berkheimer declares

that in response to an incident that occurred on June 19, 2014, he prescribed Plaintiff medication

to be administered over his objection based upon an emergency situation, pursuant to OMH

Corrections-Based Operations Manual Policy # 3.44, Administration of Emergency Policy.

(Dkt. No. 94-1 at ¶¶ 5, 6.) The record further shows Dr. Siddiqi made the decision to treat

Plaintiff after the June 20, 2014, incident. (Dkt. No. 94-1 at ¶¶ 18, 19.) Lastly, Plaintiff does not

recall Hernandez being present when he was medicated on June 19 or June 20, 2014. (Dkt. No.

94 at 71, 85.)

In light of the foregoing, the Court finds Hernandez is entitled to summary judgment for

lack of personal involvement and recommends granting Defendants' motion for summary

judgment on Plaintiff's due process claims relating to his treatment on June 19 and June 20, 2014

against Hernandez.

### b.    Defendant Bosco

As noted, the summary judgment record demonstrates Drs. Berkheimer and Siddiqi medicated Plaintiff on June 19, 2014, and June 20, 2014, respectively, pursuant to CNYPC Policy #3.44 – "Administration of Emergency Medication," which authorizes treatment over a patient's objection in emergency situations.  (Dkt. Nos. 93-1 at ¶¶ 3,5; 93-1 at 7-10; 94-1 at ¶¶ 8-19.)  Policy #3.44 defines an emergency as a "[s]ituation in which the patient engages in substantially dangerous conduct" and defines dangerousness as when a patient "engages in conduct or is imminently likely to engage in conduct that poses a risk of physical harm to him/herself or others."  (Dkt. No. 93-1 at 7.)  The Policy does not require the treating physician to consult Bosco, as Executive Director of CNYPC, or any other administrative staff at the facility before treating in such circumstances.  (Dkt. No. 93-1 at ¶ 4.)  Moreover, Bosco declares she was not consulted regarding the decisions to treat Plaintiff over his objection on June 19 and 20, 2014, or otherwise involved in those decisions.  *Id.* at ¶ 6.  Plaintiff does not argue Bosco was otherwise involved in his treatment in these dates.

In light of the foregoing, the Court finds Bosco was not personally involved in the administration of medication over objection on these dates.  Therefore, the Court recommends granting Defendants' motion for summary judgment on Plaintiff's due process claims relating to his treatment on June 19, 2014, and June 20, 2014, against Bosco.

### c.    Defendant Berkheimer

As discussed above, with regard to the treatment of Plaintiff on June 20, 2014, the record evidence shows Berkheimer was not present at the time of this incident and accordingly was not involved in the decision to administer medication over Plaintiff's objection.  (Dkt. No. 94-1 at ¶¶ 20, 23.)  Furthermore, the Behavior Management Restrictive Intervention Physician Order and

Monitoring Form for the June 20 incident indicates Plaintiff was treated by Dr. Siddiqi. (Dkt.

No. 94-1 at 18.) Plaintiff does not recall seeing Berkheimer that day and Plaintiff does not

suggest Berkheimer was otherwise involved in his treatment at issue on June 20, 2014. (Dkt. No.

94 at 85.) Accordingly, the Court finds Berkheimer was not personally involved in the

administration of medication at issue on June 20, 2014, and summary judgment is warranted on

this claim.

However, the Court reaches a different conclusion with regard to Berkheimer's treatment

of Plaintiff on June 19, 2014. As discussed above, the record evidence shows Berkheimer

authorized the administration of medication over Plaintiff's objection on June 19, 2014. (Dkt.

No. 94-1 at ¶¶ 5-16.) In his declaration, Berkheimer states he witnessed Plaintiff become

"enraged[] and begin angrily threatening security staff" after staff instructed Plaintiff not to wash

his clothing in the bathroom sink. *Id.* at ¶ 8. Berkheimer also states he saw Plaintiff assault

security staff in the process being returned to him room. *Id.* at ¶ 9. According to Berkheimer,

Plaintiff ignored staff direction to calm down, so Berkheimer authorized staff to place Plaintiff in

five-point restraints. *Id.* at ¶ 10. Once restrained, Plaintiff continued to "struggle violently." *Id.*

at ¶ 11. "Based upon this observed behavior," Berkheimer "determined that Plaintiff posed a

serious risk of harm to himself and others without medication, and that he would not voluntarily

take medication." *Id.* at ¶ 12. Berkheimer prescribed Plaintiff Haldol 5 mg. (to treat symptoms

associated with schizophrenia), Ativan 2 mg. (to calm Plaintiff), and Benadryl 50 mg. (to calm

Plaintiff and treat the side effects from the other medications) by injection. *Id.* at ¶ 13.

Berkheimer asserts these medications are "regularly prescribed to psychiatric patients in

emergency situations." *Id.* After monitoring Plaintiff's situation and concluding his condition

had not approved, Berkheimer prescribed a second round of these drugs. *Id.* at ¶¶ 14-15; *see also* Dkt. No. 94-1 at 8-15.

However, Plaintiff testified under oath that Asch assaulted him in his room and Plaintiff was not the aggressor. (Dkt. No. 94 at 37.) Plaintiff also testified Martin and Williams joined in the assault and he was "stomped down" by Asch, Martin, and Williams for approximately one to two minutes and was knocked unconsciousness. *Id.* at 51-53. Plaintiff regained consciousness while being transported to a hospital for treatment. *Id.* at 53. According to Plaintiff, he was never voluntarily offered any medication and he did not refuse medication. *Id.* at 67-68.

Because of the clear factual disputes regarding the incident occurring on June 19, 2014, including who initiated the altercation, whether and to what extent Plaintiff was violent or struggling, whether Plaintiff ignored all staff direction, and whether Plaintiff lost consciousness, the Court finds summary judgment inappropriate. If a jury were to credit Plaintiff's version of events, it could not be said as a matter of law that Berkheimer's belief that Plaintiff was dangerous and his decision to forcibly medicate him were not a substantial departure from accepted professional standards and practices. *See Haden v. Hellinger*, No. 9:14-CV-0318 (GLS/DEP), 2016 WL 8673144, at *10 (N.D.N.Y. Sept. 30, 2016) (denying summary judgment where there was a dispute as to the plaintiff's dangerousness where the plaintiff testified he did not instigate the physical altercations or resist once force was used on him), *report-recommendation adopted by* 2016 WL 6248432 (N.D.N.Y. Oct. 26, 2016); *cf. Brinson v. Kirby Forensic Psychiatric Ctr.*, No. 16-CV-1625 (VSB), 2018 WL 4680021, at *7-8 (S.D.N.Y. Sept. 28, 2018) (granting summary judgment where there was a dispute whether the plaintiff was the aggressor but where plaintiff did not dispute "the facts on which [the doctor] based his decisions" to administer medication).

In light of this factual dispute, the Court finds at this juncture Berkheimer also is not entitled to qualified immunity on this claim. Prisoners and psychiatric patients have a clearly established right to refuse medication except in emergency situations. *Washington*, 494 U.S. at 221-22; *Cruzan*, 497 U.S. at 278. If a jury were to credit Plaintiff's version of events, no reasonable official could believe that administering medicine over objection in such circumstances did not violate his rights. *See Haden*, 2016 WL 8673144, at *10 n.21 (denying qualified immunity where there was a factual dispute regarding whether the plaintiff was dangerous or not).

Accordingly, the Court recommends denying Defendants' motion for summary judgment on Plaintiff's due process claim relating to his treatment on June 19, 2014, against Defendant Berkheimer.

### 3.    Claims Relating to Obtaining Court Authorization to Medicate

Plaintiff contends Berkheimer, Hernandez, and Bosco violated his Fourteenth Amendment due process rights by seeking and receiving a court order authorizing his medication over objection for one year. (Dkt. No. 66 at ¶ 32.) Defendants argue they are entitled to summary judgment because Plaintiff received all of the process to which he was entitled. (Dkt. No. 93-4 at 15-17.)

The record evidence shows Drs. Berkheimer and Hernandez, as treating and reviewing physicians, respectively, each prepared an evaluation of Plaintiff. (Dkt. Nos. 94-1 at 53-57; 94-2 at 5-11.) Each doctor concluded the treatment he recommended was in Plaintiff's best interests, Plaintiff lacked capacity to make a reasoned decision concerning his treatment, and Plaintiff posed a risk of harm to himself or others if not treated. *Id.* The Clinical Director of CNYPC made the decision to seek a court order authorizing treatment over objection, and Executive

Director Bosco approved this decision.  (Dkt. No. 93-1 at ¶¶ 21-22.)  A hearing was held before

the New York Supreme Court, Oneida County, on September 18, 2014, where Plaintiff was

heard and represented by Mental Hygiene Legal Services.  *Id.* at ¶ 23.  Justice Patrick F. MacRae

found Plaintiff lacked the capacity to make a reasoned decision concerning his treatment and the

proposed treatment was appropriate, narrowly tailored, and in Plaintiff's best interests.  (Dkt. No.

94 at 477-78.)  Justice MacRae accordingly issued an order authorizing the treatment of Plaintiff

over his objection.  *Id.*  This process substantially complies with CNYPC Policy # 3.12 – Court

Ordered Psychotropic Medication Over Patient's Objection, which in turn tracks the procedures

outlined in Section 527.8.  Plaintiff does not argue that Defendants failed to follow the

procedures in CNYPC Policy # 3.12 or Section 527.8.  Rather, Plaintiff generally argues he was

fully competent to make his own treatment decisions and Defendants wanted to penalize him and

cover up staff misconduct by medicating him.  (*See generally* Dkt. No. 103.)

    The Court finds Defendants are entitled to summary judgment.  Courts in this circuit have

found that compliance with Section 527.8 affords a patient even more process than the

Constitution requires.  *E.g.*, *Spencer v. Bellevue Hosp.*, No. 11 Civ 7149 (CM), 2012 WL

1267886, at *8-9 (S.D.N.Y. Apr. 12, 2012) (finding that, because defendants complied with New

York state law to obtain a court order, the plaintiff received procedural protection exceeding due

process requirements); *see also Gonzales v. Carpenter*, No. 9:08-CV-629 (LEK/ATB), 2011 WL

768990, at *17 (N.D.N.Y. Jan. 3, 2011), *report-recommendation adopted by* 2011 WL 767546

(N.D.N.Y. Feb. 25, 2011).  Although Plaintiff may well be precluded from relitigating the factual

bases for the court order,[10] in any event he has not produced any evidence rebutting the

---

[10]  *See, e.g.*, *Spencer*, 2012 WL 1267886, at *8-9 (citations omitted); *Gonzales*, 2011 WL
768990, at *17-18.

presumption of correctness to which Defendants' decisions are entitled or suggesting their conduct substantially departed from accepted professional standards.  Moreover, Plaintiff has not produced any evidence supporting his conclusory allegations that Defendants acted fraudulently in seeking and obtaining the court order.[11]

The Court has carefully considered the remaining contentions in Plaintiff's opposition (Dkt. No. 103) and finds them without legal merit.  In light of the foregoing, the Court finds Berkheimer, Hernandez, and Bosco are entitled to summary judgment on Plaintiff's Fourteenth Amendment due process claim arising from the court order authorizing his medication over objection for one year.[12]  Therefore, the Court recommends granting Defendants' motion as to this claim.

## V.    CONCLUSION

For the reasons stated above, the Court recommends that Defendants' motion for partial summary judgment be granted in part and denied in part.  Specifically, the Court recommends the motion be denied as to Plaintiff's Fourteenth Amendment claim against Defendant Berkheimer with respect to the June 19, 2014, incident, but otherwise recommends the motion be granted.  Accordingly, if the District Court accepts the foregoing recommendations, Plaintiff's Eighth Amendment excessive force claims against Asch, Martin, and Williams and his Fourteenth Amendment due process claim against Berkheimer arising from the June 19, 2014, incident remain for trial.

---

[11]  The District Court previously dismissed Plaintiff's claims of conspiracy between the Defendants.  (Dkt. No. 12 at 10-11.)

[12]  Because the Court recommends granting Defendants' motion for summary judgment as to Plaintiff's Fourteenth Amendment claims, except for the claim against Berkheimer with respect to the treatment of Plaintiff on June 19, 2014, on the merits, the Court does not address Defendants' alternative argument based on qualified immunity with respect to those claims. (Dkt. No. 93-4 at 17-19.)

**ACCORDINGLY**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No.

93) be **GRANTED in part and DENIED in part** as follows:

**DENIED** as to Plaintiff's Fourteenth Amendment due process claim against Defendant

Berkheimer with respect to the June 19, 2014, incident, and

**GRANTED** in all other respects; and it is further

**ORDERED** that the Clerk modify the docket to reflect the proper spelling of "Asch" and

"Kenneth Paparella"; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance

with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to

file written objections to the foregoing report.[13]  Such objections shall be filed with the Clerk of

the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**

**WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993)

(citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 72.

Dated: June 2, 2020
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[13]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,
v.
Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the Attorney General of the State of New York, New York, New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction Officer Richard Pflueger, having moved for an order, pursuant to Fed.R.Civ.P. 56, granting him summary judgment and dismissing the amended complaint, and United States Magistrate Judge James C. Francis IV having issued a report and recommendation, dated August 20, 1999, recommending that the motion be granted, and upon review of that report and recommendation together with plaintiff's letter to this Court, dated August 28, 1999, stating that plaintiff does "not contest the dismissal of this action", it is

ORDERED that the attached report and recommendation of United States Magistrate Judge James C. Francis IV, dated August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary judgment is granted, and the amended complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983. Mr. Cole alleges that the defendant Richard Pflueger, a corrections officer, violated his First Amendment rights by refusing to allow him to attend religious services. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate in the custody the New York State Department of Correctional Services ("DOCS"), incarcerated at the Green Haven Correctional Facility. (First Amended Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the plaintiff was in keeplock because of an altercation with prison guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is confined to his cell for twenty-three hours a day with one hour for recreation. (Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must apply for written permission to attend regularly scheduled religious services. (Reply Affidavit of George Schneider in Further Support of Defendants' Motion for Summary Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3). Permission is granted unless prison officials determine that the inmate's presence at the service would create a threat to the safety of employees or other inmates. (Schneider Aff. ¶ 3). The standard procedure at Green Haven is for the captain's office to review all requests by inmates in keeplock to attend religious services. (Schneider Aff. ¶ 3). Written approval is provided to the inmate if authorization is granted. (Affidavit of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The inmate must then present the appropriate form to the gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

 **\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

*A. Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]     In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

   Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

2018 WL 3121612
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,
v.
Harrell WATTS, et al., Defendants.

Civ. No. 9:12-CV-801 (NAM/DJS)
|
Signed 03/07/2018

**Attorneys and Law Firms**

VINCENT MICHAEL MARINO, 14431-038, FCI FORT
DIX, P.O. Box 2000, Joint Base MDL, New Jersey 08640,
Pro Se.

HON. GRANT C. JAQUITH, Acting United States Attorney,
OF COUNSEL: KAREN FOLSTER LESPERANCE, ESQ.,
Assistant United States Attorney, Northern District of New
York, James T. Foley U.S. Courthouse, 445 Broadway,
Albany, New York 12207, Attorney for Defendants.

## AMENDED REPORT-
## RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

 **\*1** This action, brought pursuant to *Bivens v. Six Unknown
Named Agents of the Federal Bureau of Narcotics*, 403 U.S.
388 (1971), returns to the Court on Defendants' Motion for
Summary Judgment. Dkt. No. 133, Defs.' Mot. Summ. J. The
only remaining claims in this action are First Amendment
retaliation claims against Defendants Lucas, Sepanek, and
Schult. Defendants move for summary judgment on these
remaining claims. Plaintiff has opposed Defendants' Motion,
and Defendants have filed a Reply. Dkt. Nos. 139, Pl.'s Resp.,
& 140, Defs.' Reply. After the Court ordered the Defendants
to respond to outstanding discovery requests (Dkt. No. 157),
and Defendants complied (Dkt. No. 158), Plaintiff filed
supplemental papers in opposition to Defendants' Motion.
Dkt. Nos. 162 & 163. For the reasons that follow, the Court
recommends that Defendants' Motion be **granted** and this
action **dismissed**.

# I. BACKGROUND

### A. Plaintiff's Failure to File a Response
### to Defendants' Rule 7.1 Statement

Pursuant to this District's Local Rules, "[t]he Court shall
deem admitted any properly supported facts set forth in
the Statement of Material Facts that the opposing party
does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As
required by the Local Rules, Defendants' counsel advised
Plaintiff of the consequences of failing to file a response
to Defendants' Rule 7.1 Statement of Material Facts. Dkt.
No. 133-1. Plaintiff, however, did not file a response to
Defendants' Statement of Material Facts. *See* Pl.'s Resp. &
Dkt. No. 162, Pl.'s Reply Brief. [1] Although a *pro se* litigant
is entitled to a liberal construction of his filings, *see Sykes v.
Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se*
status does not relieve him of his obligation to comply with
the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5,
8-9 (2d Cir. 1995). The Court therefore will deem the facts as
set forth in Defendants' Statement of Material Facts admitted,
to the extent they are properly supported by the record.
Dkt. No. 133-3, Defs.' Rule 7.1 Statement of Material Facts
("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI
Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y.
2013) ("Where the non-movant either does not respond to the
motion or fails to dispute the movant's statement of material
facts, the court may not rely solely on the moving party's
Rule 56.1 statement; rather the court must be satisfied that
the citations to evidence in the record support the movant's
assertions.") (citing *Giannullo v. City of New York*, 322 F.3d
139, 143 n.5 (2d Cir. 2003) ).

[1]
On March 5, 2018 the Clerk's office received
Plaintiffs "Reply Motion In Opposition to
Defendant's Local Rule 7.1 ..." Dkt. No. 163. This
document was in addition to the Plaintiff's Reply
Brief. Dkt. No. 162. Dkt. No. 163 violates this
Court's directives in several respects. First, it is
not a properly formulated Rule 7.1 Reply. The
local Rules provide as follows: "The non-movant's
response shall mirror the movant's Statement of
Material Facts by admitting and /or denying each
of the movant's assertions in matching numbered
paragraphs. Each denial shall set forth a specific
citation to the record where the factual issue
arises." N.D.N.Y. L.R. 7.1(a)(3). The Plaintiff's

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 30 of 143

Rule 7.1 reply does not address any of the facts listed in the Defendants Rule 7.1 Statement of Material Facts. Further, Dkt. No. 163 is, in essence, a supplemental reply brief, and when combined with Dkt. No. 162, substantially exceeds the Court-imposed five page limit on this additional brief.

**B. Factual Background**

**\*2** On December 3, 2009, Plaintiff was incarcerated at FCI Ray Brook, when unit officers discovered $2,729.32 of postage stamps, gambling paraphernalia, and a homemade intoxicant in his cell during a routine cell search. Defs.' SMF at ¶¶ 26-27. A disciplinary hearing was held on December 15, 2009, at the conclusion of which Plaintiff was found guilty of several disciplinary violations and sentenced to sixty days in disciplinary segregation, twenty-seven days loss of good time credits, and 180 days restriction on his visiting, telephone, and commissary privileges. *Id.* at ¶ 28. Following the disciplinary hearing, the Special Investigative Supervisor ("SIS") conducted an investigation into the incident, which revealed that Plaintiff's girlfriend had entered into a series of financial transactions with a number of different inmates. *Id.* at ¶ 29. The report concluded that Plaintiff had been running an illegal gambling operation and recommended that he be transferred to another institution in order to "shut down" the operation. *Id.* at ¶ 30.

Defendant Lucas, Plaintiff's case manager, accepted the recommendation of the SIS, as was his standard practice, and completed the necessary paperwork to request a transfer for Plaintiff. *Id.* at ¶ 31. Lucas drafted a Request for Transfer, Form 409. *Id.* at ¶ 33; Dkt. No. 133-10, Decl. of Steven Lucas, dated Aug. 18, 2017, Ex. F ("Form 409"). The transfer request was a "Code 323," which, according to Lucas, means that the inmate "need[s] closer supervision as the result of a disciplinary incident." Dkt. No. 133-4, Lucas Decl. at ¶ 14. In stating the reason for the transfer request, Lucas summarized the findings of the SIS report, and noted that Plaintiff had a previous disciplinary violation in 2007 for operating a gambling operation at USP Canaan. Form 409. Lucas recommended "a transfer to a High security facility no closer to [Plaintiff's] release area of Massachusetts." *Id.* On the Form 409, Lucas indicated that Plaintiff's inmate security level [2] was twenty-four. *Id.* After researching suitable facilities, Lucas identified USP Hazelton and USP Big Sandy as potential facilities to which Plaintiff might be

transferred. Lucas Decl. at ¶ 17. Lucas also completed a new BP-338. [3] *Id.* at ¶ 37.

[2]    Each inmate in the custody of the Federal Bureau of Prisons ("BOP") is assigned a point score, which is used to determine their security classification. Defs.' SMF at ¶¶ 9-11. An inmate's point score, however, is not the sole factor used in determining a security classification; public safety factors and management variables are also considered. *Id.* at ¶ 11. An inmate's security classification is re-assessed at regular intervals throughout the period of incarceration. *Id.* at ¶ 13.

[3]    An Inmate Load and Security Designation Form, or BP-337, is prepared when an inmate first enters federal custody. Defs.' SMF at ¶¶ 7-8. Seven months after the inmate enters federal custody, and annually thereafter, a Custody Classification form, or BP-338, containing updated information relevant to the inmate's security classification, is prepared. *Id.* at ¶¶ 13-14. Additionally, a new BP-338 is issued at any time an event occurs that may affect the inmate's security classification, such as an incident report. *Id.* at ¶ 14.

The Request for Transfer Form was reviewed and approved by the Unit Manager, the Case Management Coordinator, the Assistant Warden, and the Warden, Defendant Schult. *Id.* at ¶ 41. The Request for Transfer Form was then submitted to the Designation and Sentence Computation Center ("DSCC") in Grand Prairie, Texas. *Id.* Once a transfer request is submitted to the DSCC, the determination of whether to approve the request and if approved, what facility the inmate is transferred to, is made solely by the DSCC. *Id.* at ¶¶ 41-42. The staff of the facility submitting the request—in this case, Ray Brook—have no further control over the request after it is submitted. *Id.* at ¶ 42. Plaintiff was transferred out of FCI Ray Brook on February 12, 2010, and arrived at USP Pollock, his new assigned facility, on July 13, 2010. *Id.* at ¶ 43.

**\*3** The remaining claims in this action are First Amendment retaliation claims arising from an affidavit Plaintiff alleges that he submitted in support of a fellow inmate named McCarroll's civil rights action against a BOP employee named Matteau. Am. Compl. at p. 4. [4] Plaintiff claims that on December 2, 2009, Helms and Poirier [5] discovered the affidavit in Plaintiff's cell during a cell search. *Id.* at pp. 6 & 16. Plaintiff claims that the Defendants intentionally

Marino v. Watts, Not Reported in Fed. Supp. (2018)

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 31 of 143

2018 WL 3121612

retaliated against him based upon this affidavit. *Id.* at pp. 13-15. Plaintiff claims that he experienced the following specific acts of retaliation: [6] (1) Defendants Lucas and Sepanek confiscated his legal work and law books when he was housed in the Special Housing Unit ("SHU") at Ray Brook, *id.* at pp. 34-35; (2) Defendants Lucas and Sepanek falsified his security level from eleven to twenty-four, causing him to be transferred to USP Pollock, which was known to have violent conditions, *id.* at p. 27; and (3) Defendant Schult caused him to be placed in BOP's "Diesel Therapy" program, whereby he was frequently transferred while on route from Ray Brook to Pollock and did not have access to his legal work, *id.* at p. 21.

[4]     Because some paragraphs of the Amended Complaint are not numbered, the Court cites to the pagination assigned by Plaintiff.

[5]     Poirier was dismissed as a Defendant from this action, Dkt. No. 62, and Plaintiff voluntarily discontinued his claims against Helms after he passed away, Dkt. No. 145.

[6]     Plaintiff has alleged other acts of retaliation— including that the incident report filed against him as a result of the cell search was retaliatory—that have been dismissed by the Court. *See* Dkt. No. 49.

## II. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

**\*4** Defendants move for summary judgment on Plaintiff's remaining First Amendment retaliation claims. For the reasons that follow, the Court agrees that Plaintiff's retaliation claims fail as a matter of law and recommends that Defendants' Motion be **granted**. [7]

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

[7] Defendants have argued that the Court should reconsider its holding allowing Plaintiff's First Amendment retaliation claim to proceed under *Bivens* in light of the Supreme Court's recent decision in *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). Dkt. No. 133-2, Defs.' Mem. of Law at pp. 9-10. *Ziglar*—as all of the Supreme Court's recent *Bivens* decisions—emphasizes that *Bivens* is a "'disfavored' judicial activity." 137 S. Ct. at 1857. However, because the Court finds that summary judgment is appropriate on the merits of Plaintiff's First Amendment claims, it declines to revisit the issue of whether a *Bivens* remedy should be implied under the First Amendment.

### A. Legal Standard [8]

[8] Due to the similarity between *Bivens* and § 1983 actions, "federal courts have typically incorporated § 1983 law into *Bivens* actions." *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493.

The plaintiff bears the initial burden in showing that "the protected conduct was a substantial or motivating factor" for the defendant's actions. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To satisfy the causal connection prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such

evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) the prisoner's prior good disciplinary record; (3) the prisoner's vindication at his disciplinary hearing; and (4) the defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. Direct evidence is not required and a plaintiff may meet this burden by presenting "sufficiently compelling" circumstantial evidence of a retaliatory motive. *Bennett v. Goord*, 343 F.3d 133, 138-39 (2d Cir. 2003). If the plaintiff carries this initial burden, the burden then shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia, Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994) ).

**\*5** Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d at 872 (citation omitted); *Dawes v. Walker*, 239 F.3d at 491("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act."); *see also Graham v. Henderson*, 89 F.3d at 79.

### B. Analysis

Defendants argue that: (1) Plaintiff was transferred to USP Pollock for legitimate non-retaliatory reasons; (2) undisputed evidence shows that Plaintiff's security classification was not falsified; (3) there is no evidence that the Defendants were personally involved in the decision to transfer Plaintiff to USP Pollock or in the manner in which that transfer was conducted; and (4) Plaintiff has not shown that he suffered any injury due to the deprivation of his legal materials. Dkt. No. 133-2, Defs.' Mem. of Law at pp. 2-3.

#### 1. Confiscation and Denial of
#### Access to Legal Work while in SHU

Plaintiff alleges that the Defendants confiscated his legal materials—his Federal Rules of Civil Procedure book, in particular—while he was in the SHU at Ray Brook. Am. Compl. at pp. 34-35. According to Plaintiff, the Defendants specifically told him that the reason they were confiscating his legal materials was the affidavit he had filed against Matteau. *See* Dkt. No. 133-25, Dep. of Vincent Michael Marino, dated

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

Apr. 18, 2017 ("Pl.'s Dep.") at pp. 16-17. Participation in a lawsuit constitutes a protected activity, *see Baskerville v. Blot*, 224 F. Supp. 2d 723, 731 (S.D.N.Y. 2002), and the intentional destruction of an inmate's property may constitute an adverse action for the purposes of a retaliation claim, *Mateo v. Bristow*, 2013 WL 3863865, at *5 (S.D.N.Y. July 16, 2013).

Plaintiff's claim, however, fails because there is insufficient evidence to conclude that he suffered an adverse action. Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated. Pl.'s Dep. at pp. 71-72, & 85. Furthermore, while Plaintiff claims that Defendants confiscated his Federal Rules of Civil Procedure book, Defendants have produced evidence that inmates in SHU at Ray Brook have access to a basic law library from 8:00 am to 9:00 pm, seven days a week. Dkt. No. 133-23, Decl. of Karen Folster Lesperance, Esq., dated Aug. 18, 2017, Ex. I, at p. 2. Plaintiff has not claimed that he was denied access to legal materials through the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library. The lack of evidence demonstrating that Plaintiff suffered an adverse action is insufficient to withstand summary judgment. Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's retaliation claim based on the confiscation and denial of access to legal materials while he was in the SHU at Ray Brook.

### 2. Falsification of Security Level and Transfer to USP Pollock

Plaintiff alleges that the Defendants falsified his security level and caused him to be transferred to a "facility which had harsher prison conditions such as ... over 16 murders, over 300 stabbings & knife shots." Am. Compl. at p. 27. Based on conversations with the Defendants, Plaintiff asserts that he believes this was out of retaliation for filing the affidavit against Matteau. *See* Pl.'s Dep. at pp. 31-32.

**\*6** Although a transfer to a facility with harsher conditions may constitute an adverse action for the purposes of a retaliation claim, *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), in this case Plaintiff has failed to establish a causal connection between his protected conduct (filing the affidavit) and the Defendants' request for his transfer. "As

a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011); *see also Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Plaintiff has claimed that certain of the Defendants had conversations with him regarding his placement in SHU and the diesel therapy program in retaliation for his litigation activities, but notably does not allege such conversations regarding his security level and transfer to USP Pollock. While Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment.

Moreover, even if Plaintiff were able to establish a causal connection between his affidavit and Defendants' alleged adverse actions, Defendants have provided significant evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation.

As proof of his claim that Defendants manipulated his security level, Plaintiff compares a BP-338 dated April 27, 2006 where his security level was 11, with a BP-338 dated February 2, 2011 where his security level was 24. *See* Am. Compl. at pp. 47-48.[9] Plaintiff claims that the transfer forms completed by the Defendants contained false information that there were pending drug and criminal enterprise charges against him and that he had been convicted of assaulting a police officer; Plaintiff asserts that these falsifications inflated his security level. Pl.'s Resp. at p. 16.

[9]     Citation is to the pagination assigned by the Court's Case Management Electronic Case Files ("CM/ECF") System.

Contrary to Plaintiff's claims, Defendant Lucas explains that on the Form 409 he is required to note any discrepancies between the inmate's initial BP-337 and the BP-338 completed at the time of the transfer request. Lucas Decl. at ¶ 22. Lucas noted two discrepancies between the BP-337 and the information available when he was completing the Form 409: (1) the BP-337 referenced pending drug and criminal enterprise charges, which had never been lodged as a detainer; and (2) a traffic stop had been scored as a crime of Serious Violence instead of a crime of Minor Violence. *Id.* at ¶ 23; Form 409. Lucas states that both of these discrepancies would have lowered Plaintiff's point score. Lucas Decl. at ¶

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 34 of 143

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

24. Lucas further explains that in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. *Id.* at ¶¶ 27-28. Lucas' explanations rebut Plaintiff's assertions that the Defendants manipulated his security level in order to transfer him to a higher security facility.

In any event, Lucas explains that the transfer request was "standard practice" following the recommendation of SIS that Plaintiff be transferred in order to "shut down" his gambling operation. *Id.* at ¶¶ 12-13. Plaintiff was transferred pursuant to Program Statement Number P5100.08, "Inmate Security Designation and Custody Classification" Code 323. Lucas Decl. ¶ 14, Ex. A, Chapt. 7, p. 5. Pursuant to that Code, an inmate may be transferred as a result of documented misconduct, to an institution of greater security. *Id.* In such cases, the inmate may only be transferred to a facility of the same level security if placement at a greater security level institution is not possible or other overriding circumstances exist. *Id.* As evidenced on Plaintiff's Form 409, the basis for the transfer was Plaintiff's misconduct. Lucas Decl., ¶ 16, Ex. F ¶ 3 ("An SIS Investigation has recommended the transfer of inmate Marino from FCI Ray Brook to 'shut down' his illicit gambling operation.... Based on the scale of this gambling operation, and the repetitive nature of these infractions, we recommend a transfer to a High security level facility no closer to his release area of Massachusetts. To do otherwise would be a reward for this type of behavior."). Defendants have demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive.

 **\*7** Plaintiff also contends that Defendants specifically transferred him to USP Pollock because of its dangerousness. Defendants have demonstrated this is not the case. On Plaintiff's Form 409, Defendant Lucas requested transfer to either USP Hazelton or USP Big Sandy. Lucas Decl. ¶ 17, Ex. F. Thus, even if Plaintiff had established a causal connection between his protected activity and the Defendants' decision to request his transfer, the Defendants have shown that they would have requested Plaintiff's transfer to a higher level security facility even in the absence of the protected activity, and that the assignment to USP Pollock was not Defendants' decision. *See Graham v. Henderson*, 89 F.3d at 79.

Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based on the alleged manipulation of his security level. [10]

[10]    Since the issuance of the Court's Original Report-Recommendation and Order, Plaintiff has had the benefit of receiving Defendants' Answers to certain Notices to Admit served by Plaintiff, and being able to make further arguments to the Court. *See* Dkt. No. 158-1, Defs' Objections and Responses to Pl.'s First Set of Requests for Admissions; Dkt. No. 162, Pl.'s Reply Brief. The Court has reviewed and considered these additional documents, but nothing contained therein causes the Court to change its analysis. The Defendants generally deny the admissions sought in the Notices to Admit, and provide additional explanations that are wholly consistent with the Affidavit of Defendant Lucas previously submitted. *See* Dkt. No. 133-4. Plaintiff objects to the Defendants' narrative contained within the Responses to the Notices to Admit, and generally claims that those responses constitute "criminal perjury." Pl.'s Reply Brief at pp. 2-4. Aside from the Plaintiff's general characterizations, Plaintiff again emphasizes that the drug and criminal enterprise charges that are referenced in Form 409 were not pending at the time of the creation that Form. Defendant Lucas responds that the reference to those charges was merely to note discrepancies between the BP-338 form he filled out and the original BP-337 Form. Accordingly, despite these additional submissions, and utilizing the standard of "skepticism and care" mandated by the Second Circuit, the Court again finds that summary judgment is warranted on this First Amendment retaliation claim.

### 3. Placement in Diesel Therapy Program

Plaintiff alleges that the Defendants orchestrated his placement in the "Diesel Therapy" program for eight months, where he was denied access to his legal work. Am. Compl. at p. 26. Plaintiff claims that Defendant Schult told him that placement in the "Diesel Therapy" program was retaliation for his litigation activities. Pl.'s Dep. at p. 17.

With respect to this claim, there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 35 of 143

Marino v. Watts, Not Reported in Fed. Supp. (2018)

2018 WL 3121612

had any personal involvement in Plaintiff's placement in the "Diesel Therapy" program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook. As stated by Defendant Lucas, once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request. Lucas Decl. at ¶ 19. "A *Bivens* action lies against a defendant only when the plaintiff can show the defendant's personal involvement in the constitutional violation." *Cohen v. Holder*, 2011 WL 809773, at *2 (E.D.N.Y. Mar. 1, 2011); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* ... a plaintiff must plead that each Government-official defendant, though the official's own individual actions, has violated the Constitution.").

**\*8** Accordingly, the Court recommends that Defendants' Motion be **granted** as to Plaintiff's First Amendment claim based upon his placement in the "Diesel Therapy" program.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 133) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [11] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) ); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[11]   If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3121612

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 36 of 143

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

2018 WL 1578163
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Vincent Michael MARINO, Plaintiff,

v.

Deborah G. SCHULT, et al., Defendants.

9:12-CV-801 (NAM/DJS)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Vincent Michael Marino, 14431-038, FCI Fort Dix, P.O. Box 2000, Joint Base MDL, NJ 08640, pro se.

Hon. Grant C. Jaquith, Acting United States Attorney, Northern District of New York, Karen Folster Lesperance, Assistant United States Attorney, James T. Foley U.S. Courthouse, 445 Broadway, Room 218, Albany, NY 12207, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Norman A. Mordue, Senior U.S. District Court Judge

**I. Introduction**

**\*1** Plaintiff *pro se* Vincent Michael Marino brought this action pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), alleging violations of his civil rights. (Dkt. No. 52). The only remaining claims are for First Amendment retaliation against Defendants Schult, Sepanek, and Lucas, who at all relevant times were employed at FCI Ray Brook, where Plaintiff was formerly incarcerated. (*See* Dkt. No. 86). Defendants have moved for summary judgment on the remaining claims. (Dkt. No. 133). On December 11, 2017, United States Magistrate Judge Daniel J. Stewart issued a Report-Recommendation and Order, recommending that Defendants' motion be granted and the action dismissed. (Dkt. No. 149). Subsequently, Plaintiff filed objections to the Report-Recommendation, [1] a motion to compel certain discovery and for permission to amend his opposition to summary judgment, and a motion for rejection of the Report-Recommendation, denial of summary judgment, imposition of the sanction of default, and other relief. (Dkt. Nos. 152–154).

[1]   The Court has reviewed Plaintiff's objections to Magistrate Judge Stewart's December 11, 2017 Report-Recommendation, which were based on the outstanding discovery Plaintiff sought in order to respond to Defendants' motion for summary judgment. (Dkt. No. 152). This discovery issue was resolved before the March 7, 2018 Amended Report-Recommendation. (Dkt. Nos. 157, 162–63). Therefore, Plaintiff's objections to the December 11, 2017 Report-Recommendation are not relevant to the March 7, 2018 Amended Report-Recommendation or this decision.

On January 11, 2018, this Court referred Plaintiff's new motions to Magistrate Judge Stewart for decision on non-dispositive issues and/or recommendation on dispositive issues, and held in abeyance the Report-Recommendation and Defendants' motion for summary judgment. (Dkt. No. 155). On January 16, 2018, Plaintiff filed an additional "reply in opposition to Magistrate Judge Stewart's Report-Recommendation and Order," wherein Plaintiff again emphasized the outstanding discovery he needed to oppose Defendants' motion. (Dkt. No. 156). On January 31, 2018, Magistrate Judge Stewart granted Plaintiff's motion to compel, allowed him to submit additional briefing in connection with Defendants' motion for summary judgment, and denied his motion for default judgment. (Dkt. No. 157). Plaintiff then submitted supplemental papers in further opposition to Defendants' motion. (Dkt. Nos. 162–63).

On March 7, 2018, Magistrate Judge Stewart issued an Amended Report Recommendation and Order, which again recommended that Defendants' motion for summary judgment be granted and the action dismissed. (Dkt. No. 164). On March 28, 2018, Plaintiff filed timely objections to the Amended Report-Recommendation. [2] (Dkt. No. 167). For the reasons set forth below, the Amended Report-Recommendation is adopted in its entirety.

[2]   Although Plaintiff's objections were received on March 28, 2018—two days after the March 26, 2018 deadline, they are dated March 20, 2018 and were mailed on March 26, 2018, and therefore, the Court will consider the objections as timely.

**II. Standard of Review**

**\*2** This court reviews *de novo* those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen*

Marino v. Schult, Not Reported in Fed. Supp. (2018)
2018 WL 1578163

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 37 of 143

*v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atlantic Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (citation omitted). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). "To the extent ... that the party makes only conclusory or general arguments ... the Court will review the Report strictly for clear error." *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "The objections of parties appearing *pro se* are generally accorded leniency and should be construed to raise the strongest arguments that they suggest." *Id.* at 340 (quotations and citation omitted).

Summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *In re World Trade Center Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). A fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In ruling on a summary judgment motion, the court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

### III. Discussion

#### a. The Amended Report-Recommendation

In the Amended Report-Recommendation, Magistrate Judge Stewart deemed admitted the facts set forth in Defendants'

Statement of Material Facts, to the extent they were properly supported by the record, based on Plaintiff's failure to file a response to Defendants' Statement. (Dkt. No. 164, p. 2). Magistrate Judge Stewart then recommended that Defendants' motion for summary judgment be granted as to Plaintiff's First Amendment retaliation claims, which alleged that after Plaintiff filed an affidavit in support of a fellow inmate's civil rights action, the Defendants took the following actions against him: 1) the confiscation of legal work and law books when Plaintiff was housed in the Special Housing Unit ("SHU") at FCI Ray Brook; 2) the falsification of Plaintiff's security level from eleven to twenty-four, and consequent transfer to USP Pollock, which was known to have violent conditions; and 3) his placement in so-called "Diesel Therapy," whereby he was in transit for eight months from one facility to another. (*Id.*).

As to the first claim, Magistrate Judge Stewart Recommended summary judgment based on "insufficient evidence to conclude that [Plaintiff] suffered an adverse action." (*Id.*, p. 10). Magistrate Judge Stewart observed that "Plaintiff has not elaborated on his allegations regarding legal work that was confiscated, and indeed, at his deposition, was unable to identify any impact on his court actions due to his legal materials being confiscated." (*Id.*). Further, while Plaintiff claimed that Defendants confiscated his Federal Rules of Civil Procedure book, it was noted that Defendants "produced evidence that inmates in SHU at Ray Brook had access to a basic law library from 8:00 am to 9:00 pm, seven days a week," and "Plaintiff has not claimed that he was denied access to legal materials from the law library, or that any of the Defendants had any personal involvement in restricting his access to the law library." (*Id.*).

**\*3** For Plaintiff's second claim based on the alleged manipulation of his security level and his transfer to a different facility, Magistrate Judge Stewart found that Plaintiff failed to establish a causal connection between his protected conduct—filing the affidavit, and Defendants' request for his transfer. (*Id.*, pp. 10–11). Magistrate Judge Stewart noted that "[w]hile Plaintiff's unsupported allegations that the Defendants retaliated against him by manipulating his security level and causing his transfer to Pollock may have been sufficient to survive at the motion to dismiss stage, they are insufficient to survive a motion for summary judgment." (*Id.*, p. 11). Magistrate Judge Stewart also found that even if Plaintiff were able to establish a causal connection between his affidavit and the alleged adverse actions, Defendants "provided significant

evidence rebutting the evidence that Plaintiff claims shows Defendants' retaliatory motivation." (*Id.*, p. 11). Defendants' evidence supporting the increase in Plaintiff's security level included that "in the five years intervening between the two BP-338 forms relied upon by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification." (*Id.*, pp. 11–12). Further, there was evidence that "the transfer request was 'standard practice' following the recommendation of SIS that Plaintiff be transferred in order to 'shut down' his gambling operation." (*Id.*, p. 12). Thus, Magistrate Judge Stewart found that Defendants "demonstrated that they would have transferred Plaintiff to a higher security level facility independent of any retaliatory motive." (*Id.*, p. 13). In addition, the evidence showed that Defendants had no personal involvement in choosing the particular facility, USP Pollock, where Plaintiff was transferred. (*Id.*).

For Plaintiff's third claim related to "Diesel Therapy," Magistrate Judge Stewart found that "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (*Id.*, p. 14). Furthermore, Magistrate Judge Stewart noted evidence that "once a transfer request is submitted to DSCC, the staff submitting the request have no further control over the request." (*Id.*).

**b. Plaintiff's Objections**

As an initial matter, Plaintiff claims for the first time in his objections that he never received Defendants' Statement of Material Facts in support of their motion for summary judgment, which he now seeks to compel. (Dkt. No. 167, p. 1). The Court has considered this claim as an objection to Magistrate Judge Stewart's decision to deemed admitted the facts set forth in Defendants' Statement of Material Facts based on Plaintiff's failure to file a response. (Dkt. No. 164, p. 2).

Contrary to Plaintiff's claim, the record shows that he received Defendants' Statement of Material Facts, along with notice of the consequences of failing to file a response to Defendants' Statement of Material Facts. (Dkt. Nos. 133-1, 133-3, 133-27). In the December 11, 2017 Report-Recommendation, Magistrate Judge Stewart noted

that Plaintiff failed to file a response to Defendants' Statement of Material Facts. (Dkt. No. 149, p. 2). Therefore, under Local Rule 7.1(a)(3), Magistrate Judge Stewart deemed that the facts set forth by Defendants were admitted by Plaintiff, to the extent the facts were properly supported by the record. (*Id.*). Despite that clear notification, Plaintiff never claimed to be missing Defendants' Statement of Material Facts in his objections filed on December 29, 2017. (Dkt. No. 152). Nor did he raise the issue in his motion to compel or letters to the Court thereafter. (Dkt. Nos. 153–54, 156). After Plaintiff obtained additional discovery, Magistrate Judge Stewart permitted Plaintiff to submit a supplemental Rule 7.1 Reply Statement of Material Fact. (Dkt. No. 157). Plaintiff submitted a document entitled "Marino's Reply Motion in Opposition to Defendant's Local Rule 7.1/Statement of Material Fact Motion with Marino's Supportive Affidavit." (Dkt. No. 163). But this document did not specifically address any of the facts listed in Defendants' Statement of Material Facts. Based on Plaintiff's failure to file a proper response, Magistrate Judge Stewart once again, in the Amended Report-Recommendation, deemed admitted Defendants' Statement of Material Facts to the extent they were properly supported by the record. (Dkt. No. 164, p. 2).

After carefully reviewing the issue *de novo*, the Court agrees with Magistrate Judge Stewart's decision because the record shows that Plaintiff received Defendants' Statement of Material Facts, he was warned of the consequences of not responding, and he failed to do so despite multiple opportunities. *See* N.D.N.Y.L.R. 7.1(a)(3). Moreover, Magistrate Judge Stewart only deemed the facts admitted to the extent they were properly supported by the record, and Plaintiff makes no claim that he lacked the record evidence in this case. Indeed, Plaintiff's objections reference such evidence. (*See, e.g.*, Dkt. No. 167, pp. 4–5). Therefore, the Court also denies Plaintiff's request to submit a response to Defendants' Statement of Material Facts.

**\*4** As to the substance of Plaintiff's First Amendment retaliation claims, he does not appear to challenge, with any evidentiary basis, the specific findings made by Magistrate Judge Stewart. Nonetheless, recognizing Plaintiff's *pro se* status, and out of an abundance of caution, the Court has undertaken a *de novo* review. In order to prevail on his retaliation claims, Plaintiff "bears the burden of showing, first, that he engaged in constitutionally protected conduct and, second, that the conduct was a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).

Marino v. Schult, Not Reported in Fed. Supp. (2018)

2018 WL 1578163

"Because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations." *Id.* (quotations and citations omitted). If a plaintiff adduces evidence of protected conduct, an adverse action, and a causal connection, the burden shifts to the defendant to demonstrate he "would have disciplined or transferred him even in the absence of the protected conduct." *Id.* (quotations and citations omitted). In other words, a defendant is entitled to judgment in his favor if he shows that the adverse action "would have been taken based on the proper reasons alone." *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). "A finding of sufficient permissible reasons to justify state action is readily drawn in the context of prison administration where we have been cautioned to recognize that prison officials have broad administrative and discretionary authority." *Id.* (quotations and citations omitted).

First, for all three claims, there is no dispute that Plaintiff engaged in protected conduct by filing an affidavit in support of a fellow inmate's civil rights action. However, for Plaintiff's retaliation claim based on the alleged confiscation and denial of access to legal materials, he has failed to adduce any specific evidence of an adverse action. Plaintiff's vague allegations that, while in SHU, he was deprived of his "legal work & legal mail" are insufficient at this stage. (*See* Dkt. No. 52, pp. 21–22; Dkt. No. 167, p. 18). The record also shows that Defendant had access to a law library while in SHU. (*See* Dkt. No. 133-23, p. 3). Moreover, Plaintiff has not adduced evidence of *who* allegedly deprived him of legal materials; he simply testified that "[t]hey lost a lot of it," and "[t]hey destroyed a lot of it." (Dkt. No. 133-25, p. 40). But there is no evidence that Defendants worked at SHU or exercised control over his legal materials there. Thus, Plaintiff has also failed to raise an issue of material fact as to Defendants' personal involvement in the alleged adverse action. *See Hallock v. Bonner*, 567 F. Supp. 2d 334, 338 (N.D.N.Y. 2008) ("[T]o defeat the defendants' motion for summary judgment, the plaintiffs must raise an issue of material fact as to the requisite personal involvement of the named defendants under *Bivens*."). Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

Second, for Plaintiff's retaliation claim based on the alleged manipulation of his security level and his transfer to a different facility, the Court agrees with Magistrate Judge Stewart's finding that Defendants demonstrated that they would have increased his security level and requested his transfer even in absence of Plaintiff's protected conduct. Plaintiff argues that Defendants put false information in his prison files in order to raise his security level and get him transferred. (Dkt. No. 167, pp. 3–9). But the record shows that Plaintiff's security classification and transfer were driven by his multiple disciplinary incidents for running gambling operations. (*See* Dkt. No. 133-4, ¶¶ 8–16; Dkt. No. 133-7; Dkt. No. 133-8; Dkt. No. 133-9; Dkt. No. 133-10; Dkt. No. 133-20). The allegedly "inaccurate" files submitted by Plaintiff do not show otherwise. (*See* Dkt. No. 167, pp. 15–22). Defendant Lucas explained that in the five years intervening between the two classification forms relied on by Plaintiff, Plaintiff had three disciplinary incidents, including the two violations for running gambling operations, and BOP changed its Program Statement regarding security classification. (Dkt. No. 133-4, ¶¶ 27–28). Moreover, Plaintiff's transfer was specifically recommended by the Special Investigative Supervisor "as a means to 'shut down' Marino's [gambling] operation," and it was "standard practice" for Defendants to follow that recommendation. (Dkt. No. 133-4, ¶¶ 12–13; Dkt. No. 133-9, p. 5). In sum, Defendants have shown that Plaintiff's security classification and transfer would have taken place even if he had never filed an affidavit for a fellow inmate, and no reasonable jury could find otherwise. Accordingly, the Court agrees with Magistrate Judge Stewart that Defendants are entitled to summary judgment on this retaliation claim.

**\*5** Third, for Plaintiff's retaliation claim based on his alleged placement in so-called "Diesel Therapy," the Court also agrees that Defendants are entitled to summary judgment. Upon review of the record, "there is no evidence, aside from Plaintiff's unsupported assertions, that any of the Defendants had any personal involvement in Plaintiff's placement in the 'Diesel Therapy' program, or any control over Plaintiff's access to his legal materials once he was transferred from Ray Brook." (Dkt. No. 164, p. 14). For example, Plaintiff alleges that Defendant Schult told him that he was going to experience "Diesel Therapy" and that Defendant Sepanek was involved too because all of the Defendants "were conspiring through this whole retaliation." (Dkt. No. 133-25, pp. 72–75). However, the record shows that Defendants requested the transfer based on Plaintiff's disciplinary incidents, and thereafter, they had no control over the request, Plaintiff's transit schedule, or his specific destination. (*See* Dkt. No. 133-4, ¶¶ 16, 19). Thus, Plaintiff's claim cannot survive summary judgment since he has again failed to raise an issue

2018 WL 1578163

of material fact as to Defendants' personal involvement. *See Hallock*, 567 F. Supp. 2d at 338.

Plaintiff also puts forward a hodgepodge of other objections. He correctly asserts that "credibility determinations are jury functions and not those of a Judge," (Dkt. No. 167, p. 2), but Magistrate Judge Stewart made no such credibility determinations. Plaintiff writes that "in ruling on a motion to Dismiss/Summary Judgment Rule 12(b)(6) '[t]he evidence of Marino's Amended Complaint is to be believed and all justifiable inferences are to be drawn in his Marino's favor.' " (*Id.*). But Magistrate Judge Stewart correctly stated the standard of review *for summary judgment.* (Dkt. No. 164, pp. 5–7). Plaintiff also once again takes issue with Defendants' discovery responses, arguing that "they failed to comply with Marino's Discovery Requests using word gymnastics to prevail." (Dkt. No. 167, p. 6). But Magistrate Judge Stewart already resolved this discovery dispute, as discussed above. Finally, Plaintiff rehashes a number of the conclusory allegations from his Amended Complaint. (Dkt. No. 167, pp. 4–5, 11). However, once again, it must be emphasized that "more than conclusory allegations are required to survive a summary judgment motion." *Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In sum, the Court finds no error in the Amended Report-Recommendation based on these general objections.

## IV. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Magistrate Judge Stewart's Amended Report-Recommendation (Dkt. No. 164) is **ADOPTED in all respects**; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt. No. 133) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 52) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the Clerk of the Court is directed to serve this Memorandum-Decision and Order in accordance with the Local Rules of the Northern District of New York and to serve Plaintiff by both regular mail and certified mail, return receipt requested.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1578163

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 41 of 143
Celestin v. Premo, Not Reported in F.Supp.3d (2014)
2014 WL 272443

2014 WL 272443
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Clives CELESTIN, Plaintiff,

v.

Jeffrey PREMO, Correction Officer, Upstate
Correctional Facility, et al., Defendants.

Civil Action No. 9:12–cv–301 (GLS/RFT).
|
Jan. 24, 2014.

**Attorneys and Law Firms**

Clives Celestin, Attica, NY, pro se.

Hon. Eric Schneiderman, Office of the Attorney General, State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for the Defendant.

### *ORDER*

GARY L. SHARPE, Chief Judge.

**\*1** The above-captioned matter comes to this court following a Report–Recommendation by Magistrate Judge Randolph F. Treece, duly filed December 9, 2013. Following fourteen (14) days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed and the court having reviewed the Magistrate Judge's Report–Recommendation for clear error, it is hereby

ORDERED that the Report–Recommendation of Magistrate Judge Randolph F. Treece filed December 9, 2013 (Dkt. No. 68) is ACCEPTED in its entirety for the reasons state therein; and it is further

ORDERED that defendants' motion for partial summary judgment (Dkt. No. 62) is GRANTED; and it is further

ORDERED that defendants Rock, Fischer and Carver are DISMISSED; and it is further

ORDERED that the case is deemed trial ready as to plaintiff's claims against defendants Premo, Tulip and Traux; and it is further

ORDERED that the case has been moved to the court's trial ready list; and it is further

ORDERED that the Clerk of the Court is to mail copies of the Order to the parties in accordance with the court's local rules.

IT IS SO ORDERED.

**CLIVENS CELESTIN,**

Plaintiff,

-v-

**JEFFREY PREMO,** *Correction Officer, Upstate Correctional Facility,* **STANLEY TULIP,** *Correction Officer, Upstate Correctional Facility,* **BRUCE TRAUX,** *Correction Officer, Upstate Correctional Facility,* **D. ROCK,** *Prison Superintendent, Upstate Correctional Facility* **BRIAN FISCHER,** *Commissioner of Dept. of Corrections,* **MRS. J. CARVER,** *Director of Inmate Classification and Movement, New York State Dept. of Corrections,*

Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Clivens Celestin brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants used excessive force, tampered with his grievances, failed to provide adequate medical care, and failed to protect him from other officers in contravention of the Eighth and Fourteenth Amendments. *See generally* Dkt. No. 1, Compl. Defendants move for Partial Summary Judgment seeking the dismissal of Defendants Rock, Fischer, and Carver. Dkt. No. 62. Plaintiff opposes the Motion. Dkt. No. 67. For the reasons that follow, we recommend that Defendants' Motion be **GRANTED.**

### I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169,

173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

## II. DISCUSSION

### A. Background

According to Plaintiff, on October 26, 1999, while incarcerated at Upstate Correctional Facility ("UCF"), Plaintiff stabbed Corrections Officer Defendant Premo in the arm with a pen. Dkt. No. 62–3, Ex. A, Clivens Celestin Dep., dated Mar. 11, 2013, at pp. 34–38; Dkt. No. 67–1, Pl.'s Opp'n at ¶ G. Disciplinary charges were filed, and after a hearing was held, Plaintiff was found guilty and transferred to Clinton Correctional Facility. Celestin Dep. at pp. 36– 38. Over the next several years, Plaintiff was transferred to various correctional facilities throughout New York State. *Id.* at pp. 38–40.

In April or May of 2009, Plaintiff was transferred back to UCF from Green Haven.[1] *Id.* at ¶ 40. Plaintiff alleges that on October 29, 2010, while awaiting transportation from UCF to an outside hospital for a minor surgical procedure, he was attacked and beaten by multiple guards, including Defendant Premo who was still employed as a corrections officer at UCF. Plaintiff claims that as a result of the assault he was sore and swollen and suffered bruises on his shoulder, lower back, knee, and thigh, as well as bruised and fractured ribs. *Id.* at pp. 7, 17, 24–26, & 30; *see also* Compl. at pp. 6–7.[2] Plaintiff further alleges that during the altercation, Defendant Premo called him a "nigger," told him it was "payback time," and asked him if he remembered Defendant Premo "from ten years ago." Celestin Dep. at pp. 33–34.

[1]    The exact date Plaintiff was transferred back to UCF in 2009 is unclear.

[2]    The pages of Plaintiff's Complaint are unnumbered; therefore, all references to Plaintiff's Complaint are to the page numbers automatically assigned by the Court's Electronic Case Filing system.

### B. Interference with Grievances

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 43 of 143
Celestin v. Premo, Not Reported in F.Supp.3d (2014)
2014 WL 272443

**\*3**  Plaintiff alleges that Defendant Rock, UCF's Superintendent:

> CONCEAL[ED] SERIOUS FACILITY COMPLAINTS BY EXPLOITING [THE PRISON LITIGATION AND REFORM ACT] AND DISCARDING MY GRIEVANCES AND APPEALS BY FINDING THE RELEVANT FACTS WITHOUT MERIT. THE SUPERINTENDENT AND EXECUTIVE TEAM ENGAGES IN NON–INVESTIGATIVE TECH[NIQUES] THAT ULTIMATELY GETS GRIEVANCES DISMISSED. AT TIMES GRIEVANCES AGAINST OFFICERS FOR SERIOUS VIOLATIONS ARE NOT FILED PROPERLY & WITHOUT IMPLEMENTATION OF A RECEIPT SYSTEM IT FURTHER COMPLICATES INMATES ABILITY TO REMAIN DILIGENT ON THEIR ISSUES. WHICH ALSO CONTRADICTS THE FOURTEENTH AMENDMENT, AND A RIGHT TO SUBSTANTIVE DUE PROCESS FOR INMATES. NOT TO MENTION NEW YORK STATE LAWS WITHIN THE FACILITY LEVEL.

Compl. at pp. 8–9.

Defendants move to dismiss this claim on the grounds that it does not state a claim under § 1983. Dkt. No. 62–8, Defs.' Mem. of Law, at p. 9.

Even when construed liberally, complaints that prison officials tampered with, failed to investigate, or improperly processed grievances, without more, do not give rise to liability under § 1983. See *Irvis v. Seally,* 2011 WL 454792, at \*2 (N.D.N.Y. Feb.4, 2011) (Sharpe, J.) ("Thus, regardless of whether and to what extent defendants followed their grievance procedures in investigating or failing to investigate Irvis's complaints, his claims must fail as a matter of law as they are not actionable under § 1983."). Therefore, we recommend Defendants' Motion be **GRANTED** and Plaintiff's claim that Defendant Rock tampered with or failed to follow proper grievance procedures be dismissed.

### C. Supervisory Liability

Defendants have not moved for Summary Judgment on Plaintiff's excessive force claims; therefore, we do not discuss the merits of this claim. However, Defendants move for Summary Judgment as against Plaintiff's allegations that Defendant Fischer, the Commissioner of the Department of Corrections and Community Supervision ("DOCCS"), and Defendant Rock, UCF's Superintendent, were liable in their supervisory capacities for the alleged excessive use of force perpetrated by Defendant Premo and other corrections officers at UCF. The entirety of Plaintiff's allegations in this regard are as follows:

> THE AFOREMENTIONED ASSAULT AND BATTERY AND FAILURE TO PROTECT WAS A PRODUCT PROXIMATE CAUSE OF CUSTOMARY WIDE SPREAD [SIC][ ]ABUSE THROUGHOUT THE NEW YORK STATE DEPARTMENT OF CORRECTIONS AND THE UPSTATE CORRECTIONAL FACILITY IN CONJUNCTION WITH GROSS NEGLIGENCE AND OR DELIBERATE INDIFFERENCE. NEW YORK STATE HAS GAPING HOLES REG[ ]ARDING TRAINING, MONITORING, SUPERVISING, SURV[EILLANCE], INVESTIGATING, AND DISCIPLINING/FIRING THEIR PERSON[N]EL FOR WRONGFUL ACTS [DEFENDANTS FISCHER AND ROCK] KNOWS OF [SIC], AND SHOULD KNOW OF

OR CONDONES OR FAIL TO INTERVENE.

Compl. at pp. 10–11.

An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> **\*4** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted); *see also Selah v. Fischer,* 2013 WL 5603866, at *2 (N.D.N.Y. Oct.11, 2013) (Sharpe, C.J.) (citing *Colon v. Coughlin).*

Even if we assume for the sake of argument that excessive force was used on October 29, 2010, Plaintiff's claim that Defendants Rock and Fischer were liable in their supervisory capacity must fail. Beyond conclusory allegations, Plaintiff fails to allege, much less provide any documentary or record evidence to support, a single fact from which it could be inferred that either Defendant was personally involved in the alleged assault at UCF. Indeed, Plaintiff conceded as much in his Deposition. When asked why he sued Defendant Rock, Plaintiff responded that "I added him to the suit because [ ] he

is the head of it, I mean, he runs the stuff, so I figured I would put him in there." Celestin. Dep. at pp. 45–46. When asked if that was the only reason that he named Defendant Rock Plaintiff responded, "[y]es; I felt he was responsible, too, even though he wasn't at the incident." *Id.* at p.. 46. When asked if "the only reason that you sued [Defendant Fischer] is because he is the boss of the entire department," Plaintiff responded in the affirmative. *Id.* And, he further admitted that Defendant Fischer was neither at the facility at the time of the assault nor physically involved in any way. *Id.* Although Plaintiff alluded, in his Complaint and Deposition, that Defendant Fischer was liable in his capacity as DOCCS' chief policy maker, he fails to identify, with any specificity, which, if any, of the policies he purportedly created or countenanced was responsible for the alleged use of excessive force which spurred the instant action. *Id.*

It is clear that mere linkage in the chain of command is insufficient to establish liability under § 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). Likewise, given Plaintiff's failure to identify any particular policy as having caused the alleged assault, Plaintiff cannot raise a triable issue of material fact as to whether either Defendant had "actual or constructive notice of the unconstitutional practices ..., [or that they] demonstrate[d] gross negligence or deliberate indifference by failing to act" in response to that knowledge. *Meriwether v. Coughlin,* 879 F.2d 1037, 1048 (2d Cir.1989) (internal quotation omitted). Thus, Plaintiff has failed to raise a triable issue of fact with regard to whether Defendants Fisher and Rock were personally involved in the alleged excessive use of force on October 26, 2010.

**\*5** Therefore, we recommend that Defendants' Motion be **GRANTED** with regard to Plaintiff's claim that Defendants Fischer and Rock were personally involved, *via* a theory of supervisory liability, in the alleged excessive use of force perpetrated by Defendant Premo and others.

### D. Failure to Protect

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 832–33, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)); *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) ("[P]rison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that

2014 WL 272443

there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.,* 1998 WL 146280, at *3 (N.D.N.Y. Mar.27, 1998).

In order to state such a claim, the prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him[.]" *Hendricks v. Coughlin,* 942 F.2d 109, 113 (2d Cir.1991). A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (cited in *Hendricks v. Coughlin,* 942 F.2d at 113). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan,* 511 U.S. at 836. To prove deliberate indifference, the plaintiff must show that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello,* 1998 WL 146246, at *2 (N.D.N.Y. Mar.24, 1998)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added); *see also Rigano v. Cnty. of Sullivan,* 486 F.Supp.2d 244, 255 (S.D.N.Y.2007) (citing *Farmer v. Brennan,* 511 U.S. at 842– 43 n. 8; *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006); & *Candelaria v. Coughlin,* 1997 WL 171256, at *10–11 (S.D.N.Y. Apr.10, 1997) for the proposition that "[b]y now, it is well-established that to defeat a motion for summary judgment on an Eighth Amendment claim, there must be genuine issues as to whether the corrections officers were aware that the plaintiff faced a substantial risk of serious danger.").

Evidence that " 'a substantial risk of inmate attacks [which were] 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past' " is sufficient to establish the existence of a significant risk of harm. *Walters v. Gardner,* 2012 WL 1029658, at *4 (N.D.N.Y. Feb.15, 2012) (quoting *Coronado v. Le Fevre,* 886 F.Supp. 220, 224 (N.D.N.Y.1995)).

**\*6** Plaintiff claims that Defendant J. Carver, the Director of Inmate Classification and Movement for the New York State Department of Corrections and Community Supervision ("DOCCS"), and her subordinates are

RESPONSIBLE TO ASSURE THE PROTECTION OF INMATE FROM DOCUMENTED CIRCUMSTANCES AGAINST OTHER INMATES OR SECURITY STAFF ... [HOWEVER, HERE THEY] FAILED TO PROPERLY SCREEN OR DELIBERATELY TRANSFERRED PLAINTIFF TO UPSTATE FACILITY WHILE HAVING DIRECT KNOWLEDGE OF THE INCIDENT BETWEEN OFFICER (PREMO) AND PLAINTIFF IN (OCTOBER 26, 1999)[ ] FILES. MRS CARVER AND SUBORDINATE FAILED IN THEIR DUTY TO REASONABLY PROTECT THE PLAINTIFF BY TRANSFER[R]ING THE PLAINTIFF BACK TO UPSTATE CORRECTION FACILITY ... [WHERE] A SERIOUS INMATE/ OFFICER INCIDENT OCCUR [R]ED CREAT[ING] A HIGH PERCENTAGE [RISK THAT] ASSAULT AND BATTERY RETALIATION ... [WOULD] OCCUR BETWEEN THE OFFICERS AND INMATE.

Pl.'s Opp'n at ¶ G; *see also* Compl. at pp. 9–10.

Here, the record is devoid of any evidence, direct or circumstantial, that Defendant Carver was or should have been aware that by transferring Plaintiff to UCF in April or May of 2009 he faced a specific threat of harm from Defendant Premo or any other significant risk of being harmed generally.

To begin with, it is uncontroverted [3] that in her capacity as Director of Movement and Classification, Defendant Carver was responsible for overseeing nine subordinates, and the movement and classification of 50,000 inmates amongst sixty different correctional facilities. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013, at ¶ 2. Defendant Carver was not personaly involved "in determining where Plaintiff

Clivens Celestin ... would have been housed in the 2009 and 2010 time period. This would have been decided by one of [her] subordinates." *Id.* at ¶¶ 3–4. Moreover, nothing in the record indicates that Defendant Carver was aware of the fact that Plaintiff had stabbed Defendant Premo in October of 1999, nor that he was subsequently found guilty of the same at a disciplinary hearing. *See id.* at ¶ 5. For one thing, Defendant Carver did not become the Director of Classification and Movement until December of 2007; thus, there is no indication that she would have learned of Plaintiff's initial transfer out of UCF in 1999 or the circumstances surrounding that transfer when it occurred. *See id.* at ¶ 1.

3    Despite receiving Notice of the potential consequences of failing to properly respond to Defendants' Motion for Partial Summary Judgment, including the potential that his claims might be dismissed, Plaintiff provided only terse single sentence admissions or denials in response to Defendants' Statement of Material Fact Pursuant to Local Rule 7.1 ("7.1 Statement"). Moreover, despite having had the benefit of engaging in discovery, Plaintiff failed to submit a single document, affidavit, or declaration in support of his claims. *See* Dkt. Nos. 62–1, Notice of Consequences, & 67, Pl.'s 7.1 Statement; *see also* Pl.'s Opp'n. Defendants, on the other hand, submitted a proper 7.1 Statement supported, in pertinent part, by the sworn Declaration of Defendant Carver, and Plaintiff's Deposition. Dkt. No. 62–6, Joyce Carver Decl., dated Aug. 1, 2013; Celestin Dep. Consequently, given Plaintiff's lapse, we apply Local Rule 7.1(a)(3), and accept as true Defendants' version of the facts as established in their 7.1 Statement. *See Van Loan v. Hartford Acc. & Indent. Co.,* 2006 WL 3782709, at *2–3 (N.D.N.Y. Dec.22, 2006) (reaching a similar conclusion and citing cases to support that holding).

Likewise, the record lacks any indication that Defendant Carver should have known Plaintiff would be subjected to a significant risk of harm. Critically, more than a year transpired between the time Plaintiff was transferred to UCF in April or May of 2009 and when Plaintiff was allegedly assaulted by Defendant Premo in October of 2010. Yet, there is no evidence that Plaintiff ever complained of any risk to his safety, either before being transferred back to UCF, or during the year between being transferred and the alleged assault. Nor has Plaintiff provided any evidence that such attacks

were widespread or commonplace at UCF. Plaintiff's wholly conclusory and unsupported allegations to the contrary are insufficient as a matter of law to raise a genuine issue of material fact as to the issue of whether Defendant Carver knew or should have known that transferring Plaintiff to UCF placed him at a significant risk of harm. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**\*7** Moreover, to the extent that Plaintiff has alleged that Defendant Carver should be held liable because she negligently failed to screen for inmate/guard conflicts before transferring him to UCF in 2009, such a claim, even if true, does not state a cause of action under § 1983. *See Whitley v. Albers,* 475 U.S. at 319; *see also Shell v. Brun,* 585 F.Supp.2d 465, 470 (W.D.N.Y.2008); *cf. Abdul–Matiyn v. New York State Dep't of Corr. Servs.,* 871 F.Supp. 1542, 1547 (N.D.N.Y.1994) (citing *Morales v. New York State Dep't of Corr.,* 842 F.2d 27, 30 (2d Cir.1988) for the proposition that "section 1983 does not provide [a] cause of action for negligent failure of prison officials to protect an inmate from injury at hands of another inmate").

Likewise, Plaintiff's conclusory and unsupported allegation that one of Defendant Carver's subordinates was responsible for the alleged constitutional deprivation is also insufficient to raise a genuine issue of material fact as to whether Defendant Carver could be found liable in her supervisory capacity. *See Bennett v. Fischer,* 2010 U.S. Dist. LEXIS 139587, at *35–36, 2010 WL 5525368 (N.D.N.Y. Aug. 17, 2010) (citing *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) for the proposition that "[i]t is well settled that vague and conclusory allegations that a supervisor has failed to properly manage a subordinate do not suffice to establish the requisite personal involvement and support a finding of liability."). Indeed, nothing in the record suggests that Defendant Carver had any reason to suspect that one of her subordinates would violate Plaintiff's rights. *See Pettus v. Morgenthau,* 554 F.3d at 300 citing *Poe v. Leonard,* 282 F.3d 123, 140 (2d. Cir.2002) & *Iqbal v. Hasty,* 490 F.3d 143, 166 (2d Cir.) *cert. granted sub nom. Ashcroft v. Iqbal,* 554U.S. 902 (2008), for the proposition that "[t]o the extent that the complaint attempts to assert a failure-to-supervise claim, ... it lacks any hint that [defendant] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."); *see also Poe v. Leonard,* 282 F.3d at 140 n. 14 ("We have often equated gross negligence with recklessness, and have defined it as the 'kind of conduct [ ] where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and

2014 WL 272443

deliberately acts or fails to act in conscious disregard or indifference to that risk.' ") (quoting *Bryant v. Maffucci,* 923 F.2d 979, 985 (2d Cir.1991)).

Therefore, we recommend that Defendants' Motion be **GRANTED** as to Plaintiff's failure to protect claim against Defendant Carver and she be **DISMISSED** from this action.

### E. Qualified Immunity

Defendants have also argued that Defendant Carver was entitled to qualified immunity. Defs.' Mem. of Law at p. 15. However, as we have found no evidence that Defendant Carver was personally involved in any constitutional wrongdoing, the issue of qualified immunity is moot. *See Cathedral Church of The Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 375, 391 (E.D.N.Y.2005) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

### III. CONCLUSION

**\*8** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Partial Summary Judgment (Dkt. No. 62) be **GRANTED;** and it is further

**RECOMMENDED,** that Defendants Rock, Fischer, and Carver be **DISMISSED;** and it is further

**ORDERED,** that if the above Recommendation is adopted, this case be deemed trial ready as to Plaintiff's claims against Defendants Premo, Tulip, and Traux; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

### All Citations

Not Reported in F.Supp.3d, 2014 WL 272443

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 48 of 143
Groves v. Davis, Not Reported in F.Supp.2d (2012)
2012 WL 651919

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### *MEMORANDUM DECISION and ORDER*

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"), against
numerous employees of New York State or the Central New
York Psychiatric Center ("Defendants"), are Plaintiff's motion
to proceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his motion
for appointment of counsel. (Dkt.Nos.2, 3, 4.)[1] For the
reasons set forth below, Plaintiff's motion to proceed *in
forma pauperis* is granted; his motion for a preliminary
injunction is denied; his motion for appointment of counsel
is denied; Plaintiff's claims of deliberate indifference to his
mental health needs against Defendants Bill, Carver, and
DeBroize are *sua sponte* dismissed with prejudice; Plaintiff's
claims against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged personal
involvement in the August 8, 2011 assault are *sua sponte*
dismissed without prejudice and with leave to amend in this

action in accordance with Fed.R.Civ.P. 15; Sgt. Sweet is *sua
sponte* dismissed without prejudice as a Defendant in this
action; the Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on Defendants
Davis, Sill, and Nicolette.

| [1] | This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ). The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation. |

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with a
motion to proceed *in forma pauperis.* (Dkt. Nos.1, 2.)[2]
Liberally construed, Plaintiff's Complaint alleges that the
following constitutional violations against him occurred
during his confinement at Central New York Psychiatric
Center ("CNYPC"): (1) Defendants Davis and Sill used
excessive force against him under the Eighth and/or
Fourteenth Amendments; (2) Defendant Nicolette knew of
and failed to take action to protect Plaintiff from the
assault under the Eighth and/or Fourteenth Amendments;
(3) Defendants Bill, Carver, and DeBroize were deliberately
indifferent to his mental health needs under the Eighth and/
or Fourteenth Amendments; and (4) Defendants Bill, Carver,
DeBroize, Nowicki, Maxymillian, Bosco, and Hogan failed to
"adequately train the staff under their supervision" and to take
appropriate action in response to the incident. (*See generally*
Dkt. No. 1.) For a more detailed description of Plaintiff's

claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2       At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

28 U.S.C. § 1915(e)(2)(B). [3]

3       The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim

2012 WL 651919

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy

the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted]. [6]

[4]     *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]     *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]     It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

### B. Analysis of Plaintiff's Complaint

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to

cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]  *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe,

M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

### 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4**  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicollette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to intercede [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the

use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize**

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged

deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]    Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]    Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 53 of 143
Groves v. Davis, Not Reported in F.Supp.2d (2012)
2012 WL 651919

the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

[10]   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut.*

*Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

[11]   *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an

2012 WL 651919

investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]    See also *Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]    See also *Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize,

Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right— without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1) (B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a) (2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

 *7    Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where

there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that

review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first
> determine whether the indigent's
> position seems likely to be of

2012 WL 651919

substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]     For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination

of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is ***GRANTED;*** [15] and it is further

[15]     Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is ***DENIED*** without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* ***DISMISSED*** with prejudice pursuant to 28 U.S.C. § 1915(e) (2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* ***DISMISSED*** without prejudice and with leave to amend in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B) (ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* ***DISMISSED*** without prejudice and with leave to be reinstated as a Defendant in this action in accordance with

2012 WL 651919

Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3442977
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ramón Ísídro MEJÍA, Plaintiff,

v.

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION; Mark A. Schear, MD, Defendants.

16-cv-9706
|
Signed 07/17/2018

**Attorneys and Law Firms**

Ramon I. Mejia, Bronx, NY, pro se.

Morgan Chmiel McKinney, New York City Law Department,
Austa Starr Devlin, Nicole Teresa Attia, Heidelt, Pittoni,
Murphy & Bach, LLP, Gregory John Radomisli, Martin
Clearwater & Bell LLP, New York, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge

 *1  On September 10, 2015, Plaintiff was peacefully in
his apartment when police officers arrived at his door, shot
out his peep hole, and forced him outside to be transported
to the North Central Bronx Hospital. Upon arriving at the
hospital, Plaintiff was involuntarily admitted without being
asked about his medical history and without being evaluated
by any doctor. Plaintiff was held down and medicated with
antipsychotic drugs against his will. Despite his pleas to
leave, Plaintiff was confined in the hospital for six days.
Plaintiff filed this matter *pro se*, bringing claims against
New York City Health and Hospitals Corporation ("HHC"),
Mark A. Schear, M.D., and various other Defendants for
violations of his constitutional rights under 42 U.S.C. § 1983
("Section 1983"). HHC and Dr. Schear have moved to dismiss
Plaintiff's claims against them. Because Plaintiff pleads that
Dr. Schear failed to comply with certain procedural and
substantive requirements of New York's Mental Hygiene
Law, Dr. Schear's motion to dismiss the due process claims
against him is DENIED. Because Plaintiff fails to plead a
medical condition that was met with deliberate indifference
and fails to plead that he timely served a notice of claim

on HHC, Defendants' motion to dismiss the deliberate
indifference and state law claims against them is GRANTED.

**I. BACKGROUND** [1]

[1]    Unless otherwise noted, the facts are taken from the
fourth amended complaint or Plaintiff's opposition
to Defendant's motion to dismiss, and are accepted
as true for the purposes of this motion. *See, e.g.,*
*Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152
(2d Cir. 2002); *Walker v. Schult,* 717 F.3d 119, 122
n.1 (2d Cir. 2013) ("A district court deciding a
motion to dismiss may consider factual allegations
made by a *pro se* party in his papers opposing the
motion."). However, "the tenet that a court must
accept as true all of the allegations contained in
a complaint is inapplicable to legal conclusions."
*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

**A. Factual Background**

Plaintiff is a sixty-five-year-old disabled man of Latino and
Caribbean descent. Fourth Amended Complaint (ECF No.
108) ("FAC") ¶¶ 1, 28. [2]  On or about September 10, 2015,
at approximately 9:30 am, two individuals—Alicia Robinson
and Wilfredo Velez—came to Plaintiff's apartment in the
Bronx. FAC ¶¶ 3-4. Robinson and Velez asked to inspect
Plaintiff's apartment for housing code violations, and Plaintiff
invited them inside. *Id.* After Plaintiff instructed Robinson
and Velez to "leave and never come back," they left Plaintiff's
apartment. *Id.* ¶ 4.

[2]    The fourth amended complaint is composed of a
form complaint and several additional typewritten
pages. The allegations set forth in the typewritten
pages are organized in numbered paragraphs. The
allegations set forth in the form complaint are
not organized in numbered paragraphs. The Court
therefore cites to page numbers when citing to
the allegations in the form complaint and to
paragraph numbers when citing to the additional
typewritten pages. The page numbers cited to are
those indicated on the ECF docket notation, not
the page numbers included as footers on the form
complaint.

 *2  Plaintiff alleges on information and belief that Robinson
and Velez called the police. *Id.* ¶ 5. According to Plaintiff,
"[n]othing that they told the police would have justified the
police coming to Plaintiff's apartment," Plaintiff "had not

2018 WL 3442977

engaged in any behavior to justify the police coming to the apartment," and, therefore, anything that Robinson and Velez told the police "would have been false." *Id.* The police arrived approximately fifteen minutes later, and twelve unidentified officers (John Doe Police Officers Nos. 1 through 12) "began banging on Plaintiff's door demanding to talk to" him. *Id.* ¶ 6. The officers also "demanded that Plaintiff stand directly behind" the closed front door, which Plaintiff refused to do. *Id.*

Plaintiff refused to open the door for the police and "never consented" to the police's entry into his home. *Id.* ¶ 10. Plaintiff asserts that he "never threatened anyone," "never committed any visible crime while inside his apartment," and "never caused any disturbance of any kind inside his apartment." *Id.* After approximately one hour, the police officers broke the door down, and one of the officers placed Plaintiff in handcuffs and "pushed" him out the door. *Id.* ¶ 12. Plaintiff had "an injured foot" and had difficulty navigating the stairs leading down from his apartment. *Id.*

Police officers escorted Plaintiff to an ambulance outside, and two emergency medical technicians ("EMTs") transported Plaintiff to North Central Bronx Hospital. *Id.* ¶ 14. A uniformed police officer accompanied them to the hospital, and, at the hospital, "police were everywhere." *Id.*

Upon Plaintiff's arrival at the North Central Bronx Hospital, hospital staff asked Plaintiff for his name, address, and date of birth. *Id.* ¶ 17. Plaintiff provided the requested information, and his responses were recorded on a computer. *Id.* The staff asked Plaintiff nothing about his medical condition, whether he was injured, whether he had any allergies, or the reason for his presentment at the hospital. *Id.* Hospital staff instructed Plaintiff to remove any personal property from his pockets and person and logged those items on a written form. *Id.* While at the hospital, Plaintiff "never engaged in any threatening or dangerous behavior directed at himself or others, was well-groomed, appeared physically healthy, and appropriately clothed." *Id.* ¶ 16. He was "favoring his right foot" as a result of "the injury on the staircase in the apartment building." *Id.*

Plaintiff was then taken to the psychiatric unit located on the thirteenth floor. *Id.* ¶¶ 16-17. There, Plaintiff's handcuffs were removed, but he was told that he was not free to leave. *Id.* ¶ 16. Plaintiff observed that the hospital contained "many armed uniformed police officers," *Id.* ¶ 17, and the doors had "code systems." *Id.*¶ 18. "[T]his was not a regular hospital." *Id.* ¶ 17.

Plaintiff was instructed to sit in a waiting area while his room was being prepared. *Id.* An unidentified doctor, John Doe Doctor No. 1, then ordered Plaintiff "forcibly hospitalized" without performing "an independent assessment." *Id.* "Not long" after Plaintiff arrived at the hospital, Dr. Mark A. Schear ordered Plaintiff to be medicated without "an independent evaluation." *Id.* ¶ 21. Despite Plaintiff's objections, he was held down by John Doe Officers Nos. 1-12, John Doe Nurse No. 1, and other hospital staff and was given an injection of Risperdal by a nurse. *Id.* Plaintiff was "afraid to try and leave." *Id.* ¶ 19.

Plaintiff remained in the hospital from September 10, 2015 to September 16, 2015. *Id.* ¶ 20. During his commitment, Plaintiff was forced to take Risperdal pills prescribed by Dr. Schear. *Id.* ¶ 21. John Doe Orderly No. 1 regularly told Plaintiff he had to take the pills, and John Doe Nurse No. 5 warned Plaintiff that if he did not take the pills, the nurse would report that to her supervisor, who would then send nurses to "physically force [Plaintiff] to take the pills." *Id.* ¶¶ 21, 23. Plaintiff was also subjected to mandatory blood draws. *Id.* ¶ 27. Plaintiff made numerous requests to the nursing station to be released from the hospital, but he was told that only the in-house psychologist or Dr. Schear could authorize his release. *Id.* ¶ 22. On September 16, 2015, Plaintiff was released into the care of his sisters. *Id.* ¶ 24.

**B. Procedural Background**

**\*3** Plaintiff initiated this action on December 15, 2016. ECF No. 2. Plaintiff was granted leave to proceed *in forma pauperis* on January 17, 2017. ECF No. 3.

On January 26, 2017, the Court *sua sponte* dismissed Plaintiff's claims against the Civil Court of the City of New York, Bronx County, the Health and Hospitals Corporation, its unidentified employees, Dr. Schear, Ari Benedict, Sergio Anagunbla, the New York City Police Department ("NYPD"), the 50th Precinct, and the "NYCEMS." ECF No. 5. The Court granted Plaintiff leave to replead his claims against the Health and Hospitals Corporation, its unidentified employees, and against Dr. Schear, Ari Benedict, and Sergio Anagunbla. *Id.*

On March 15, 2017, Plaintiff filed a first amended complaint. ECF No. 17. On April 6, 2017, after obtaining leave of court, Plaintiff filed a second amended complaint. ECF No. 27. On July 19, 2017, the Court granted Plaintiff leave to file a third amended complaint for the purpose of naming individuals

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 60 of 143

2018 WL 3442977

defendants that the City of New York had identified pursuant to the Court's *Valentin* order. ECF No. 65. Plaintiff filed his third amended complaint on July 28, 2017. ECF No. 66.

On September 8, 2017, Defendants New York City Health and Hospitals Corporation ("HHC") and Dr. Schear moved to dismiss Plaintiff's third amended complaint. ECF No. 77. On October 5, 2017, Plaintiff filed an opposition to that motion. ECF No. 83. On October 19, 2017, Defendants filed a reply. ECF No. 88.

On February 23, 2018, the Court granted Plaintiff leave to file a fourth amended complaint for the purpose of correctly identifying certain Defendants. ECF No. 107. The Court explained in its order that, because Plaintiff represented that he would make no substantive change to the allegations, the Court would construe the motion to dismiss the third amended complaint as a motion to dismiss the fourth amended complaint. *Id.* On February 27, 2018, Plaintiff filed a fourth amended complaint, amending only the newly identified Defendants' names. ECF No. 108. Accordingly, the Court evaluates Defendants HHC and Dr. Schear's motion to dismiss as a motion to dismiss the fourth amended complaint.

## II. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

**\*4**  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the

plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions ... are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678-79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

Because Plaintiff is proceeding *pro se*, the Court must liberally construe Plaintiff's allegations and 'interpret[ ] [them] to raise the strongest arguments that they *suggest*." [3] *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted); *see also, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("A document filed *pro se* is to be liberally construed...." (internal quotation marks and citation omitted) ); *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) ("Where ... the complaint was filed *pro se*, it must be construed liberally to raise the strongest claims it suggests." (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013) ) ). Nevertheless, "dismissal of a *pro se* complaint is [ ] appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F. Supp. 3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997) ).

3    Defendants argue that because Plaintiff allegedly received assistance from a licensed attorney, the Court should not apply the liberal *pro se* standard and should not consider facts or legal theories raised for the first time in Plaintiff's opposition. Defs.' Reply (ECF No. 88) at 3. At the May 2017 initial pretrial conference, Plaintiff acknowledged that he had received assistance from this district's *pro se* clinic. Plaintiff's submissions to the Court, however, do not indicate who, if anyone, aided Plaintiff in their preparation. The Court observes that Plaintiff's memorandum of law in opposition

to Defendants' motion to dismiss appears to have been drafted with the assistance of an attorney. Accordingly, the Court will not afford Plaintiff's memorandum of law the special solicitude usually afforded to *pro se* litigants. *See Spira v. J.P. Morgan Chase & Co.*, 466 Fed.Appx. 20, 22 n.1 (2d Cir. 2012) (summary order). However, there is no clear indication that Plaintiff's fourth amended complaint was prepared by an attorney. That complaint consists of both a form *pro se* complaint and several appended type-written pages. The complaint alleges various facts, but is entirely devoid of any specifically identified causes of action, which the Court would expect to see had the complaint been prepared by an undisclosed attorney. Therefore, the Court will continue to afford Plaintiff special solicitude in construing the allegations of the fourth amended complaint. *See Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010).

## III. DISCUSSION

### A. Federal Claims

**\*5** Plaintiff's fourth amended complaint can be construed as raising claims against Defendants for violations of Plaintiff's constitutional rights under Section 1983. To state a claim under Section 1983, a plaintiff must allege that the defendant "acted under the color of state law and that [he] deprived him of a right secured by the Constitution or laws of the United States." *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004) (citing *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) ). "Section 1983 does not in and of itself create any substantive rights; rather, a plaintiff bringing a § 1983 claim must demonstrate a violation of an independent federal constitutional or statutory right." *Watts v. N.Y. City Police Dep't*, 100 F. Supp. 4th 314, 322 (S.D.N.Y. 2015) (citing *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 617-18 (1979) ).

The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks omitted) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering or helping others to

do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (citation omitted). Additionally, to hold a defendant liable under Section 1983, "a plaintiff must demonstrate some affirmative link to casually connect the action with the discriminatory action." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ).

#### 1. Under Color of State Law

An individual acts under color of state law when he or she exercises power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (citation omitted). Therefore, a violation of a federal constitutional or statutory right is actionable under Section 1983 when that violation is the result of "the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988); *see also Lugar*, 457 U.S. at 937.

HHC is a "public benefit corporation created to provide health and medical services to New York City residents pursuant to New York City Health and Hospitals Corporation Act." *Simpkins v. Bellevue Hosp.*, 832 F. Supp. 69, 73 (S.D.N.Y. 1993) (citing N.Y. Unconsol. Laws § 7382); *see also Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). As a municipal corporation, HHC and its employees are state actors for purposes of Section 1983. *See Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983); N.Y. Pub. Auth. Law § 1261 (16) (defining "state agency" to include any "public benefit corporation ... of the state"). Plaintiff's allegations suggest that the relevant actions of the Individual Defendants were taken while these Defendants were acting in their roles as employees of HHC. Accordingly, Plaintiff has satisfied the first element of his Section 1983 claims.

#### 2. Constitutional Violations

**\*6** Defendants have moved to dismiss only Plaintiff's claims for due process violations, deliberate indifference to his

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

medical needs, and *Monell* liability. Plaintiff asserts in his opposition that his complaint can also be read to raise a Fourth Amendment claim. Defendants do not move to dismiss that claim. Therefore, to the extent that Plaintiff's fourth amended complaint can be read to assert a Fourth Amendment claim, or any other federal claim, those claims survive.

### a. Claims Against Dr. Schear

### i. Procedural Due Process

To succeed on a procedural due process claim, a plaintiff must establish that (1) he possessed a liberty interest, and (2) defendants deprived him of that interest through insufficient process. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004). "Civil commitment for any purpose requires due process protection," *Project Release v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983), and "erroneous commitments, of course, implicate the individual's interest in liberty," *Goetz v. Crosson*, 967 F.2d 29, 33 (2d Cir. 1992). On the other hand, the Second Circuit has found that compliance with the New York's Mental Hygiene Law ("MHL") satisfies both the procedural and substantive due process rights of involuntary committed individuals. *See Project Release*, 722 F.2d at 971; *Rodriguez v. City of New York*, 72 F.3d 1051, 1062 (2d Cir. 1995) ("New York's overall statutory scheme governing involuntary commitments has been held facially sufficient to meet the requirements of due process."). Therefore, "if defendants' actions comported with the strictures of the New York Mental Hygiene Law, they also satisfied the requirements of procedural due process." *Capellupo v. Nassau Health Care Corp.*, No. 06-cv-4922 (JFB) (ETB), 2009 WL 1705749, at *7 (E.D.N.Y. June 16, 2009); *accord Coleman v. State Sup. Ct.*, 697 F. Supp. 2d 493, 504 (S.D.N.Y. 2010).

Article 9 of New York's Mental Hygiene Law ("MHL") governs the involuntary commitment of individuals. Based on Plaintiff's allegations, it can reasonably be inferred that he was admitted to the hospital on an emergency basis. While various provisions of the MHL discuss involuntary commitment on an emergency basis, Plaintiff's arguments in opposition to dismissal rely on MHL § 9.39. *See* Pl.'s Opposition to Mot. to Dismiss (ECF No. 83) ("Pl.'s Opp.") at 7.[4] That section, titled Emergency Admissions for Immediate Observation, Care, and Treatment, provides in relevant part that

[t]he director of any hospital maintaining adequate staff and facilities for observation, examination, care, and treatment of persons alleged to be mentally ill and approved by the commissioner to receive and retain patients pursuant to this section may receive and retain therein as a patient for a period of fifteen days any person alleged to have a mental illness for which immediate observation, care, and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or others.

N.Y. Mental Hygiene Law § 9.39(a). Under the MHL, "likelihood to result in serious harm" means "[ (1) ] substantial risk of physical harm to himself as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that he is dangerous to himself, or [ (2) ] a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear or serious physical harm." *Id.*

[4]    Other sections of the MHL also allow for the involuntary commitment of a person. For example, MHL § 9.27 provides that a hospital "may receive and retain therein as a patient any person alleged to be mentally ill and in need of involuntary care and treatment upon the certificates of two examining physicians, accompanied by an application for the admission of such person." MHL § 9.41 permits police to "take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." MHL § 9.58 allows members of a mobile crisis team to "remove ... or direct the removal of any person to a hospital ... for the purpose of evaluation for admission if such person appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." Plaintiff alleges that a mobile crisis team came to his home and that the police

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 63 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

were called by that team. He does not allege that any family member or other person filed an application for his admission. Therefore, MHL §§ 9.41 and 9.58 may apply to Plaintiff's claims against the crisis team and the police officers. However, from Plaintiff's allegations, it appears that Plaintiff correctly identifies § 9.39 as the statute applicable to the claims against HHC as the receiving hospital.

**\*7** MHL § 9.39 further provides that the hospital director "shall admit such person ... only if a staff physician of the hospital upon examination of such person finds that such person qualifies under the requirements of this section." *Id.* A person admitted pursuant to § 9.39 "shall not be retained for a period of more than forty-eight hours unless within such period such finding is confirmed after examination by another physician who shall be a member of the psychiatric staff of the hospital." *Id.*; *see also Rueda v. Charmaine D.*, 906 N.Y.S.2d 246, 251 (1st Dep't 2010) (acknowledging that the MHL requires "a hospital staff psychiatrist" to confirm the admitting doctor's initial diagnosis); *Liu v. N.Y. State Dep't of Health*, No. 16-cv-4046 (ER), 2017 WL 3393944, at \*8 (S.D.N.Y. Aug. 7, 2017) (noting that if a person is retained for more than forty-eight hours another psychiatric staff member must examine and confirm that the patient should be admitted pursuant to § 9.39).

Plaintiff alleges that John Doe Doctor No. 1 admitted him without an initial examination, which, as just explained, is required under MHL § 9.39(a). Plaintiff also alleges that he was kept at the hospital for more than forty-eight hours without the required second examination by a member of the psychiatric staff. According to the fourth amended complaint, Dr. Schear was one of two hospital physicians responsible for authorizing Plaintiff's release. In light of these allegations, Plaintiff sufficiently pleads a procedural due process violation by Dr. Schear. Though Dr. Schear may not have been responsible for the failure to screen Plaintiff upon admission, he is alleged to have been responsible for Plaintiff's continued detention during the following five days. In the absence of both of the examinations mandated by the MHL, Plaintiff sufficiently alleges that Dr. Schear violated his procedural due process rights in keeping Plaintiff confined without the requisite screenings. *Cf. Liu*, 2017 WL 3393944, at \*8 (dismissing due process claim where medical records attached to the complaint showed that plaintiff was examined after being transported to Bellevue Hospital, a determination was made that "she had a mental illness that would likely result in serious harm to herself or others," and Plaintiff was

examined a second time less than forty-eight hours after her admission).[5]

[5]     Defendants argue that, "[b]ecause Plaintiff did not identify the governing legal standard in his complaint, and cites conflicting legal standards in opposition to co-defendant's motion, it necessarily follows that he has not adequately pleaded that the Hospital defendants did not comply with the governing legal standard." Defs.' Reply (ECF No. 88) at 6. Defendants point out that, in opposing a previous motion to dismiss filed by co-Defendant New York Presbyterian Hospital, Plaintiff stated that he was not sure whether he was involuntarily committed pursuant to MHL § 9.41 or § 9.58. *Id.*; *see* ECF No. 73 at 2. Plaintiff's opposition to the motion currently before the Court argues that Defendants violated MHL § 9.39. *See* Pl.'s Opp. (ECF No. 83) at 7-8. At the pleading stage, a plaintiff is not required to plead specific statutes or legal theories. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules call for a short and plan statement of the claim showing that the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."). Moreover, Defendants are in much better of a position to know on what basis they admitted and kept Plaintiff involuntarily in their hospital. Accordingly, the Court declines to dismiss Plaintiff's complaint based on Plaintiff's failure to specify in the complaint the section of the MHL that he believes was violated.

### ii. Substantive Due Process

**\*8** Construing Plaintiff's complaint liberally, Plaintiff alleges that his substantive due process rights were violated when (1) he was involuntarily committed despite showing no signs of dangerousness and (2) he was forcibly medicated against his will.

"The substantive component of the Due Process Clause of the Fourteenth Amendment prohibits certain state actions 'regardless of the fairness of the procedures used to implement them.' " *Matthews v. City of New York*, No. 15-cv-2311 (ALC), 2016 WL 5793414, at \*5 (S.D.N.Y. Sept. 30, 2016) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833,

2018 WL 3442977

840 (1998) ). "An involuntary civil commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without due process of law." *Rodriguez*, 72 F.3d at 1061 (quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980) ) (other citations omitted). To constitute a substantive due process violation, a defendant's conduct must be so offensive that it "shocks the conscience" and violates the "decencies of civilized conduct." *Lewis*, 523 U.S. at 846-47.

**A. Involuntary Commitment**

"As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." *Rodriguez*, 72 F.3d at 1061 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) ). Nonetheless, "due process does not require a guarantee that physician's assessment of the likelihood of serious harm be correct." *Id.* at 1062. "[A] doctor will not be liable under § 1983 for treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.' " *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (second alteration in original) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) ); *see also P.C. v. McLaughlin*, 913 F.2d 1033, 1042-43 (2d Cir. 1990). Therefore, "a physician's decision to involuntarily commit a mentally ill person because he poses a danger to himself or others shocks the conscience ... when the decision is based on 'substantive and procedural criteria that are ... substantially below the standards generally accepted in the medical community.' " *Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010) (quoting *Rodriguez*, 72 F.3d at 1063); *see also Lewis*, 523 U.S. at 846-47 (requiring conduct that "shocks the conscience" to sustain a substantive due process claim). The "substantial departure" standard "requires more than simple negligence on the part of the doctor but less than deliberate indifference." *Kulak*, 88 F.3d at 75 (citations omitted).

The Second Circuit has recognized that a physician's decision to commit a person involuntarily under the MHL "does not ordinarily involve matters 'within the layman's realm of knowledge.' " *Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 190 (2d Cir. 2005) (quoting *Sitts v. United States*, 811 F.2d 736, 740 (2d Cir. 1987) ). Whether a decision to commit someone violates substantive due process "turns on the meaning of the fact which [typically] must be interpreted by expert psychiatrists and psychologists." *Id.* at

191 (alteration in original) (quoting *Addington v. Texas*, 441 U.S. 418, 429 (1979) ). Accordingly, where a dispute exists as to whether a physician's decision to involuntarily admit a person to a hospital was a substantial departure from accepted medical practice, that dispute is often more appropriate for resolution at the summary judgment stage, not on a motion to dismiss.

**\*9** Plaintiff states a due process claim with respect to his hospitalization. The fourth amended complaint is rife with allegations that Plaintiff "never threatened anyone," "never committed any visible crime while inside his apartment," and "never caused any disturbance of any kind inside his apartment" that would have given the police reason to believe that he was a danger. FAC ¶ 10. Plaintiff further alleges that during his stay at the hospital, he "never engaged in any threatening or dangerous behavior directed at himself or others[,] ... was well-groomed, appeared physically healthy, and appropriately clothed." *Id.* ¶ 16. According to Plaintiff, "[a]t no point during the entirety of this interaction did Plaintiff verbally or physically threaten, intimidate, or frighten another person or himself, nor did he attempt to do any of those actions." *Id.* ¶ 15. Particularly given Plaintiff's allegation that "[n]o hospital staff performed a medical evaluation of Plaintiff," the fourth amended complaint sufficiently alleges that no basis existed for the conclusion that Plaintiff posed a danger to himself or to others.

Defendants argue that Plaintiff's substantive due process claim must fail because he has not alleged that "an evaluation was never performed during his admissions," he simply claims that an evaluation was not performed by Dr. Scher or the admitting physician. Defs.' Mem. in Support of Motion to Dismiss (ECF No. 78) ("Defs.' Mem.") at 12-13. Defendants misread the fourth amended complaint. Plaintiff clearly alleges: "No hospital staff performed a medical evaluation of Plaintiff." FAC ¶ 21.

Defendants further argue that Plaintiff's substantive due process claim must be dismissed because the fourth amended complaint "falls well short of stating facts from which an inference of 'a substantial departure from accepted judgment, practice, or standards as to demonstrate that [he] actually did not base the decision on such a judgment' can be made. Defs.' Mem. at 12 (alteration in original). As the Court has explained, however, Plaintiff alleges plausibly that he demonstrated no behavior that would have suggested that he was a danger to himself or others. Plaintiff also alleges that an initial evaluation was not performed, that Dr. Schear

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 65 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

conducted no independent evaluation, and that no medical evaluation was conducted by any hospital staff. Defendants posit that Plaintiff's "altercation" with the police, which resulted in the police breaking down his door, provided a sufficient basis for a finding of dangerousness. *Id.* However, the fourth amended complaint suggests that Plaintiff did not engage in an altercation with the police, but simply did not acquiesce to the police's request to stand directly behind the door of his apartment. *See* FAC ¶ 6. Plaintiff's assertions that he exhibited no behavior that could be deemed dangerous are not controverted by anything further in his pleadings, for example, by medical records attached as exhibits to the fourth amended complaint. In light of the utter lack of any allegations to the contrary, it is Plaintiff's alleged commitment in the absence of any evaluation and any outward behavior suggesting Plaintiff's dangerousness that departs from accepted standards and "shocks the conscience."

*Lewis*, 523 U.S. at 846-47. [6]

[6]    Defendants assert that Plaintiff's allegations regarding his lack of threatening behavior are conclusory and should be disregarded. Defs.' Reply (ECF No. 88) at 3-4. Those allegations are made in the negative. That is, Plaintiff alleges that he did *not* conduct himself in a threatening or dangerous way. Defendants provide no basis on which the Court should hold Plaintiff, particularly in light of his *pro se* status, to a standard that would require him to list specifically everything that he did *not* do.

Because Dr. Schear is alleged to have been responsible for Plaintiff's discharge, yet kept Plaintiff confined for six days despite the alleged lack of any showing of dangerousness, Plaintiff states a claim for a substantive due process violation against Dr. Schear. *See Capelluto*, 2009 WL 1705749, at *7 ("[T]hough no overt act is expressly required, there must be some showing of danger in order to invoke the procedures of Section 9.39." (citing *Rodriguez*, 72 F.3d at 1062-63) ); *see also Matthews*, 2016 WL 5793414, at *6 n.3 (denying motion to dismiss where plaintiff alleged that hospital staff mischaracterized facts in their reports, falsified documents, "reached medical conclusions without seeing, meeting, or speaking with [p]laintiff," and sought to commit plaintiff for reasons unrelated to her medical condition). Defendants will have the opportunity following discovery to demonstrate that Dr. Schear's actions did not substantially depart from accepted standards of medical care.

## B. Forced Medication

**\*10**    Psychiatric patients have a " 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.' " *Sell v. United States*, 539 U.S. 166, 178 (2003) (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990) ). Forcing such drugs on a patient is unconstitutional "absent a finding of overriding justification and a determination of medical appropriateness" by a medical professional. *Riggins v. Nevada*, 504 U.S. 127, 135 (1992); *see Harper*, 494 U.S. at 231.

New York law has established that an adult has the right to refuse medical treatment except "in narrow circumstances, including those where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." *Jelich v. Hogan*, No. 09-cv-3278 (BMC), 2009 WL 3497495, at *3 (E.D.N.Y. Oct. 27, 2009) (quoting *Kulak*, 88 F.3d at 74); *see Kulak*, 88 F.3d at 74 ("It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." (citation omitted) ). This right and its exception are codified in the New York Code of Rules and Regulations ("NYCRR"), which provide in relevant part that

(c) Patients who object to any proposed medical treatment or procedure ... may not be treated over their objection except as follows:

(1) Emergency treatment. Facilities may give treatment, except electroconvulsive therapy, to any inpatient, regardless of admission status or objection, *where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness.* Such treatment may continue only as long as necessary to prevent dangerous behavior.

14 N.Y.C.R.R. § 527.8(c)(1) (emphasis added). The NYCRR defines "dangerous" to mean "that a patient engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others." *Id.* § 527.8(a)(4).

Plaintiff alleges that upon his admission, "no medical questions were asked of [him], [he] was not asked if he was injured, [and he] was not asked if he was allergic to anything." FAC ¶ 17. Further, he claims Dr. Schear "did not perform an independent evaluation," yet an orderly "would regularly tell

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 66 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

plaintiff that he had to take pills prescribed by Dr. Schear." *Id.* ¶¶ 21, 23. The fourth amended complaint also alleges that, following Dr. Schear's orders, unidentified police officers and hospital staff forcibly injected Plaintiff with Risperdal despite Plaintiff's objections. *See id.* ¶ 21.

As the Court has explained, Plaintiff sufficiently alleges that there was no basis on which to conclude that he was dangerous. Therefore, Plaintiff's allegations suggest that he was a competent person, and that no "overriding justification" or finding of medical necessity existed that would permit Plaintiff's medication over his objections. *Riggins,* 504 U.S. at 135. While Plaintiff fails to plead any facts that suggest that Dr. Schear knew of Plaintiff's objections to the medication or was otherwise involved personally in the administration of the medication itself, Plaintiff alleges that Dr. Schear prescribed the injection and the pills without first conducting an evaluation of Plaintiff and without the benefit of Plaintiff's medical history.[7] The New York Court of Appeals has noted the potential "devastating" side effects of antipsychotic drugs, which include "an irreversible neurological disorder." *Rivers v. Katz,* 67 N.Y.2d 485, 490 n.1 (1986). The prescription of potentially dangerous antipsychotic medication without first conducting a medical evaluation of the patient may be a "substantial departure" from generally accepted standards of medical care. *Kulak,* 88 F.3d at 75; *see, e.g., Cameron v. Zucker,* No. 17-cv-3420 (JGK), 2017 WL 2462692, at *5 (S.D.N.Y. June 7, 2017) (describing charges against a physician for his failure to perform physical examinations and his prescription of medication "without appropriate medical indications" as "allegations of professional misconduct"); *Gross v. N.Y. State Dep't of Health,* 716 N.Y.S.2d 780, 828 (3d Dep't 2000) (affirming finding of professional medical misconduct where physician prescribed narcotic pain relievers "without ever having examined the patient"). Medical experts are required, however, to establish the applicable medical standards and whether Dr. Schear's actions amounted to a substantial departure from those standards. *See Olivier,* 398 F.3d at 190. At this stage, Plaintiff's allegations are sufficient.

[7]     Defendants argue that there is no allegation that Plaintiff actually took the pills or was actually forced to take them. See Defs.' Mem. at 12. The fourth amended complaint, however, alleges that "Plaintiff was not given the option to refuse to take the medication, *and he was forced to take it.*" FAC ¶ 23 (emphasis added). The Court is satisfied that Plaintiff pleads that he was forced to take the pills, and it can reasonably be inferred from this allegation that he did, in fact, take the pills against his will.

### 3. Deliberate Indifference to Plaintiff's Medical Needs

**\*11** Defendants move to dismiss any claim for deliberate indifference to Plaintiff's medical needs that his fourth amended complaint may be read to raise. Any such claim is dismissed.

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must make a "threshold showing" of a "serious illness or injury." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir. 2003) (citing *Hudson v. McMillian,* 503 U.S. 1, 9 (1992) ); *see also Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir. 2000) (explaining that, under the Fourteenth Amendment, a deliberate indifference claim lies if defendants denied the plaintiff "treatment needed to remedy a serious medical condition and did so because of [their] deliberate indifference to that need" (alteration in original) (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996) ) ).

Here, Plaintiff fails to allege any injury or illness for which hospital staff failed to provide adequate medical care. While he alleges that his foot was injured when the police escorted him from his home to the ambulance, he does not allege that the hospital staff failed to treat his foot injury. Rather, any deliberate indifference claim against the hospital staff, including Dr. Schear, appears to be premised on the administration of medication against Plaintiff's will and in the absence of any medical evaluation. The prescription of medication for an underlying condition without any medical exam may be grounds for a deliberate indifference claim. *See, e.g., Abraham v. DiGugleilmo,* No. 06-cv-0058, 2010 WL 2136600, at *1, 9 (E.D. Pa. May 25, 2010) (finding that plaintiff's allegations that he suffered from pain and swelling of a testicle but that the treating physician prescribed antibiotics "without examining plaintiff or administering tests to confirm the diagnoses" were sufficient to state a claim for deliberate indifference); *cf. Koehl v. Bernstein,* No. 10-cv-3808 (SHS) (GWG), 2011 WL 2436817, at *23 (S.D.N.Y. June 17, 2011) (citing to *Abraham v. DiGuglelimo* and finding that plaintiff failed to state deliberate indifference claim when his pleadings did not suggest that he "was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference"), *report and recommendation adopted,* No. 10-cv-3808 (SHS), 2011 WL

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 67 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

4390007 (S.D.N.Y. Sept. 21, 2011). However, in the absence of the threshold pleading of an injury or condition that required treatment, the Court cannot find that Plaintiff has stated a deliberate indifference claim. [8]

[8]  It is unclear to what extent the deliberate indifference standard applicable to pretrial detainees applies to claims brought by involuntarily committed plaintiffs. In *Youngberg v. Romero*, the Supreme Court held that it was error to apply the Eighth Amendment deliberate indifference standard to involuntarily committed patients. 457 U.S. 307, 325 (1982). The Court explained that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321-22. At the same time, the Court recognized that physicians are better suited than the courts to determine the appropriate course of medical treatment of a patient. *See id.* at 322-23. In light of these considerations, as well as the states' interests in being able to provide care to the involuntarily committed without an overburdening threat of liability, the Court held the appropriate standard applicable to the claims of involuntarily committed patients to be the following: the decision made by a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. The Second Circuit has explained that this standard "requires more than simple negligence on the part of the doctor *but less than deliberate indifference.*" *Kulak v. City of New York*, 88 F.3d 63, 75 (2d Cir. 1996) (emphasis added) (citations omitted). The Second Circuit has not indicated, however, whether an involuntarily committed plaintiff may bring a deliberate indifference claim, under the standard applicable to pretrial detainees, separate and apart from a claim under *Youngberg*'s substantial departure standard. At least two other courts in this district have recognized this unanswered question. *See Muhammad v. New York City*, No. 15-cv-5603 (LTS) (JCF), 2016 WL 4367970, at *4 (S.D.N.Y. Aug. 12, 2016) (noting that "the case law is somewhat unclear as to what standard should apply to the Fourteenth Amendment claim" brought by an involuntarily committed individual); *Dubose v. Boudreaux*, No. 12-cv-7633 (KBF), 2014 U.S. Dist. LEXIS 123777, at *14-16 (S.D.N.Y. Aug. 20, 2014) (discussing the two standards and speculating that the "substantial departure" standard of *Youngberg* would apply to plaintiff's forcible medication claim but the deliberate indifference standard would apply to a claim of inadequate dental and medical care). The Court need not answer this question, however, because to the extent that the deliberate indifference framework is applicable, Plaintiff fails to allege an underlying medical condition or injury that was met with deliberate indifference.

**b. Claims Against HHC**

 **\*12**  To the extent that the fourth amended complaint can be construed to raise a claim against HHC for municipal liability under *Monell*, that claim is also dismissed.

As the Court has explained, HHC is a "public benefit corporation created to provide health and medical services to New York City residents pursuant to New York City Health and Hospitals Corporation Act." *Simpkins*, 832 F. Supp. at 73 (citing N.Y. Unconsol. Laws § 7382); *see also Rookard v. Health and Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983). As a municipal corporation, HHC cannot be held liable under Section 1983 pursuant to a theory of *respondeat superior*. *See Rookard*, 710 F.2d at 45; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) ("[A] municipality cannot be made liable [under Section 1983] by application of the doctrine of *respondeat superior*."). Rather, "liability under [Section] 1983 is governed by principles set forth in *Monell.*" *Simpkins*, 832 F. Supp. at 73 (citing *Rookard*, 710 F.2d at 44-45). To establish a claim under *Monell*, a plaintiff must "demonstrate that, through its deliberate conduct, the municipality was a moving force behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks and citation omitted). Therefore, to state a claim against a municipal corporation, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 68 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

marks and alterations omitted); *see Monell*, 436 U.S. at 690-91.

A plaintiff may satisfy the "policy or custom" prong in one of four ways: by proving the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact, *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996). A single occurrence does not give rise to liability unless caused by an official policy or the decision of a final policymaker. *Roe*, 542 F.3d at 37; *see also Pembaur*, 475 U.S. at 480.

Here, Plaintiff does not allege the existence of any formal HHC policy or persistent practices. In fact, he alleges no facts regarding any conduct by the hospital in connection with any other patient. His allegations address only his own brief stay at the hospital. Further, while Plaintiff alleges that nearly all of the hospital staff with whom he interacted violated his due process rights in one form or another, he does not allege any facts that would suggest he blames the hospital's failure to properly train or supervise its employees.

**\*13** Nor does Plaintiff allege facts suggesting that any of the actions taken against him were by a final policymaker. Where the contention is not that the defendants' actions were taken pursuant to a formal policy, but rather that they were taken or caused by an official whose decisions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved. *See Jeffes v. Barnes*, 208 F.3d 49, 57-58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) ("[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge...."). It is not enough that the official has been granted discretion in the performance of his duties. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions

are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality."). "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *Id.* at 123 (quoting *Pembaur*, 475 U.S. at 483).

Whether the official in question had final policymaking authority is a legal question, which is to be answered on the basis of state law. *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997) (explaining a proper "understanding of the actual function of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law"; *accord Jett*, 491 U.S. at 737; *Praprotnik*, 485 U.S. at 123-24. "[T]he relevant legal materials[ ] includ[e] state and local positive law, as well as custom or usage having the force of law." *Jett*, 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1) (internal quotation marks omitted). The determination of whether the official is a final policymaker under state law is "to be resolved by the trial judge before the case is submitted to the jury." *Id.*

**\*14** The fourth amended complaint contains no facts that suggest that any of the nurses responsible for administering the medication had any decision-making authority. To the contrary, Plaintiff's allegations suggest that the nurses were acting pursuant to Dr. Schear's orders. The allegations that John Doe Doctor No. 1 and Dr. Schear had the authority to involuntarily commit Plaintiff and to discharge him, respectively, also do not suffice to suggest that either of those physicians was a final policymaker. Plaintiff's allegations fail to suggest that John Doe Doctor No. 1 or Dr. Schear had any authority beyond the discretionary authority that is normally afforded physicians in their treatment of patients. Nothing in the fourth amended complaint suggests that either doctor had the authority to establish hospital policy or to determine what procedures were to be used in admitting, treating, and discharging involuntarily committed patients. Accordingly, Plaintiff fails to state a *Monell* claim based on a single act of a final policymaker. *See, e.g., Powell v. Corr. Med. Care, Inc.*, No. 13-cv-6842, 2014 WL 4229980, at \*6 (S.D.N.Y. Aug. 15, 2014) (dismissing *Monell* claim where plaintiff alleged "no facts suggesting any individual [physician] defendant was acting as a policymaker"); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 454 (S.D.N.Y. 2012) (dismissing *Monell* claim because plaintiff alleged no facts indicating that "any of the persons employed by [New York Medical College ("NYMC") ] who committed allegedly unconstitutional acts are final policymakers of NYMC"); *Smiley by Smiley v.*

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

*Westby*, No. 87-cv-6047 (LAP), 1994 WL 519973, at *10 (S.D.N.Y. Sept. 22, 1994) (rejecting argument that physician was final policymaker because he was "vested with discretion to determine the course of treatment for patients he sees"); *but see Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 370-71 (E.D.N.Y. 2011) (finding triable issue of fact as to whether defendant was final policymaker when evidence showed that hospital staff "referred to and deferred to [the defendant] in determining a course of action" and that the Administration for Children Services "always followed" the defendant's recommendations and made decision to remove a child "in unison" with the defendant).

In sum, in the absence of allegations of a policy or custom or constitutional violations by a final policymaker, Plaintiff's *Monell* claim must be dismissed.

### B. State Law Claims

Defendants move to dismiss any state law claims suggested by the fourth amended complaint on the ground that Plaintiff failed to comply with New York's notice of claim requirements.

Section 7401 of the New York Unconsolidated Laws provides in relevant part that

> an action against the corporation for damages for injuries to real or personal property, ... or for personal injuries, alleged to have been sustained, shall not be commenced more than one year and ninety days after the cause of action thereof shall have accrued, *nor unless a notice of intention to commence such action* and of the time when and the place where the tort occurred and the injuries or damage, were sustained, together with a verified statement showing in detail the property alleged to have been damaged or destroyed and the value thereof, or the personal injuries alleged to have been sustained and by whom, *shall have been filed with a director or officer of the corporation within ninety*

> *days after such cause of action shall have accrued.*

N.Y. Unconsol. Law § 7401(2) (emphasis added). This "notice of intention to commence [an] action," or "notice of claim," is a condition precedent to bringing actions against HHC. *Scantlebury v. N.Y.C. Health & Hosps. Corp.*, 4 N.Y.3d 606, 609 (2005); *see Jean-Laurent v. Wilkerson*, 461 Fed.Appx. 18, 24 n.3 (2d Cir. 2012) ("A notice of claim is a condition precedent to the filing of an action against an employee of the City of New York."); *accord Hardy*, 164 F.3d at 793. The notice-of-claim requirement does not apply to federal claims brought under Section 1983. *See, e.g. Bordeau v. Metro. Transit Auth.*, No. 06-cv-6781 (DLI), 2008 WL 4455590, at *1 (E.D.N.Y. Sept. 30, 2008). However, "in a federal court, state notice-of-claim statutes apply to *state-*law claims." *Hardy*, 164 F.3d at 793 (emphasis in original) (citation omitted); *see also Cruz v. City of New York*, 232 F. Supp. 3d 438, 448 (S.D.N.Y. 2017). "The notice of claim requirements apply equally to state tort claims brought as pendent claims in a federal civil rights action." *Cruz*, 232 F. Supp. 3d at 438 (quoting *Fincher v. City of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997) ).

Compliance with the notice of claim requirement is strictly construed. *Hardy*, 164 F.3d at 793-74. In fact, the New York Court of Appeals has held that service of a notice of claim on the wrong public entity merits dismissal of a plaintiff's tort claim. *Scantlebury*, 4 N.Y.3d at 614. To ensure that the notice-of-claim requirement is followed, "New York's law requires a plaintiff to plead in the complaint that: (1) the plaintiff has served the notice of claim; (2) at least thirty days have elapsed since the notice was filed (and before the complaint was filed); and (3) in that time the defendant has neglected to or refused to adjust or to satisfy the claim." *Hardy*, 164 F.3d at 793.

**\*15** Defendants argue that any state law claims against them are barred because Plaintiff does not allege that he served a notice of claim on HHC. Defendants acknowledge Plaintiff's allegation that he filed a timely notice of claim with co-defendant New York City by filing a notice with the Comptroller's Office. *See* FAC ¶ 29. Defendants contend, however, that service of a notice of claim on the Comptroller's Office is insufficient to serve HHC because HHC is a separate and distinct entity from the City for purposes of notices of claim. Defendants are correct.

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 70 of 143

Mejia v. New York City Health and Hospitals Corporation, Not Reported in Fed. Supp....

2018 WL 3442977

New York courts "have long recognized that the City of New York and HHC are separate entities for the purposes of a notice of claim." *Scantlebury*, 4 N.Y.3d at 611; *see Bender v. New York City Health & Hosps. Corp.*, 38 N.Y.2d 662, 665-66 (1976). The provisions of New York's General Municipal Law § 50-e apply to the notice-of-claim requirement with respect to claims brought against NYCHHC. *See Scantlebury*, 4 N.Y.3d at 610; N.Y. Unconsolidated Laws § 7401(2) ("All the provisions of section fifty-e of the general municipal law shall apply to such notice [of intention]."). General Municipal Law § 50-e(3) explains that proper service of a notice of claim requires delivery of "a copy thereof personally, or by registered or certified mail, to the person designated by law as one to whom a summons in an action in the supreme court issued against such corporation may be delivered, or to an attorney regularly engaged in representing such public corporation." N.Y. Gen. Mun. Law § 50-e(3)(a). The New York Court of Appeals has made clear that service of a notice of claim on the City Comptroller's Office is not effective service on HHC. *See Scantlebury*, 4 N.Y.3d at 613 (citing *Stallworth v. N.Y.C. Health & Hosps. Corp.*, 663 N.Y.S.2d 287 (2d Dep't 1997) ). Therefore, because Plaintiff alleges only that he served a notice of claim on the Comptroller's Office, he has not satisfied the requirement of pleading timely service on HHC. His state law claims are dismissed. [9]

[9] Defendants also move to dismiss Plaintiff's state law claims because "he does not specify any basis for those claims." Defs.' Mem. at 14. Defendants fail to elaborate on that argument, however. Although the Court has dismissed Plaintiff's state law claims on other grounds, Defendants and their counsel are reminded that Plaintiff's complaint is subject to the liberal construction standard applicable to *pro se* litigants. Defendants, on the other hand, have the benefit of counsel. The Court expects that, going forward, Defendants and their counsel will provide the Court with fully developed arguments, providing both the factual and legal predicates that they believe support their arguments.

## IV. CONCLUSION

For the reasons sated above, HHC and Dr. Schear's motion to dismiss is GRANTED in part and DENIED in part.

Plaintiff states a claim for a Fourteenth Amendment procedural due process violation against Dr. Schear.

Plaintiff states a claim for a Fourteenth Amendment substantive due process violation against Dr. Schear.

Plaintiff's deliberate indifference claim against Dr. Schear is dismissed without prejudice.

Plaintiff's *Monell* claim against HHC is dismissed without prejudice.

Plaintiff's state law claims are dismissed without prejudice.

Plaintiff is granted leave to replead those claims that have been dismissed without prejudice. In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). The Court will schedule a deadline for submission of a fifth amended complaint after the Court has decided the outstanding motion to dismiss.

**\*16** The Court requests that counsel for Defendants provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is directed to terminate the motion pending at ECF No. 77 and to mail a copy of this order to Plaintiff by certified mail and by regular, first class mail.

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2018 WL 3442977

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 940559
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Scott LOMBARDO, Plaintiff,

v.

James STONE, Renate Wack, Paula Crescent,
Gerald Greene, Frank Burgos, Carlos Rosario,
Romy Rousseau, and Kin Wah Lee, Defendants.

No. 99 CIV 4603 SAS.
|
Aug. 20, 2001.

**Attorneys and Law Firms**

Scott Lombardo, Mid–Hudson Forensic Psychiatric Centric,
New Hampton, New York, Plaintiff, pro se.

Jonathan Birenbaum, Assistant Attorney General of the State
of New York, New York, New York, for Defendants.

*OPINION AND ORDER*

SCHEINDLIN, J.

**\*1** Pro se plaintiff Scott Lombardo, a former patient
at Kirby Forensic Psychiatric Center ("Kirby"), is suing
Secure Health Treatment Aid ("SHTA") Paula Crescent,
SHTA Gerald Greene, SHTA Frank Burgos, SHTA Carlos
Rosario, Registered Nurse Romy Rousseau, James Stone
—the Commissioner of the New York State Office of
Mental Health, Dr. Renate Wack—the former Executive
Director of Kirby, and Kin Wah Lee—the Director of Quality
Assurance at Kirby. Plaintiff brings this suit under 42 U.S.C.
§ 1983 alleging various violations of his constitutional
rights. Pursuant to Rule 56(b) of the Federal Rules of Civil
Procedure, defendants move for summary judgment on all of
plaintiff's claims. For the reasons stated below, defendants'
motion is granted in its entirety with respect to Stone, Wack
and Lee and is granted in part and denied in part as to all other
defendants.

I. BACKGROUND

A. Lombardo's Assault on Reede
Plaintiff's allegations arise out of a string of incidents
that occurred while plaintiff was a patient at Kirby. At
approximately 3:50 a.m. on January 4, 1998, plaintiff became
irrationally angry with SHTA Pamela Reede because, in his
words "she was giving me a bunch of shit." Deposition
of Scott Lombardo ("Lombardo Dep."), Ex. B to 3/8/01
Affidavit of Assistant Attorney General Jonathan Birenbaum
("Birenbaum Aff."), at 70. The parties do not dispute that
plaintiff attacked Reede when her back was turned and choked
her until she lost consciousness.[1] *See id.* at 69–72. Staff
members and security personnel quickly subdued Lombardo
and took him to the seclusion room where he was placed in a
five-point restraint. *See id.* at 73–77.

[1]     Plaintiff was accused of attempted first degree rape,
        attempted second degree assault, and third degree
        assault. *See* Deposition of New York State Safety
        Officer Kenneth Young, Ex. N to Birenbaum Aff.,
        at 1. Lombardo pled guilty to attempted second
        degree assault and was sentenced to one to three
        years imprisonment. *See* Defendant's Rule 56.1
        Statement ("Def.56.1") ¶ 30.

B. Lombardo's Time in Restraints
After the assault on SHTA Reede, plaintiff was placed in a
bed and restrained. *See* Lombardo Dep. at 92–93. In plaintiff's
words, "as I was being restrained, I heard Paula Crescent
say, 'I saw it, I saw what you did. You struck Mr. Burgos;
understand, okay?' Like she was giving them [sic] an order."
*Id.* at 93. Lombardo was wheeled into the seclusion room
where he alleges that Greene told him "[y]ou're going to get
this all week long." *Id.* at 95.

While restrained, plaintiff received range of motion exercises
at fairly regular intervals. For example, on January 4, plaintiff
received range of motion exercises at 6:00 a.m., 11:15 a.m.,
12:45 p .m., 2:30 p.m., 4:00 p.m., 6:00 p.m., 9:15 p.m. and
11:15 p.m. *See* Med. Rec. at 1138–40. Plaintiff claims, and
the medical records reflect, that he did not receive range of
motion exercises after 11:15 p.m. on January 4 until 6:00 a.m.
on January 5. *See id.* at 1140.

It is undisputed that later in the morning of January 4, at
approximately 4:30 a.m., SHTA Doeman brought plaintiff
a urinal and allowed him to urinate. *See id.* at 101–02.
Defendants contend that plaintiff was toileted at 7:00 a.m.
However, plaintiff denies being toileted at this time and
defendants' records concerning this assertion are vague.[2] *See
id.* at 102–04. Plaintiff claims that at about 8:00 a.m. he asked
for a urinal. *See id.* at 79–80. He contends that his request

was ignored and, at approximately 8:20 a.m., he urinated on himself. *See id.*

<sup></sup>

    2      An SHTA whose name has been redacted wrote that patient was toileted at 7:00 a.m. *See* Kirby Medical Records ("Med.Rec."), Ex. F to Birenbaum Aff., at 1130. As plaintiff points out, the Patient Monitoring Form does not contain any entries for 7:00 a.m. *See id.* at 1139–1140.

**\*2** Defendants claim that plaintiff did not give staff adequate advance warning of the problem, and the accident was caused "because [Lombardo] could not wait." Def. 56.1 ¶ 14. At 11:15 a.m., Lombardo, who had been lying in his own urine for approximately three hours, informed Crescent of his predicament. *See* Lombardo Dep. at 81. Plaintiff alleges that Crescent responded with the words "fuck you." *Id.*

Lombardo was then medicated and, at approximately 12:30 p.m., given a cup of water. *See id.* at 98–99; Def. 56.1 24. The medication caused plaintiff to sleep for much of the time. *See id.* Sometime during the evening of January 4, 1998, plaintiff claims he informed Rousseau that he had to use the bathroom. *See id.* at 100. She allegedly responded "you get nothing" and left the seclusion room. *Id.* Lombardo claims to have subsequently urinated on himself again. *See id.* at 101. Plaintiff's medical records indicate that he refused a urinal three times between 3:00 p.m. and 11:00 p.m. on January 4 and make no mention of plaintiff urinating on himself during that time period. *See* Med. Rec. at 1131–34.

Plaintiff admits that he was given an Ensure dietary supplement around 12:15 a.m. on January 5, 1998. *See* Lombardo Dep. at 103–04. Plaintiff also admits that he drank half a cup of water with the Tylenol given to him at 12:30 p.m. on January 4, 1998. *See id.* at 104. Defendants contend that plaintiff was hydrated several times. *See* Def. Mem. at 12–14. They further contend that he repeatedly refused food and water and that his behavior was such that it was unsafe to attempt to feed him. *See id.* Plaintiff remained in restraints until approximately 2:30 p.m. on January 5 when he was allowed to shower and change his clothes before being placed in padded restraints. *See* Lombardo Dep. at 104–05. At approximately 4:30 p.m., the state police took him into custody. *See* Def. 56.1 ¶ 28.

    C. The Alleged Assault of Lombardo by Kirby Staff
Shortly thereafter, Greene, Burgos, and Rosario released plaintiff from his restraints and escorted him to the shower

room so that he could wash himself.<sup>3</sup> *See id.* at 81–85. After showering, Lombardo was escorted back to the seclusion room by Greene, Burgos and Rosario while Crescent watched. *See id.* at 84–86. According to plaintiff, Burgos suddenly grabbed him from behind. *See id.* at 87–88. Burgos allegedly choked plaintiff to the point where plaintiff nearly lost consciousness and then dropped him to the ground. *See id.* Plaintiff claims that Greene, Burgos and Rosario proceeded to kick and "stomp" him for approximately five to ten minutes as he lay on the ground. *See id.* at 87–91. During the beating, Greene allegedly admonished plaintiff "you don't do this to a[SH]TA." *Id.* at 93. According to plaintiff, Greene, Burgos, and Rosario continued to kick him until just moments before security officers arrived. *See id.* at 90–92.

<sup></sup>

    3      Plaintiff claims that he drank water from the showerhead. *See* Complaint ¶ 18.

**\*3** Defendants' version of events is different from plaintiff's. According to defendants, plaintiff was walking back from the shower room when, without provocation, he suddenly turned around and punched Burgos in his left temple. *See* Deposition of Frank Burgos ("Burgos Dep."), Ex. K to Birenbaum Aff., at 22, 26, 29. Defendants presented substantial corroborating evidence of Burgos' claimed injuries. *See id.* at 20–23, 29– 30. Specifically, Burgos suffered a head injury, a shoulder injury, and a knee injury. *See id.* As a result of these injuries, Burgos was unable to work for approximately five months and received Workers Compensation. *See* 10/29/99 Workers Compensation Board form of Frank Burgos, Ex. L to Birenbaum Aff., at 2; 5/6/98 Letter from Renate Wack to Frank Burgos, Ex. L to Birenbaum Aff.

Defendants also contend that Lombardo's injuries are much more consistent with reasonable restraint than with assault. *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Def.Mem.") at 16. Defendants' records indicate that plaintiff

> sustained slight swelling and
> hematoma<sup>4</sup> (bluish discoloration)
> over the nasal bridge and in between
> the eyebrows ... five<sup>5</sup> scratches
> over [Lombardo's] shoulder ... small
> hematoma over midback ... no
> swelling, no limitation of movement ...

[n]o difficulty of breathing through nose, no bleeding.

**4**  A hematoma is defined as "a tumor or swelling containing blood ." Webster's Ninth New Collegiate Dictionary 563 (9th ed. 1987) ("Webster's").

**5**  The reporting nurse's handwriting was unclear and in the bulk of their materials defendants contend that she wrote "fine" instead of "five." In their 56.1 statement, defendants contend that plaintiff suffered "line" scratches. Def. 56.1 ¶ 24.

Med. Rec. at 1117–18. A later document refers to an "erythema [6] over his upper back" that appeared around the time of the alleged assault. 2/27/98 Memorandum of Maryse Chardonet, Treatment Team Leader ("Chardonet Mem."), Ex. R to Birenbaum Aff., at 2.

**6**  An erythema is defined as an "abnormal redness of skin due to capillary congestion (as in inflammation)." Webster's at 423.

Chardonet investigated plaintiff's complaint and wrote:

[t]he injuries sustained by pt. Lombardo on his back and one shoulder are more consistent with his being accidentally scratched by his being combative during applications of restraints, his agitating himself while in the restraints, trying to get out of the restraints, and the first time he was in restraints having been naked ... They were not, however, consistent with being 'yoked, thrown down to the ground, kicked and stomped,' by three men.

*Id.* at 3–4. The erythema was explained as having possibly been caused by Lombardo "lying on his back." *Id.* at 2. The explanation for the nose injury was that plaintiff was "out of control and [had] to be restrained." *Id.* at 4.

### D. Lee's Involvement

Lee was Director of Quality Assurance at Kirby when the incidents in question occurred. *See* Def. 56.1 ¶ 31. Plaintiff alleges that during a phone call from Rikers Island, he asked Lee to preserve the security video footage of the room where the alleged beating occurred. *See* Lombardo Dep. at 92, 116; Plaintiff's Answer to Defendant's [sic] Motion for Summary Judgment ("Pl.Resp.") at 6–7. Lee denies that plaintiff made

this request. *See* Telephonic Deposition of Kin Wah Lee ("Lee Dep."), Ex. P to Birenbaum Aff., at 14.

### E. Dr. Wack's Involvement

**\*4**  Dr. Wack was the Executive Director of Kirby when the events in question occurred. *See* Def. 56.1 ¶ 31. Her only direct involvement in the case occurred when she reviewed a report of plaintiff's allegations and declined to take action. *See* Deposition on Written Interrogatories of Renate Wack ("Wack Dep."), Ex. Q to Birenbaum Aff., at 3–5, 8.

### F. Stone's Involvement

Stone is the Commissioner of the New York State Office of Mental Health. *See* Def. 56.1 ¶ 31. Plaintiff notes that section 45.07 of the New York Mental Hygiene Law obligates the Commission on Quality Care to "[m]ake findings concerning matters referred to its attention and, where it deems appropriate, make a report and recommendations. Such report shall be delivered to the commissioner and the director of the facility involved." N.Y. Mental Hyg. Law § 45.07 (McKinney 2001). Plaintiff contends that Stone "had notice of prior occurrences which should have alerted defendants to the necessity of closer supervision or better training of their subordinates." Pl. Resp. at 8.

## II. LEGAL STANDARD

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Clorox Co. v. Sterling Winthrop, Inc.,* 117 F.3d 50, 55 (2d Cir.1997). The moving party has the burden of identifying the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997).

Once the moving party has satisfied this burden, the opposing party must produce sufficient evidence that a reasonable jury could return a verdict in its favor, identifying "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986); *see also Gonzalez v. City of New York,* No. 99 Civ. 9128, 2000 WL 1678036, at \*3 (S.D.N.Y. Nov. 8, 2000).

The Second Circuit has recently summarized this standard: "genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir.1999) (quoting *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996)). In determining whether summary judgment should be granted, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 721 (2d Cir.1994). Ultimately, "[a] court may grant summary judgment only when no rational jury could find in favor of the non-moving party." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir.1998).

**\*5** The papers of a party proceeding pro se should be read liberally and interpreted "to raise the strongest arguments that they suggest ." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quotation marks and citations omitted); *see also Haines v. Kerner,* 404 U.S. 519, 520 (1972). However, a pro se party's bald assertions, if unsupported by evidence, are not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

III. DISCUSSION

A. Lombardo Fails to State a Valid Claim Under the New York Mental Hygiene Law

Plaintiff alleges "[t]he actions of defendants ... violated state Mental Hygiene Law." Complaint ¶ 25. However, "[t]he Mental Hygiene Law is a regulatory statute." *McWilliams v. Catholic Diocese of Rochester,* 536 N.Y.S.2d 285, 286 (4th Dep't 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.* Accordingly, plaintiff's claims under New York's Mental Hygiene Law must be dismissed.

B. Elements of a Section 1983 Claim

In order to state a cause of action under section 1983, a plaintiff must establish that: (1) the conduct complained of was "committed by a person acting under color of state law; and (2) the conduct complained of ... deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *see also Overhoff v. Ginsburg Dev., L.L.C.,* 143 F.Supp.2d 379 (S.D.N.Y.2001). Section 1983 creates no substantive rights, but it does provide a "procedure for redress

for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

"Once the State assumes responsibility for a patient by admitting him to a State mental hospital that is operated under State authority, the state is acting under color of law." *Seide v. Prevost,* 536 F.Supp. 1121, 1136 (S.D.N.Y.1982) (citing *O'Connor v. Donaldson,* 422 U.S. 563 (1975)). Furthermore, "[s]tate employment is generally sufficient to render the defendant a state actor." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 935 n .18 (1982). Here, defendants do not contest that they were acting under color of state law. Thus, the only question is whether Lombardo suffered a violation of his constitutional rights. *See Gonzalez,* 2000 WL 1678036, at \* 4.

C. Lombardo Fails to State a Valid Claim Against Stone

Plaintiff does not contend that Stone had any direct involvement in the alleged events. Instead, he alleges that "Stone [is] responsible for the training, supervision, discipline, and control of the actions of SHTA staff at Kirby." Complaint ¶ 20. However, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." ' *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

**\*6** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information

indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

Lombardo's claims against Stone fail to satisfy any of the prongs of the *Williams* test. Obviously, Stone did not participate directly in the alleged constitutional violation. Stone was never informed that a violation had occurred and therefore cannot be held liable for failing to remedy the situation. There is no evidence that he created any policies or customs that would have allowed the alleged constitutional violations to take place. Stone was not grossly negligent in supervising his subordinates, nor did he exhibit deliberate indifference to the rights of patients.

It has been established that "[t]he bare fact that [defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain" a section 1983 claim. *Colon,* 58 F.3d at 874 (citing *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). The same principle applies to the mental health field. Accordingly, Lombardo's claims against Stone are dismissed.

### D. Lombardo Fails to State a Valid Claim Against Dr. Wack

Plaintiff claims that Dr. Wack was "responsible for the training, supervision, discipline, and control of the actions of SHTA staff at Kirby." Complaint ¶ 20; *see also* Pl. Resp. at 7. In 1996, Dr. Wack received a letter from the Commission on Quality Care that pointed out various instances where staff did not adhere to mental hygiene standards when dealing with Lombardo. The Commission found that the Kirby staff had committed several violations including: denying Lombardo his privacy while he showered, failing to give him all of his range of motion exercises, and failing to serve him lunch one day. *See* 4/3/96 Letter from Randall Holloway, Mental Hygiene Facility Review Specialist, to Renate Wack ("Holloway Let."), Ex. S to Birenbaum Aff., at 1–3. Dr. Wack testified that a committee reviewing these incidents "found that Kirby's corrective actions were satisfactory and they closed the case." Wack Dep. at 7. Dr. Wack was also alerted of plaintiff's current allegations by letter. *See id.* at 4.

*7 Plaintiff cites *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir.1985), to support his claim that, because of the 1996 violations, "Dr. Wack knew of a[c]onstitutional violation and failed to do anything about it, and must be held liable." Pl. Resp. at 8. This argument is dubious for two reasons. One, it is highly doubtful that any of the 1996 violations rose to a constitutional level. Two, even if the staff's misdeeds were constitutional violations, Dr. Wack did not fail to do anything about them; staff was counseled on how to properly treat patients and supervisors were told to ensure that "procedures are properly adhered to by all staff." Holloway Let. at 3. There were no deficiencies in Dr. Wack's handling of the 1996 violations that could render her responsible for the events alleged here. *See Morton v. Becker,* 793 F.2d 185, 187 (8th Cir.1986) (noting that "[c]ausation is an essential element of a section 1983 cause of action.").

When Dr. Wack was informed of the current allegations she supervised a full investigation. Chardonet reported "the allegations of abuse, neglect, and mistreatment made by pt. Lombardo are not substantiated." Chardonet Mem. at 3. Dr. Wack's decision to accept Chardonet's report as accurate was reasonable. Even if plaintiff's allegations concerning the assault are correct, Dr. Wack simply cannot "reasonably be expected to guard against the deliberate criminal acts of [her] properly trained employees when [s]he has no basis upon which to anticipate misconduct." *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir.1994). Accordingly, Lombardo's claims against Wack are dismissed.

### E. Lombardo Fails to State a Valid Claim Against Lee

For purposes of this motion, the Court must assume that plaintiff asked Lee to preserve the video footage and that she refused to do so. Even assuming that Lee failed to preserve the video footage, plaintiff's claims against Lee must fail. Lombardo does not allege that Lee directly participated in any of the alleged violations of his constitutional rights. Nor does he allege that Lee could have intervened on his behalf and failed to do so. Plaintiff's claims against Lee is that she failed to investigate her subordinates and preserve evidence against them. The failure to investigate is not sufficient to sustain an Eighth Amendment claim. *See Vukadinovich v. McCarthy,* 901 F.2d 1439, 1444 (7th Cir.1990) (failure to investigate alleged physical abuse cannot render supervisory defendants liable unless there is evidence that the failure to investigate caused the abuse); *see also Wilson v. Detella,* No. 97 Civ. 7833, 1999 WL 1000502, at *5 (N.D.Ill. Nov. 1, 1999) ("[f]ailure to investigate or to impose discipline on the

wrongdoers after the fact [does] not amount to a constitutional violation [if] the omission was not the cause of [p]laintiff's injuries."). Accordingly, plaintiff's claims against Lee are dismissed.

### G. The Fourteenth Amendment Claims [7]

[7] Plaintiff asserts all of his claims under both the Eighth and Fourteenth Amendments. However, at the time of the alleged events, plaintiff was had not been convicted of any crime. Accordingly, plaintiff's claims are more appropriately analyzed under the Fourteenth Amendment's Due Process Clause. See *DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 199 n.6 (1989) ("The Eighth Amendment applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.' ") (quoting *Ingraham v. Wright,* 430 U.S. 651, 671–72 (1977) (alterations in original).

**\*8** The Supreme Court has stated, in dicta, that the substantive component of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed mental patients with adequate food, shelter, clothing and medical care. See *Youngberg v. Romeo,* 457 U.S. 307, 315 (1982). Such patients also retain liberty interests in safety and freedom from bodily restraint. See *id.* at 315–16, 324 ("The State also has the unquestioned duty to provide reasonable safety for all residents and personnel within the institution. And it may not restrain residents except when and to the extent professional judgment deems this necessary to assure such safety....").

In determining whether there has been a due process violation, it is necessary to balance " 'the liberty of the individual" ' and " 'the demands of an organized society." ' *Id.* at 320 (quoting *Poe v. Ullman,* 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)). In doing so, it must be noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id.* at 321–22. Accordingly, whether a plaintiff's "constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests" in restraining individual liberty. *Id.* at 321.

There is a presumption of correctness that applies when determining whether the State has met its obligations with respect to reasonable care, safety and non-restrictive confinement conditions. *See id.* at 324. Thus, decisions made by appropriate professionals are presumptively valid. *See id.* at 323. Therefore, "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

### 1. The Alleged Assault by Greene, Burgos, Rosario and Crescent

Plaintiff alleges that Greene, Burgos, Rosario, and Crescent violated his Fourteenth Amendment rights by assaulting him after he left the shower. *See* Part I.C. *supra.* Defendants do not contend that the unprovoked choking, kicking, and stomping alleged by plaintiff can be justified as a necessary exercise of force. Rather, they contend that plaintiff's version of the events is fabricated. *See* Def. Mem. at 15–16. Defendants claim that Lombardo caused them to use reasonable force when he assaulted Burgos, and that their use of force was appropriately limited to restraining plaintiff. *See id.*

Defendants do not dispute that the amount of force alleged by plaintiff was gratuitous and excessive. Nor do they contend that the decision to assault Lombardo was a professional judgment made within accepted medical practice.

> What defendants are really asking this Court to do is decide an issue of fact, namely whether the beating really took place. The fact that plaintiff testified to the beating at his deposition is sufficient to raise a genuine issue of material fact. This Court is both unwilling and unable to decide this issue against plaintiff on summary judgment.

**\*9** *Showers v. Eastmond,* No. 00 Civ. 3725, 2001 WL 527484, at \*3 (S.D.N.Y. May 16, 2001) (citing *Payne v. Coughlin,* No. 82 Civ. 2284, 1987 WL 10739, at \*3 (S.D.N.Y.

May 6, 1987); *Crawford v. Braun,* No. 99 Civ. 5851, 2001 WL 127306, at *4 (S.D.N.Y. Feb. 9, 2001)). "Credibility assessments and choices between conflicting versions of events are matters for a fact-finder at trial, not for the Court on a summary judgment motion." *Moncrieffe v. Witbeck,* No. 97–CV–253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Fischl v. Armitrage,* 128 F.3d 50, 55 (2d Cir.1997)). Accordingly, plaintiff's assault claims against Greene, Burgos, Rosario, and Crescent cannot be dismissed on summary judgment. [8]

[8]    Although Crescent is not accused of physically participating in the beating, she is potentially liable because plaintiff alleges that her presence sanctioned the assault and because she failed to intervene on plaintiff's behalf. *See O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *Davis v. Patrick,* No. 92 Civ. 548, 2000 WL 1154065, at *4 (S.D.N.Y. Aug. 14, 2000); *Newland v. Achute,* 932 F.Supp. 529, 534 (S.D.N.Y.1996).

### 2. The Denial of Toileting

People in custody have no constitutional right to use the bathroom whenever they please. *See, e.g., Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4–5 (S.D.N.Y. Sept. 17, 1997) (plaintiff's claim that he was denied access to the bathroom for ten hours was not sufficient to survive summary judgment). This same principle applies to mental patients being held in restraints. Nonetheless, "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs...." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994).

Plaintiff contends that his requests to be toileted were repeatedly ignored, as a result of which he urinated on himself twice, and on one occasion was forced to lie in his own urine for over three hours. [9] Defendants do not argue that under the circumstances alleged by plaintiff, no constitutional violation occurred. Instead, defendants again argue that Lombardo's account is false. Defendants cite their own records which: make no mention of plaintiff's requests to urinate; note only one instance of plaintiff urinating on himself; and do not record plaintiff being forced to lie in his own urine. *See* Med. Rec. at 1113–40. Because a jury is best equipped to resolve these types of factual conflicts, Lombardo's failure to toilet claims against Rousseau and Crescent must proceed to trial.

[9]    Rousseau and Crescent are the only defendants alleged to have ignored his requests to use the bathroom.

### 3. The Forced Administration of Medication

Plaintiff alleges that his Fourteenth Amendment right to refuse medication was violated when defendants medicated him against his will. The Second Circuit has held:

"It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." Such a right may be set aside only in narrow circumstances, including those where the patient "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution."

*Kulak v. City of New York,* 88 F.3d 63, 74 (2d Cir.1996) (quoting *Rivers v. Katz,* 67 N.Y.2d 485, 492, 495 (1986)); *see also Project Release v. Prevost,* 722 F.2d 960, 978–80 (2d Cir.1983).

*10   The right to refuse medication is derived from the policy stated in the New York Code of Rules and Regulations ("N.Y.C.R.R."), which provides:

(c) Patients who object to any proposed medical treatment or procedure ... may not be treated over their objection except as follows: (1) Emergency treatment. Facilities may give treatment, except electroconvulsive therapy, to any inpatient, regardless of admission status or objection, where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness. Such treatment may continue only as long as necessary to prevent dangerous behavior.

14 N.Y.C.R.R. § 527.8(c)(1); *see also Kulak,* 88 F.3d at 74 (noting that this right is protected under the Fourteenth Amendment's due process clause); *Johnson v. Silvers,* 742 F.2d 823, 825 (4th Cir.1984) (the Fourteenth Amendment creates a liberty interest protecting patients from being unnecessarily forced to take anti-psychotic drugs); *Doe v. Dyett,* No. 84 Civ. 6251, 1993 WL 378867, at *2 (S.D.N.Y. Sept. 24, 1993) ("The Due Process Clause of the Fourteenth Amendment prohibits the involuntary administration of anti-psychotic drugs.").

There is no dispute that plaintiff was medicated on three separate occasions from January 4 to January 5, 1998. *See* Def. Mem. at 5–7. At 4:00 a.m. on January 4, plaintiff was given an intramuscular dose of 50 milligrams of Benadryl. [10] *See* Def. 56.1 ¶ 10. At 11:00 a.m. later that day, another 50 milligrams of Benadryl was administered. *See id.* at 11. Finally, at 8:00 p .m. on January 4, plaintiff was given Ativan and another 50 milligrams of Benadryl. [11] *See id.* at 26.

[10]   Plaintiff does not contend that his rights were violated when he was medicated immediately after attacking Reede. *See* Pl. Resp. at 2. Rather, he contends that his rights were violated on the two later occasions when he was medicated. *See id.* at 2–3.

[11]   Benadryl is a antihistamine having sedative side effects. *See* 2001 Physicians' Desk Reference at 2420 (55th ed.). Ativan is an anti-anxiety agent similar in action to the benzodiazepines (Valium). *See id.* at 3348.

Defendants argue that plaintiff was assaultive and dangerous throughout this period and that medication was therefore necessary to protect his safety and the safety of others. [12] *See, e.g., Doe,* 1993 WL 378867, at *3 (administering medicine to a dangerous patient in order to make the patient less dangerous does not violate the Fourteenth Amendment). Plaintiff disputes that he was dangerous throughout this period. *See* Pl. Resp. at 2. According to plaintiff, "defendants collaborated [sic] a story of an alleged assault on defendant Burgos to justify continued restraint and medication on plaintiff to sadistically cause harm to plaintiff as revenge for his attack on SHTA Reede." *Id.* at 3.

[12]   A dangerous patient is defined as one who "engages in conduct or is imminently likely to engage in conduct posing a risk of physical harm to himself or others." 14 NYCRR § 527.8(a)(4).

Plaintiff's conclusory allegations of a purported conspiracy by defendants do not raise a triable issue of fact. *See Project Release,* 722 F.2d at 969 ("a non-moving party may not rely on mere conclusory allegations but must set forth 'concrete particulars' "). In defendants' professional medical judgment, plaintiff was dangerously and unpredictably assaultive throughout the period of medication. [13] *See* Med. Rec. at 1119, 1123, 1125, 1128. Such judgment is entitled to a presumption of correctness, *see Youngberg,* 457 U.S. at 324, especially where there is no evidence that defendants were not appropriately reacting to an emergency situation in giving plaintiff mild, non-psychotropic sedatives such as Benadryl and Ativan. [14] *See Odom v. Bellevue Hosp. Ctr.,* No. 93 Civ. 2794, 1994 WL 323666, at *3 (S.D.N.Y. July 5, 1994) ("[A] patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution."). Accordingly, plaintiff's forced medication claim is dismissed.

[13]   Indeed, it is undisputed that plaintiff was initially medicated because he violently attacked a staff member.

[14]   Most of the case law in this area involves the forced administration of anti-psychotic drugs. *See generally Project Release,* 722 F.2d at 977–79. While there is no logical reason to limit such claims to a particular class of drugs, plaintiff's liberty interest in not being involuntarily medicated is surely not as strong when relatively innocuous, non-psychotropic medications are being forcibly administered.

4. The Unconstitutional Restraint

**\*11** " 'Liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." ' *Youngberg v. Romeo,* 457 U.S. at 316 (quoting *Greenholtz v. Nebraska,* 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part). *See also Branham v. Meachum,* 77. F.3d 626, 629 (2d Cir.1996); *Wells v. Franzen,* 777 F.2d 1258, 1261–62 (7th Cir.1985) ("Freedom of bodily movement

is a substantive right derived from the due process clause, and it is breached when a [patient] is bodily restrained except pursuant to an appropriate exercise of judgment from a health professional ... it is the duty of a court to ensure that professional judgment in fact was exercised in the decision to restrain.").

Plaintiff was placed in restraints shortly after the attack on SHTA Reede, at approximately 3:50 a.m. on January 4, 1998, and was kept in restraints until approximately 2:30 p.m. on January 5, 1998. Plaintiff received adequate range of motion exercises on January 4, 1998. *See* Part I.B. *supra.* Plaintiff's restraint claims can thus be summarized as: (1) failure to receive proper range of motion exercises between 11:15 p.m. and 5:45 a.m. on January 4–5; *see* Pl. Resp. at 4; and (2) failure to timely release plaintiff from restraints during the time he claims he was not dangerous. *See id.* at 2–3. Plaintiff's range of motion claim represents, at most, a de minimis imposition on his liberty interests [15] while his failure to release claim is not supported by any evidence whatsoever. [16] Because plaintiff's restraint claims do not rise to the level of a constitutional violation, they are dismissed.

[15] Kirby's medical records indicate that plaintiff was agitated during the period from 11:15 p.m. on January 4 through 5:30 a.m. on January 5. *See* Med. Rec. at 1140. This further justifies the medical staff's decision to withhold exercises on a short-term basis. Furthermore, section 33.04(f) of New York's Mental Hygiene Law provides that "[a] patient in restraint shall be released from restraint at least every two hours, *except when asleep.*" (emphasis added). If plaintiff was not in an agitated state, presumably he would have been sleeping between 11:00 p.m. and 6:00 a .m. Thus, the decision to keep him in restraints during the night, without release for exercise, is justified as a matter of law.

[16] Plaintiff has offered no competent evidence to rebut defendants' conclusion that he remained dangerous throughout the period of restraint. Plaintiff's conclusory allegations as to his state of mind, without any supporting evidence or corroboration, cannot contradict defendants' medical decision in keeping plaintiff restrained.

5. The Denial of Food and Water

"[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *see also Williams v. Coughlin,* 875 F.Supp. 1004, 1015 (S.D.N.Y.1995); *Demaio v. Mann,* 877 F.Supp. 89, 93 (N.D.N.Y.1995); *Moss v. Ward,* 450 F.Supp. 591 (W.D.N.Y.1978). A constitutional violation occurs when the government " 'so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs' including food ...." *Reed v. McBride,* 178 F.3d 849, 852 (7th Cir.1999) (quoting *Helling v. McKinney,* 509 U.S. 25, 32 (1993)).

Plaintiff alleges that he was denied meals for approximately twenty-four hours. *See* Complaint ¶ 26. Plaintiff contends further that the denial of meals and fluids was in violation of his Fourteenth Amendment rights. *See* Pl. Resp. at 4. Plaintiff's claimed deprivations are, however, contradicted by both the evidence of record and plaintiff's own admissions. During his deposition, plaintiff admitted to receiving half a cup of water with some Tylenol at approximately 12:30 p.m. on January 4. *See* Lombardo Dep. at 98–99; *see also* Med. Rec. at 1131. Earlier that day, at approximately 11:15 a.m., plaintiff was allowed to shower in a bathroom where he had access to a sink and water. *See* Lombardo Dep. at 82. Plaintiff also admitted to having received an Ensure dietary supplement at approximately 12:15 a.m. on January 5. *See id.* at 104. In addition to these admissions, Kirby's medical records note that plaintiff drank one cup of water at 6:00 a.m. on January 4, *see* Med. Rec. at 1130, that he accepted eight ounces of water at 11:00 p.m. that same day, *see id.* at 1134, and that he accepted two cups of water at 3:30 p.m. on January 5, *see id.* at 1147.

**\*12** Furthermore, the medical records also show that plaintiff was offered, but refused, fluids and meals on several occasions. For example, the Progress Notes show that at 7:00 a.m. on January 4, plaintiff was offered fluids. *See id.* at 1114. Later that day, at 5:00 p.m. and some time between 9:15 p.m. and 11:15 p.m., plaintiff was offered dinner but refused it. *See id.* at 1118. In light of the above, plaintiff's claimed deprivations simply do not rise to the level of a constitutional violation. *Cf. Buthy v. Commissioner of the Office of Mental Health of New York State,* 818 F.2d 1046, 1050 (2d Cir.1987) ("[S]ome restrictions on individual liberty rise only to a 'de minimis level of imposition with which the Constitution is not concerned.' ") (quoting *Ingraham v. Wright,* 430 U.S. 651, 674 (1977)). Accordingly, plaintiff's denial of food and water claims are dismissed.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 80 of 143
Lombardo v. Stone, Not Reported in F.Supp.2d (2001)
2001 WL 940559

H. Defendants Are Not Entitled to Qualified Immunity

The Supreme Court has recognized that government officials acting under color of law enjoy qualified immunity from section 1983 claims: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987) (quoting *Harlow,* 457 U.S. at 819). The constitutional right must have been clearly established at the time when the alleged infringement occurred. *See Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998).

Here, defendants are accused of several severely abusive acts. As "reasonably competent public officials," defendants should have been aware that these acts, if actually committed, were objectively unreasonable and violated established constitutional rights. *Harlow,* 457 U.S. at 819; *McCormack v. Cheers,* 818 F.Supp. 584, 599 (S.D.N.Y.1993). Because defendants have failed to raise any "extraordinary circumstances [or prove] that [they] neither knew nor should have known of the relevant legal standard," their request for qualified immunity must be denied. *Harlow,* 457 U.S. at 819.

If, at trial, it appears that plaintiff can only prove offenses much less severe than those currently alleged, qualified immunity may become appropriate. At present, there is no basis to grant defendants' motion for summary judgment based on the doctrine of qualified immunity.

IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted except as to plaintiff's assault and denial of toileting. A conference is scheduled for August 31, 2001 at 12:30 p.m.

**\*13**  SO ORDERED:

All Citations

Not Reported in F.Supp.2d, 2001 WL 940559

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 81 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Darnell v. Pineiro, 2nd Cir., February 21, 2017

2016 WL 8673144
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert HADEN, Plaintiff,

v.

Karl HELLINGER, et al., Defendants.

Civil Action No. 9:14-CV-0318 (GLS/DEP)
|
Signed 09/30/2016

**Attorneys and Law Firms**

ROBERT HADEN, #70751, Central New York Psychiatric Center, P.O. Box 300, Marcy, NY 13403, Pro se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN, New York State Attorney General, OF COUNSEL: KEVIN M. HAYDEN, ESQ., Assistant Attorney General, 615 Erie Blvd. West, Suite 102, Syracuse, NY 13204.

REPORT AND RECOMMENDATION

David E. Peebles, U.S. Magistrate Judge

**\*1** This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by *pro se* plaintiff Robert Haden, a convicted sex offender who, following completion of his sentence, was civilly committed to the Central New York Psychiatric Center ("CNYPC") for participation in a sex offender treatment program. Plaintiff's amended complaint, which names eighteen present or former CNYPC employees as defendants, alleges, *inter alia*, that he was assaulted by some of the defendants on five separate occasions and denied adequate medical treatment.

Currently pending before the court is a motion brought by the defendants seeking the entry of partial summary judgment dismissing all of plaintiff's causes of action, with the exception of his excessive force claims. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied.

I. BACKGROUND [1]

[1]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

The CNYPC is a facility operated by the New York State Office of Mental Health ("OMH") and located in Marcy, New York. Dkt. No. 84-26 at 1. The Sex Offender Treatment Program ("SOTP") operates within the CNYPC, and "promotes community safety through the provision of quality sex offender treatment services in a secure setting that employs evidence-based methods and is consistent with best practices in the field of sex offender treatment." [2] Dkt. No. 84-24 at 2. At the times relevant to his claims in this action, plaintiff was a resident involuntarily confined at the CNYPC, where he was undergoing sex offender treatment after having completed a thirty-year prison sentence following convictions of first-degree rape, burglary, sodomy, and robbery. Dkt. No. 42 at 1; Dkt. No. 84-21 at 9; *see also* New York State DOCCS, http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130 (last visited Sept. 28, 2016).

[2]      The Supreme Court has recognized that "[s]tates ... have a vital interest in rehabilitating sex offenders [because when they] reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *McKune v. Lile*, 536 U.S. 24, 33 (2002) (citations omitted).

At various times described in his amended complaint, plaintiff was placed on constant observation and in the Administrative Restrictions/Motivations on Deck ("MOD") program operated at the CNYPC. [3] Dkt. No. 84-24 at 16. When residents become violent, a medical doctor or nurse practitioner may direct that he be placed on constant observation. *Id.* at 14. "The purpose of this is to allow the resident to calm down in a safe environment without access to objects that may injure or threaten the resident or staff." *Id.* at 13. One staff member is required to observe the resident under observation "at all times as to allow for immediate unobstructed intervention." *Id.* In that setting, staff members document all of the resident's actions, including his behavior, sleeping patterns, consumption of meals, use of the bathroom, and bathing. *Id.* at 13-14. The resident under constant observation is not permitted to possess sharp objects, pens, reading materials, certain foods, certain clothing, utensils, and mattresses. *Id.* at 14.

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 82 of 143

2016 WL 8673144

[3]     In his affidavit submitted in support of defendants' motion, the CNYPC Medical Director, Dr. Joseph Colosi, who is not a named defendant, indicates that he has attached the policies governing the constant observation and MOD programs as Exhibits B and C. Dkt. No. 84-24 at 14. Neither of those exhibits, however, is included as an attachment, nor does defendants' submission include them elsewhere. Nonetheless, the court has located both of those policies among the materials supplied by plaintiff in opposition to defendants' summary judgment motion. Dkt. No. 94-2; Dkt. No. 94-3 at 28-34; Dkt. No. 94-4 at 63-86; see also Dkt. No. 97-1.

**\*2** After the period of constant observation ends, the resident "may be placed in the [MOD] program," which provides a strategy for dealing with violent and aggressive residents "[i]n order to better ensure a therapeutic environment and protect the safety and security of SOTP residents and staff[.]" Dkt. No. 84-24 at 14. There are three levels of MOD restrictions, including room MOD, unit MOD, and program MOD. Id. The intent of the MOD program is to progressively restore privileges as behavior is normalized, with the first and most restrictive step being room MOD, under which a resident is confined to his dormitory room except when using the bathroom, showering, attending medical appointments, or utilizing the telephone. Id. at 15. A resident placed in unit MOD is given greater freedom to interact with residents and staff and may leave his dormitory room to attend the day room and other activities on the unit. [4] Id. at 16.

[4]     The third component, program MOD, is not discussed in Dr. Colosi's affidavit. It does not appear, however, that plaintiff has complained about being placed on program MOD, instead focusing on being restricted to room and unit MOD.

Plaintiff's claims in this action arise from a series of incidents occurring at the CNYPC, as well as the medical treatment received from health care professionals at the facility. The incidents and plaintiff's medical treatment are summarized below.

A. February 20, 2012 Incident
On February 20, 2012, defendant Karl Hellinger, a Secure Care Treatment Aid ("SCTA") at the CNYPC, assaulted plaintiff as he was returning to his room. Dkt. No. 42 at 7-8; see also Dkt. No. 84-21 at 17-18. After an alarm

was triggered, an emergency response team comprised of defendant SCTA Hans Kuntz and other SCTAs employed at the facility assisted in restraining plaintiff. Dkt. No. 42 at 8; see also Dkt. No. 84-21 at 18; Dkt. No. 84-27. After plaintiff was placed in five-point restraints, defendant Maura Pavlot, a registered nurse employed at the CNYPC, injected drugs into plaintiff's thigh without his consent. [5] Dkt. No. 42 at 8; see also Dkt. No. 84-21 at 19; Dkt. No. 84-27 at 6. That injection was made at the direction of the staff physician, Dr. Hernandez, in accordance with the facility's policy for emergency medications. [6] Dkt. No. 84-24 at 21; Dkt. No. 85 at 3. Following the incident, Dr. Hernandez placed plaintiff on constant observation through February 24, 2012. Dkt. No. 84-24 at 16; see also Dkt. No. 42 at 9; Dkt. No. 84-21 at 19.

[5]     Plaintiff alleges defendant Pavlot injected him with psychotropic drugs. Dkt. No. 42 at 8. Defendants' evidence, however, reflects that the injection was a combination of Benadryl and Ativan, neither of which is a psychotropic drug. Dkt. No. 84-24 at 21.

[6]     Again, Dr. Colosi indicates that he has attached the CNYPC's Emergency IM Medications policy as Exhibit D to his affidavit submitted in support of defendants' motion, but that exhibit is not included in defendants' submission. Dkt. No. 84-24 at 21.

At plaintiff's request, the February 20, 2012 incident was investigated by the CNYPC Incident Review Committee ("IRC"), which is chaired by defendant Anthony Gonzalez, the Director of Risk Management at the facility. Dkt. No. 84-26 at 1-2; see also Dkt. No. 84-27. As a result of that investigation, the IRC determined that plaintiff's complaints concerning the incident were not substantiated and did not warrant a criminal investigation. Dkt. No. 84-26 at 2, 4.

B. August 20, 2012 Incident
Plaintiff alleges that on August 20, 2012, he was assaulted by defendants Eric Fical, Jason Searcy, and David Sill, all of whom are SCTAs, aided by defendant Daniel Simpkins, a registered nurse at the facility. [7] Dkt. No. 42 at 10-13; Dkt. No. 84-21 at 54. After plaintiff was restrained, defendant Simpkins injected him with a combination of Haldol, a psychotropic drug, Ativan, and Benadryl at the direction of a physician, again without Haden's consent. Dkt. No. 42 at 13; Dkt. No. 84-21 at 56; Dkt. No. 84-24 at 21. Plaintiff suffered, inter alia, shoulder injuries as a result of the assault. Dkt. No. 84-21 at 56, 85, 93; see also Dkt. No. 42 at 14.

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 83 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

7       The clerk of the court is respectfully directed to
        modify the docket in this matter to reflect that the
        correct spelling of this individual's last name is
        "Simpkins." *See* Dkt. No. 85 at 43.

**\*3**  Immediately after the incident, plaintiff was again placed
under constant observation. Dkt. No. 84-24 at 16; *see also*
Dkt. No. 42 at 13; Dkt. No. 54-21 at 57. He was taken off of
constant observation on the morning of August 21, 2012, and
placed on room MOD. *Id.* at 17.

The August 20, 2012 incident was investigated by Risk
Management at the CNYPC. Dkt. No. 84-26 at 2-3; *see
also* Dkt. No. 84-28. The investigation failed to substantiate
plaintiff's claims or reveal the existence of any potentially
criminal conduct. Dkt. No. 84-26 at 4.

### C. August 24, 2012 Incident

On August 24, 2012, while on unit MOD status, plaintiff
became involved in another physical altercation with
defendant Hellinger. Dkt. No. 42 at 17; Dkt. No. 84-21 at 94;
Dkt. No. 84-24 at 17. An emergency response team arrived
and restrained plaintiff to a bed for a period of approximately
two hours. Dkt. No. 42 at 17; Dkt. No. 84-21 at 96-97.
Plaintiff was placed on constant observation until August 29,
2012. Dkt. No. 84-21 at 97; Dkt. No. 84-24 at 17-18.

### D. September 22, 2012 Incident

Plaintiff again became involved in a physical confrontation
with staff members on September 22, 2012; that incident
stemmed from an earlier interaction with defendant SCTA
Tom Box on September 19, 2012. Dkt. No. 42 at 18; Dkt. No.
84-21 at 107; *see also* Dkt. No. 84-26 at 3. Plaintiff contends
that, after filing a complaint at the CNYPC alleging that
he had been threatened by defendant Box on September 19,
2012, he was assaulted by Box three days later on September
22, 2012. [8] Dkt. No. 42 at 18; Dkt. No. 84-21 at 107-09; *see
also* Dkt. No. 84-26 at 3. Plaintiff was placed in room MOD
immediately following the incident, and then placed in unit
MOD on September 24, 2012, where he remained through
approximately October 17, 2012. Dkt. No. 85 at 110-78.

8       According to defendants, an investigation into the
        incident revealed that plaintiff attempted to stab
        defendant Box with a ball point pen. Dkt. No. 84-26
        at 3.

### E. June 20, 2013 Incident

On June 20, 2013, while plaintiff was getting dressed,
defendant SCTA John Santamassino assaulted him. Dkt. No.
42 at 20; Dkt. No. 84-21 at 132-35. While the assault was
underway, defendant SCTA David Paulson responded to the
scene and, according to plaintiff, began punching him. Dkt.
No. 42 at 20-21; Dkt. No. 84-21 at 137-38. After plaintiff
was restrained and placed on constant observation, defendant
Kuntz threatened him with further physical harm. Dkt. No. 42
at 21; Dkt. No. 84-21 at 143. Plaintiff remained on constant
observation until June 24, 2013, at which time he was placed
in MOD for another twenty-eight days. [9] Dkt. No. 85 at
196-226.

9       It is not clear from the record whether plaintiff was
        placed in room, unit, or program MOD on June 24,
        2013.

This incident was also the subject of the investigation by
Risk Management. Dkt. No. 42 at 21; Dkt. No. 84-26 at 4;
Dkt. No. 84-29. The investigation revealed that plaintiff was
subjected to psychological abuse on June 20, 2013. Dkt. No.
84-26 at 4. Plaintiff also reported the incident to the New
York State Police, who, after an investigation, concluded that
plaintiff had provided false statements and charged plaintiff
accordingly. Dkt. No. 84-29 at 20.

### F. History of Medical Treatment Regarding Plaintiff's
### Shoulders

**\*4**  Beginning as early as February 2012, plaintiff
complained to medical personnel at the CNYPC of bilateral
shoulder pain. *See, e.g.*, Dkt. No. 85 at 1. Defendant Richard
Kaskiw, a medical doctor employed at the CNYPC, ordered
an x-ray of plaintiff's left humerus on February 24, 2012. Dkt.
No. 84-24 at 4. The x-ray revealed no fractures, dislocations,
or abnormalities. *Id.*; Dkt. No. 85 at 1. On March 1, 2012, in
response to plaintiff's complaints of left shoulder pain, he was
provided Tylenol for relief. Dkt. No. 85 at 37. Following the
incident on August 20, 2012, plaintiff again complained of
left shoulder pain and was provided Naprosyn. *Id.* at 46. On
August 26, 2012, plaintiff complained of bilateral shoulder
pain. *Id.* at 79. It does not appear that plaintiff received
any treatment on that date. *Id.* Plaintiff refused Tylenol on
September 3, 2012, when he complained again of bilateral
shoulder pain. *Id.* at 103.

On September 5, 2012, plaintiff was prescribed physical
therapy one-to-two times per week for his left shoulder pain.

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 84 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

Dkt. No. 85 at 104. After four physical therapy sessions, plaintiff showed slow progress. *Id.* at 105, 107.

Plaintiff's shoulders were x-rayed again on September 21, 2012, upon the referral of defendant Kaskiw. Dkt. No. 85 at 108, 109. Plaintiff's right shoulder showed no fracture and mild degenerative disease. *Id.* Plaintiff's left shoulder showed "mild degenerative change" and "superior subluxation of the humeral head suggesting chronic rotator cuff tear." *Id.* at 109. When plaintiff continued to complain of shoulder pain on September 27, 2012, Gregory Paradis, whose position at the CNYPC is unknown, recommended that plaintiff follow-up with an orthopedic surgeon to address a possible torn rotator cuff. *Id.* at 128, 130.

Following plaintiff's annual physical examination, conducted on October 5, 2012, a request for a consultation was made to address his bilateral shoulder pain. [10] Dkt. No. 85 at 162-66. Dr. Bhatt saw plaintiff on November 15, 2012, and administered a steroid injection in his left shoulder and suggested that an additional x-ray of the right shoulder be conducted. *Id.* at 177; *see also* Dkt. No. 84-24 at 5. Defendant Kaskiw subsequently reviewed the report of the consultation and, on November 19, 2012, issued an order for the recommended x-ray. Dkt. No. 85 at 179; *see also* Dkt. No. 84-24 at 5. While the x-ray was scheduled for December 1, 2012, plaintiff refused the examination on that date, demanding that both shoulders be x-rayed. [11] Dkt. No. 85 at 180-81.

[10]   The quality of the photocopy of the consultation request submitted by defendants does not permit me to discern who signed the request. Dkt. No. 85 at 166.

[11]   In his response to defendants' statement of undisputed material facts, plaintiff denies that he refused the scheduled x-ray. Dkt. No. 94 at 5. There is no citation to the record to support this denial, however, nor has plaintiff submitted an affidavit to that effect. *Id.*

On December 13, 2012, Dr. Bhatt again examined plaintiff, reviewed the x-rays from September 21, 2012, and recommended that magnetic resonance imaging ("MRI") testing of plaintiff's left shoulder be conducted as soon as possible. Dkt. No. 85 at 182; *see also* Dkt. No. 84-24 at 5-6. Both of plaintiff's shoulders were x-rayed again on January 4, 2013. Dkt. No. 85 at 183. The x-ray report noted

that there were "mild degenerative changes ..., no fracture, dislocation or destructive changes" to plaintiff's right shoulder as compared to the x-rays taken on September 21, 2012. *Id.* With respect to the left shoulder, the report noted "mild degenerative changes[,] no fracture or dislocation." *Id.*

The record reveals that, on January 9, 2013, and January 23, 2013, plaintiff was observed engaging in strenuous physical activity, including 200 jumping jacks, sprinting, aggressive one-on-one basketball, push-ups, pull-ups, bicep curls, and shoulder shrugs. *Id.* at 185-86, 189. On January 18, 2013, plaintiff received Tylenol for his shoulder pain. *Id.* at 187. According to defendant Pavlot's progress note dated January 23, 2013, plaintiff requested Tylenol only three times in one month. *Id.* at 189. Based upon plaintiff's physical activity and limited need for pain medication, defendant Kaskiw discontinued the planned MRI of plaintiff's left shoulder. *Id.* at 298; *see also* Dkt. No. 84-24 at 6. Defendant Kaskiw discussed plaintiff's activity level with him on February 6, 2013, and explained to plaintiff that his symptoms did not warrant an MRI. Dkt. No. 85 at 299. On the same date, defendant Kaskiw conferred with Dr. Bhatt regarding the MRI, and in defendant Kaskiw's progress note he indicates that Dr. Bhatt "agree[d] the MRI [was] not indicated at [that] time." *Id.*

**\*5** Defendant Kaskiw requested another orthopedic consultation for plaintiff on April 23, 2013. Dkt. No. 85 at 191. On June 6, 2013, Dr. Bhatt examined plaintiff and recommended that MRI testing of plaintiff's left shoulder be conducted. *Id.* at 192. Defendant Kaskiw ordered the MRI on the same day, which was performed on July 11, 2013. *Id.* at 193, 230. The MRI disclosed a rotator cuff tear. *Id.* at 230, 231. Although plaintiff was advised that an operation might not be successful, he ultimately opted to proceed with arthroscopic surgery, which was performed on October 15, 2013. [12] *Id.* at 232-34, 237, 242-44. Although the surgery revealed no repairable tissue, *id.* at 266, upon a follow-up examination with Dr. Bhatt, plaintiff was found to be doing well. *Id.* at 247.

[12]   Plaintiff's surgery was originally scheduled for October 3, 2013, but it was cancelled by the hospital because a "previous case ran late." Dkt. No. 85 at 241.

Following the surgery on his left shoulder, plaintiff continued to lodge complaints about right shoulder pain. An MRI of plaintiff's right shoulder was administered on December 18,

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 85 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

2013, revealing "a full-thickness tear of the supraspinatus tendon extending to involve the anterior portion of the infraspinatus tendon with tendon retraction and with atrophy of the belly of the supraspinatus muscle[.]" Dkt. No. 85 at 251. The MRI testing also revealed degenerative changes in the plaintiff's AC joint, and the possibility of labral tears. Id.

Defendant Kaskiw subsequently made arrangements for plaintiff to be examined at State University of New York Upstate Orthopedics ("Upstate Orthopedics") on several occasions, including by Drs. Scuderi and Setter and Physician Assistant ("PA") Bowser, beginning in February 2014. Dkt. No. 85 at 257, 259, 265-68, 275-84. During a visit to Upstate Orthopedics in April 2014, plaintiff was told that "there is nothing they can do for his shoulder." Id. at 276. During an examination in August 2014, however, Dr. Setter concluded that plaintiff would be a candidate for reverse shoulder replacement with respect to his left shoulder, and an additional MRI could be performed on his right shoulder to determine if arthroscopic surgery was appropriate. Id. at 283. Plaintiff opted to "hold off any surgery" at that time. Id. As of the date of defendants' pending motion, it does not appear that any definitive decisions had been reached concerning the appropriate course of action moving forward.

II. PROCEDURAL HISTORY

Plaintiff commenced this action on or about March 24, 2014, and, after a series of initial rulings by the court, filed an amended complaint, the currently operative pleading, on or about January 13, 2015. Dkt. Nos. 1, 42. Named as defendants in plaintiff's amended complaint are the following CNYPC employees:

| Name | Position |
| --- | --- |
| Karl Hellinger | SCTA |
| Maura Pavlot | Registered Nurse |
| Jason Searcy | SCTA |
| David Sill | SCTA |
| Eric Fical | SCTA |
| Daniel Simpkins | Registered Nurse |
| Elizabeth Farnum | Psychiatrist |
| Quaseem Piracha | SCTA |
| James Morgan | Treatment Team Leader |
| Thomas Box | SCTA |
| Cindy Comstock | Nurse Administrator |
| Charmaine Bill | Treatment Team Leader |
| John Santamassino | SCTA |
| David Paulson | SCTA |
| Hans Kuntz | SCTA |
| Anthony Gonzalez | Director of Risk Management |
| Richard Kaskiw | Medical Doctor |
| Jeff Nowicki | Chief of Mental Health Services |

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

<u>Dkt. No. 42 at 2-6</u>. His amended complaint asserts claims (1) against defendants Hellinger, Pavlot, Morgan, Searcy, Sill, Farnum, Fical, Simpkins, Piracha, Gonzalez, Box, Comstock, Santamassino, Paulson, Kuntz, and Bill based upon their alleged physical and psychological abuse, in violation of the Fourteenth Amendment; (2) against defendants Farnum, Pavlot, Simpkins, and Kaskiw for failing to provide adequate medical treatment and care, including injecting plaintiff with alleged psychotropic drugs without his consent, also in violation of the Fourteenth Amendment; (3) against defendants Hellinger, Searcy, Sill, Fical, Simpkins, Piracha, Santamassino, Box, and Kuntz for retaliating against him for filing complaints at the CNYPC regarding alleged mistreatment, in violation of the First and Fourteenth Amendments; and (4) against defendants Nowicki, Gonzalez, Morgan, and Bill for failing to take appropriate action to address the constitutional deprivations, in violations of the First and Fourteenth Amendments. [13] <u>Dkt. No. 42 at 24-26</u>. Liberally construed, plaintiff's amended complaint also asserts a conditions of confinement cause of action arising under the Fourteenth Amendment. *See, e.g., id.* at 9.

[13]      In his opposition to defendants' motion, plaintiff appears to assert that his rights to procedural due process were violated by his placement in isolation without being afforded necessary process envisioned under the Fourteenth Amendment. <u>Dkt. No. 94-1 at 4-5</u>, 6. A close reading of plaintiff's second amended complaint, however, fails to disclose the existence of a procedural due process cause of action. *See generally* <u>Dkt. No. 42</u>. To the extent plaintiff's second amended complaint could be construed as asserting a procedural due process claim, however, it would nonetheless fail because there is no authority in this circuit for the proposition that plaintiff has a liberty interest in being assigned to any particular status at the CNYPC. *Smith v. Hogan*, No. 09-CV-0554, 2011 WL 4343978, at *10 (N.D.N.Y. Aug. 1, 2011) (Lowe, M.J.), *report and recommendation adopted by* 2011 WL 4343809 (N.D.N.Y. Sept. 14, 2011) (Suddaby, C.J.), (citing *Groves v. N.Y.*, No. 09-CV-0412, 2010 WL 1257858, at *8-10 (N.D.N.Y. Mar. 1, 2010) (Peebles, M.J.)).

**\*6** On October 23, 2015, following the close of discovery, defendants moved for the entry of partial summary judgment. <u>Dkt. No. 84</u>. In their motion, which seeks dismissal of certain of plaintiff's claims, defendants have argued that (1) plaintiff's deliberate medical indifference claims are subject to dismissal for failure to satisfy the objective and subjective requirements for establishing such a claim; (2) plaintiff's conditions of confinement claims are subject to dismissal as a matter of law; (3) plaintiff's claims against defendants Nowicki, Gonzalez, Morgan, Bill, Farnum, Comstock, Piracha, and Kuntz are subject to dismissal based upon their failure to establish their personal involvement in the constitutional deprivations alleged; (4) plaintiff's retaliation claims lack merit as a matter of law, and are unduly conclusory and speculative; (5) plaintiff's damage claims against the defendants in their official capacities are subject to dismissal under the Eleventh Amendment; and (6) defendants are entitled to qualified immunity. *See generally* <u>Dkt. No. 84-1</u>. In essence, defendants request that the court enter judgment dismissing all of plaintiff's claims with the exception of those in which he alleges the use of excessive force. *Id.* at 3. On January 11, 2016, plaintiff responded in opposition to defendants' partial summary judgment motion. <u>Dkt. No. 94</u>. Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. §§ 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Defendant John Santamassino

Among the defendants named in plaintiff's amended complaint is John Santamassino, who, at the relevant times, was an SCTA at the CNYPC. Dkt. No. 42 at 4. The summons issued for that individual, however, was returned unexecuted on or about September 10, 2014. Dkt. No. 26. On September 17, 2014, plaintiff requested an extension of time to complete service upon defendants Santamassino and Piracha. Dkt. No. 30. The request was denied as moot, however, because, on September 10, 2014, an answer was filed on behalf of all named defendants, including defendants Santamassino and Piracaha. Dkt. Nos. 28, 31. According to defendants' counsel, the filing of an answer on behalf of defendants Santamassino and Piracha, who had not yet been served and therefore had not yet requested representation, was inadvertent. Dkt. No. 32. That oversight was rectified on January 27, 2015, by the filing of an answer to the amended complaint, which had been filed by plaintiff in the interim.[14] Dkt. No. 44.

[14]    Defendant Piracha was served in the action on December 14, 2014. Dkt. No. 40.

**\*7** Following an inquiry by the court to defendants' counsel as to whether the Office of the New York State Attorney General was authorized to accept service on behalf of defendant Santamassino, Dkt. No. 47, defendants' counsel responded on February 5, 2015, advising that the office was not authorized to accept service on his behalf and provided his last-known address to assist plaintiff in serving

him.[15] Dkt. Nos. 48, 49. The court reissued a summons as to defendant Santamassino on February 6, 2015. Dkt. No. 50. The summons, which was sent to the address provided by defendants' counsel, together with a request for acknowledgment of service, however, was returned as undeliverable with a notation "not at this address." Dkt. No. 58.

[15]    In order to clarify the fact that the Office of the New York State Attorney General was not authorized to represent defendants Santamassino, who has yet to appear in the action, a text order was issued on August 26, 2015, granting an oral application by the defendants' counsel to withdraw as attorney of record for that defendant. Dkt. No. 77.

Plaintiff thereafter filed a letter with the court requesting a status update regarding the service of defendant Santamassino. Dkt. No. 60. On April 1, 2015, I issued a text order informing plaintiff that, according to the docket, "defendant John Santamassino is no longer employed at CNYPC" and that service upon that individual had been unsuccessful. Dkt. No. 61. The court advised plaintiff that, because "defendant Santamassino is no longer employed by CNYPC and defendants' counsel does not have within their possession, custody, or control any information for locating and serving this defendant, the court cannot offer advice to the plaintiff on how to litigate this matter regarding service upon this individual." *Id.*

On September 28, 2015, plaintiff submitted a written request that the United States Marshal Service serve defendant Santamassino at a new address provided by the plaintiff. Dkt. No. 81. That request was granted by text order issued on September 28, 2015, Dkt. No. 82, and a summons was reissued to that defendant on the same day. Dkt. No. 83. The summons was again returned unexecuted on December 7, 2015. Dkt. No. 89.

When this action was filed, Rule 4(m) of the Federal Rules of Civil Procedure authorized "the court—on motion or on its own after notice to the plaintiff"—to dismiss a plaintiff's claims against a defendant where a summons and complaint were not served upon that party within 120 days after filing of the complaint, absent a showing of good cause.[16] Fed. R. Civ. P. 4(m); *see also Shuster v. Nassau Cnty.*, No. 96-CV-3635, 1999 WL 9847, at \*1 (S.D.N.Y. Jan. 11, 1999) ("Rule 4(m) authorizes a court upon a motion to dismiss an action without prejudice as against a defendant if service of the summons and

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 88 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

complaint is not made upon that defendant within 120 days after the filing of the complaint."); [17] *Romand v. Zimmerman, 881 F. Supp. 806, 809 (N.D.N.Y. 1995)* (McAvoy, J.) ("[T]he 120-day filing requirement applies to pro se plaintiffs as well as those represented by counsel."). This is because when named defendants have not been served or otherwise appeared in the action within this time period, the court does not acquire jurisdiction over them. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1282 (S.D.N.Y. 1989)* (citing *Miss. Publ'g Corp. v. Murphree, 326 U.S. 438, 444-45 (1946)*).

[16] Effective on December 1, 2015, Rule 4(m) was amended to require service of a summons within ninety days. It should be noted, moreover, that the period specified in Rule 4(m) is further restricted by the local rules of this court, which require that service be effectuated within sixty days. N.D.N.Y. L.R. 4.1(b).

[17] All unreported cases cited to in this report have been appended for the convenience of the *pro se* plaintiff.

**\*8** Upon a showing of good cause, the time for service must be extended. *Panaras v. Liquid Carbonic Indus. Corp., 94 F.3d 338, 340 (7th Cir. 1996).* "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Panaras, 94 F.3d at 340* (citing Fed. R. Civ. P. 4(m)); *see also Zapata v. City of N.Y., 502 F.3d 192, 196 (2d Cir. 2007)* ("We hold that district courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc., 807 F.2d 309, 311 (2d Cir. 1986).* When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *Zapata, 502 F.3d at 197.*

As was explained in detail above, plaintiff has had ample opportunity to locate and serve defendant Santamassino in this action. There is no indication that plaintiff has made any further attempts after his last effort to serve that individual failed in December 2015. In addition, both the court and defendants' counsel have assisted plaintiff in his efforts to locate defendant Santamassino, to no avail. Accordingly, dismissal of plaintiff's claims against defendant Santamassino appears to be appropriate at this juncture. Before *sua sponte*

dismissal, however, Rule 4 requires the court provide plaintiff with notice of that possibility. *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant[.]"); *see also Thompson v. Maldonado, 309 F.3d 107, 110 (2d Cir. 2002)* ("Because [the plaintiff] was not given prior notice and was, therefore, precluded from attempting to show good cause for his failure to serve process ..., the District Court's dismissal violated [Rule 4(m) ]."). For that reason, plaintiff is notified of my recommendation that, unless he provides good cause for his failure to serve defendant Santamassino during the objection period following the issuance of this report, his claims against that individual should be dismissed without prejudice.

C. Plaintiff's Deliberate Medical Indifference Claims

Liberally construed, plaintiff's deliberate medical indifference claim has three components. First, he accuses defendant Kaskiw of not providing him with adequate medical care for his shoulders. *See* Dkt. No. 84-21 at 160. Second, plaintiff contends that defendants Pavlot and Simpkins provided inadequate medical care when they allegedly injected him with medication without his consent. Dkt. No. 42 at 8, 13, 25-26; Dkt. No. 84-21 at 41. Lastly, plaintiff maintains that defendant Farnum ignored his need for medical treatment after sustaining injuries during the August 20, 2012 incident. Dkt. No. 42 at 13; Dkt. No. 84-21 at 53.

As a civilly committed resident at the CNYPC, plaintiff is not entitled to the protections afforded by the Eighth Amendment. *Youngberg v. Romeo, 457 U.S. 307, 312 (1982).* He is, however, entitled to the substantive due process protections afforded by the Fourteenth Amendment, which include a guaranty of certain minimal levels of medical treatment. *See, e.g., Youngberg, 457 U.S. at 315-16* ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed—who may not be punished at all—in unsafe conditions."). The standard governing medical indifference claims brought by civilly committed individuals, like the plaintiff in this case, is the same as the one applicable to medical claims asserted by convicted prisoners and pretrial detainees. *See, e.g., Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009)* ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health and safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."); *see also Ahlers*

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

*v. Kaskiw*, No. 12-CV-0501, 2014 WL 4184752, at *4-6 (N.D.N.Y. Aug. 21, 2014) (Sharpe, J., *adopting report and recommendation by* Baxter, M.J.) (concluding that *Youngberg* did not mandate a different standard for medical claims brought by civil detainees as compared to those brought by pretrial detainees or convicted prisoners).

**\*9** A claim that officials have been deliberately indifferent to an individual's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by [the individual] due to the challenged deprivation of care, rather than the severity of [his] underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

"Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

### 1. Defendant Kaskiw

It appears from plaintiff's amended complaint that his medical indifference claim against defendant kaskiw is based upon allegations that defendant Kaskiw (1) "failed to forward X-rays of plaint's [sic] shoulders to Dr. Bhatt" on November 16, 2012; (2) delayed in ordering an MRI of plaintiff's left shoulder as recommended by Dr. Bhatt on December 15, 2012; and (3) failed to schedule shoulder replacement surgery for plaintiff's left shoulder as recommended by Dr. Bowser in August 2014. Dkt. No. 42 at 16, 22.

#### a. Failure to Forward X-ray Films

Plaintiff's medical records do not substantiate plaintiff's claim that defendant Kaskiw failed to forward x-rays to Dr. Bhatt on November 16, 2012. No mention is made by Dr. Bhatt in his November 15, 2012 report of not having reviewed plaintiff's shoulder x-rays. Dkt. No. 85 at 167. While it appears that Dr. Bhatt recommended a right shoulder x-ray on November 15, 2012, plaintiff refused to submit to an x-ray examination on December 1, 2012.[18] *Id.* at 167; Dkt. No. 42 at 15. In addition, it is uncontroverted that Dr. Bhatt examined plaintiff on December 13, 2012, at which time he reviewed both of the shoulder x-rays performed on September 21, 2012. *Id.* at 182. Even assuming *arguendo* that the delay occurred as alleged by plaintiff, however, there is no record evidence giving rise to a genuine dispute of material fact regarding whether defendant Kaskiw failed to forward the x-rays with the requisite deliberate indifference in light of the treatment plaintiff had received for his shoulder pain up until that time, which included pain medication, physical therapy, x-rays, and an orthopedic consult. *See, e.g., id.* at 59, 104-05, 107, 109, 162-66.

18    Plaintiff alleges that he refused the x-ray because he had "endure[d] a large number of X-rays ... and began to become cautious of having to have to [sic] much radiation." Dkt. No. 42 at 15.

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

### b. Delay in Conducting MRI of Left Shoulder

**\*10** Following Dr. Bhatt's examination of plaintiff on December 13, 2012, he recommended that an MRI be performed "as soon as possible" on plaintiff's left shoulder to rule out a rotator cuff tear. Dkt. No. 85 at 182. According to a progress note dated January 28, 2013, defendant Kaskiw had scheduled an MRI as recommended by Dr. Bhatt but canceled it because of reports from CNYPC staff that plaintiff had been engaged in weight lifting and aggressive athletic activity. *Id.* at 298. Six days later, defendant Kaskiw met with plaintiff to discuss his activity level as observed by staff. *Id.* at 299. Defendant Kaskiw's progress note regarding that discussion indicates that plaintiff became upset, demanded an MRI, and left the visit angry. *Id.* Defendant Kaskiw immediately consulted with Dr. Bhatt about his decision to cancel the MRI in light of plaintiff's activity, and Dr. Bhatt is reported to have "agreed [that] the MRI is not indicated at present time." *Id.* It is clear from those exchanges that plaintiff's complaint regarding the canceled MRI represents a classic disagreement as to the appropriate medical care, which does not give rise to a deliberate indifference cause of action and is therefore not cognizable. *See Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("But the question [of] whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a "classic" example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not [give rise to a section 1983 claim]."); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim.").

### c. Failure to Schedule Recommended Shoulder Replacement

Plaintiff alleges that he was seen by PA Bowser, an outside specialist, on or about August 25, 2014, and, at the time, a possible shoulder replacement was recommended. Dkt. No. 42 at 16. He claims that despite this recommendation, "the medical department at CNYPC never scheduled it because they claim not to know anything of it." *Id.* While plaintiff's medical records support plaintiff's allegation that PA Bowser indicated that plaintiff would "be a candidate for a reverse [left] shoulder replacement," PA Bowser also noted that, during the same appointment in which he rendered that recommendation, plaintiff opted "to hold off any surgery[.]" Dkt. No. 85 at 283. Accordingly, any allegation that CNYPC medical staff violated any of plaintiff's constitutional rights

by failing to follow-up with PA Bowser's recommendation is not supported by the record. In any event, there is no evidence that anyone in particular at CNYPC, much less defendant Kaskiw, was involved in ignoring any of PA Bowser's recommendations for treatment. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.").

For all of the reasons discussed above, I recommend that defendants' motion for summary judgment be granted with respect to defendant Kaskiw, and that all claims asserted against that individual be dismissed.

### 2. Defendants Pavlot and Simpkins

Plaintiff has also asserted medical indifference claims against defendants Pavlot and Simpkins based upon his allegation that they injected him with psychotropic medications without his consent on two occasions. *See, e.g.,* Dkt. No. 42 at 8, 13, 25-26; Dkt. No. 84-21 at 41. It is well established that psychiatric patients have "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *see also Kulak v. City of N.Y.*, 88 F.3d 63, 74 (2d Cir. 1996) ("It is a firmly established principle of the common law of New York that every individual of adult years and sound mind has a right to determine what shall be done with his own body and to control the course of his medical treatment." (quotation marks omitted)). "Such a right may be set aside only in narrow circumstances, including those where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." *Kulak*, 88 F.3d at 74 (quotation marks omitted).

Plaintiff's medical records reveal that, following the February 20, 2012 incident, defendant Pavlot injected plaintiff with a combination of Benadryl and Ativan, neither of which is a psychotropic drug.[19] Dkt. No. 84-24 at 21; Dkt. No. 85 at 2-3. On August 20, 2012, defendant Simpkins injected plaintiff with Haldol, a psychotropic drug, in combination with Ativan and Benadryl. Dkt. No. 85 at 39, 43. With respect to both incidents, there are genuine disputes of material fact that exist within the record evidence regarding whether plaintiff became a danger to himself or others. Plaintiff alleges in his amended complaint, and testified during his deposition, that, in both instances, he did not instigate the

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

physical altercations nor did he resist once force was used upon him. *See, e.g.*, Dkt. No. 42 at 7-8, 10-11; Dkt. No. 84-21 at 17-19, 52-56. In contrast to those allegations are plaintiff's medical records, which describe the plaintiff as having been volatile and assaultive during the incidents. *See, e.g.*, Dkt. No. 85 at 2-3, 39, 43. While there is some evidence that defendant Pavlot administered Benadryl and Ativan on February 20, 2012, at the direction of a physician in accordance with a CNYPC policy,[20] Dkt. No. 85 at 2-3, only Dr. Colosi's affidavit obliquely suggests that defendant Simpkins administered Haldol, Benadryl, and Ativan to plaintiff on August 20, 2012, pursuant to that policy. Dkt. No. 84-24 at 21; *see also* Dkt. No. 85 at 39, 43. Indeed, the CNYPC form documenting the intervention exercised on August 20, 2012, does not indicate the "Name of Physician Called," Dkt. No. 85 at 39, and Dr. Colosi similarly failed to identify the physician consulted before the drugs were administered to plaintiff on that date, Dkt. No. 84-24 at 21. Even assuming that a physician did authorize CNYPC staff to inject plaintiff with the medications, however, there is no evidence describing the information the physician considered in rendering his decision. Moreover, even if a physician was consulted, it does not resolve the dispute regarding whether plaintiff became a danger to himself or others, which would otherwise justify the medical intervention at issue. Accordingly, I recommend the court deny defendants' motion for partial summary judgment with respect to defendants Pavlot and Simpkins.[21]

[19]  It appears that, by its statutory scheme, New York has created a liberty interest applicable to psychiatric patients to control their medical treatment, regardless of the nature of the medication or medical procedure. *See* N.Y.C.C.R.R. § 527.8(c) ("Patients who object to any proposed medical treatment or procedure ... may not be treated over their objection except ... where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing that dangerousness."); *accord, Kulak,* 88 F.3d at 74. Thus, the analysis of plaintiff's claim against defendant Pavlot does not turn on whether he was in fact injected with a psychotropic drug.

[20]  A copy of the policy has not been included in defendants' submission in support of the pending motion.

[21]  Defendants Pavlot and Simpkins are not entitled to qualified immunity at this juncture in light of the competing evidence regarding plaintiff's conduct during the February 20, 2012 incident and August 20, 2012 incident. As was noted above, it is well established that psychiatric patients have a due process right to refuse medical intervention absent circumstances where they become a danger to themselves or others. *Washington,* 494 U.S. at 221-22. Defendants do not dispute that plaintiff did not consent to the administration of the drugs. Thus, the question in this case regarding qualified immunity is whether defendants Pavlot and Simpkins believed that their conduct was objectively reasonable and not in violation of any of plaintiff's established constitutional rights. In the event a factfinder credits plaintiff's version of the events, however, no official could believe that administering medication to plaintiff without his consent did not violate his rights.

### 3. Defendant Farnum

**\*11** Plaintiff alleges that defendant Farnum, a psychiatrist, entered his room on August 21, 2012, but failed to render medical treatment for his physical injuries.[22] Dkt. No. 42 at 13; Dkt. No. 84-21 at 53. Although plaintiff alleges he was "bloody" from the physical altercation, his medical records from that date indicate that he complained only of shoulder pain and was noted to have "erythema L outer orbit." Dkt. No. 85 at 43. Plaintiff refused medical treatment after the incident. *Id.* In light of the well-documented and ongoing treatment plaintiff received for his shoulders during the relevant time period, and the vague allegations regarding plaintiff's other injuries suffered during the August 20, 2012 incident, I recommend dismissal of plaintiff's medical indifference claim asserted against defendant Farnum. In my view, no reasonable factfinder could conclude that defendant Farnum ignored a serious medical condition with deliberate indifference to plaintiff's healthy and safety.

[22]  Plaintiff also alleges that defendant Farnum directed that plaintiff be placed in a side room following the August 20, 2012 incident, and that he strip down to his underwear. Dkt. No. 84-21 at 53. This allegation, on its own, is not sufficient to give rise to a cognizable constitutional claim. *See, e.g., Holland v. City of N.Y.,* —— F.3d ——, No.

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 92 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

14-CV-5517, 2016 WL 3636249, at *9 (S.D.N.Y. June 24, 2016) ("For challenges to strip searches in particular, ... courts in this Circuit require that a plaintiff allege that the defendants engaged in egregious conduct." (citing cases)).

### D. Conditions of Confinement Claim

Liberally construed, plaintiff's complaint could be construed as asserting a claim challenging the conditions of his confinement at the CNYPC under the substantive due process clause of the Fourteenth Amendment. *See, e.g., Gallagher v. Sullivan,* No. 15-CV-1327, 2016 WL 4146128, at *4 (N.D.N.Y. Aug. 4, 2016) (McAvoy, J.) (analyzing a conditions of confinement claim asserted by a civil detainee under the Fourteenth Amendment). More specifically, plaintiff alleges that, while under constant observation or in the MOD program, he was denied various liberties, including access to a telephone and mail, recreation, communication with friends and family, writing materials, and, in one instance, hygienic living conditions. *See, e.g.,* Dkt. No. 42 at 9, 13, 19.

It is well established that involuntarily committed civil detainees enjoy "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg,* 457 U.S. at 321. Due process "requires that the conditions and duration of confinement [of civil detainees] bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young,* 531 U.S. 250, 265 (2001). In determining whether a plaintiff's rights have been violated, a court must balance "the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints." *Youngberg,* 457 U.S. at 321. In doing so, courts must "make certain that professional judgment ... was exercised." *Id.*

According to plaintiff's medical records, he was placed under constant observation and/or into the MOD program after the incidents on February 20, 2012, August 20, 2012, August 24, 2012, September 22, 2012, and June 20, 2013. On February 20, 2012, Dr. Hernandez ordered plaintiff on constant observation. Dkt. No. 85 at 3. Plaintiff remained under observation until February 24, 2012. *Id.* at 36. During the period of observation, plaintiff was given a mattress, used the bathroom regularly, visited with Risk Management and medical providers, ate his meals, was provided a pen and pain medications, made a legal phone call, and showered. *Id.* at 3-36.

At approximately 11:45PM on August 20, 2012, plaintiff was placed on constant observation. Dkt. No. 85 at 40. He was restrained just after midnight because it is alleged that he assaulted defendant Fical. *Id.* at 41, 43. At 2:00AM on August 21, 2012, plaintiff was released from the restraints and fell asleep on a mattress. *Id.* at 41. At approximately 10:30AM, plaintiff was removed from constant observation and placed on room MOD. *Id.* at 45. While on room MOD, plaintiff ate his meals, visited with Risk Management and his treatment team leader, was provided medical care and an opportunity for a half hour of recreation, and showered. *Id.* at 47-49.

**\*12** During the afternoon on August 23, 2012, plaintiff was placed on unit MOD. Dkt. No. 85 at 52-53. Plaintiff was seen by medical providers, spent a half hour in the dayroom, used the bathroom, and ate his meals. *Id.* at 52-54. Plaintiff returned to constant observation on August 24, 2012, however, after he allegedly attacked defendant Hellinger. *Id.* at 55-59. While on constant observation between August 24, 2012 and August 29, 2012, plaintiff received a mattress, met with Risk Management, used the bathroom regularly, was treated by medical providers, used the telephone, showered, received mail, had access to a pen, and ate his meals. *Id.* at 57-96.

At approximately 9:00AM on August 29, 2012, plaintiff's status was changed to room MOD, and he was restricted to leaving his room only for use of the bathroom, telephone, and shower. Dkt. No. 85 at 97. On August 31, 2012, he was upgraded to unit MOD, and was permitted to use the dayroom and participate in off-ward activities. *Id.* at 100. Plaintiff received a visitor on September 1, 2012. *Id.*

Although it is unclear based on plaintiff's medical records when he was removed from unit MOD status, when plaintiff became involved in another physical altercation with staff on September 22, 2012, he was immediately transferred to a different ward for "[a]lternate housing" and placed in room MOD until September 24, 2012, at which time he was again placed in unit MOD. Dkt. No. 85 at 110-19. While in unit MOD, plaintiff had access to his mail, the telephone for legal business, a pen, and the dayroom. *Id.* at 119-78. In addition, plaintiff regularly used the bathroom and was granted access to the dayroom, as well as routinely ate most of his meals. *Id.* Plaintiff remained on unit MOD under these conditions until at least October 17, 2012.

Following another physical altercation with staff on June 20, 2013, plaintiff was again placed on constant observation.

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 93 of 143
Haden v. Hellinger, Not Reported in Fed. Supp. (2016)
2016 WL 8673144

Dkt. No. 85 at 196. Plaintiff was placed on a different ward for "alternate sleep"[23] on June 23, 2013. *Id.* at 220. While on constant observation, plaintiff used the bathroom regularly, visited with a psychiatrist and his treatment team leader, showered, ate his meals, attended to legal matters, and received medical treatment. *Id.* at 196-225. Plaintiff was removed from constant observation at 9:00AM on June 24, 2012. *Id.* at 225.

23    There is nothing in the record that explains what types of conditions accompany "alternate housing" or "alternate sleep," or under what circumstances they are implemented.

The above-described medical records overwhelmingly contradict plaintiff's allegations that he "was not allowed to receive mail, had no access to the phone, had no access to any type of recreation or outdoor exercise, had no access to his attorney, any other communication with his family, friends or loved ones[, h]ad very limited access to the toilet[, and n]o psychiatrist or any other doctor interviewed [him while he was on constant observation]." Dkt. No. 42 at 9; *see also* Dkt. No. 84-21 at 19, 57, 58, 119-20. Aside from plaintiff's allegations, there is no record evidence to support a factfinder's conclusion that plaintiff was deprived of those liberties. It appears that each of plaintiff's periods on constant observation or in the MOD program (either on room or unit MOD) were well documented, and plaintiff was closely monitored. Moreover, plaintiff's medical records support the medical professionals' decisions to place plaintiff on constant observation or in the MOD program. Each time plaintiff was placed in some restricted status, it was prompted by a physical altercation with CNYPC staff. The medical records also reflect that plaintiff was released or upgraded from a particular restricted status after he demonstrated good behavior. While I acknowledge that the parties dispute whether plaintiff or CNYPC staff initiated the physical altercations preceding his placement on restricted status, they seem to agree that, on each occasion, plaintiff was in fact involved in a physical altercation prior to being placed on restricted status. Because the policies governing constant observation and the MOD program are aimed at reducing safety threats, and plaintiff's medical records overwhelmingly reflect that plaintiff's behavior created a safety risk, no reasonable factfinder could conclude, based on all of the record evidence, that the decisions to place him on restricted status were not supported by adequate professional judgment.

**\*13** Similarly, the conditions of confinement experienced by plaintiff on both constant observation and in the MOD program did not deprive him of any constitutional rights. Plaintiff was clearly permitted to use the bathroom and showers; he was provided access to recreation upon demonstrating good behavior, as well as the telephone and mail; and he continued working on his legal matters. Aside from plaintiff's bare allegations contending otherwise, there is no support in the record for his claims that he was deprived of any right that was unreasonably related to the safety risk he posed with his conduct, as documented in his medical records.

Accordingly, I recommend plaintiff's conditions of confinement claim be dismissed. *See Yeldon v. Hogan*, No. 08-CV-0769, 2010 WL 983819, at \*4-5 (N.D.N.Y. Mar. 15, 2010) (Mordue, J., *adopting report and recommendation by* Treece, M.J.), (approving of the MOD program implemented at the CNYPC, finding that, while it imposes "greater liberty restrictions than those imposed upon the general SOTP population, ... the[ ] additional restrictions are [neither] arbitrary nor ... arbitrarily applied").

### E. Personal Involvement

In their motion, defendants argue that plaintiff's claims against defendants Jeff Nowicki, Gonzalez, Morgan, Bill, Farnum, Comstock, Piracha, and Kuntz are subject to dismissal based on the absence of any record evidence demonstrating their personal involvement in the offending conduct. Dkt. No. 84-1 at 16-20.

As was noted above, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright*, 21 F.3d at 501 (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). Indeed, the Supreme Court has noted that a defendant may only be held accountable for his actions under section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. United States Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at \*3 (S.D.N.Y. Jan. 24, 1994).

2016 WL 8673144

Certain of the individuals identified in this portion of defendants' motion have been named by plaintiff because of their roles as supervisors at the CNYPC. It is well-established that a supervisor cannot be liable under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior.*" *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Wright,* 21 F.3d at 501. To establish responsibility on the part of a supervisory official for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501.

## 1. Defendant Nowicki

**\*14** Defendant Nowicki is identified by plaintiff as the Chief of Mental Health Services at the CNYPC. Dkt. No. 42 at 6. Plaintiff's amended complaint does not identify any role defendant Nowicki played in connection with any of the events giving rise to his claims, instead stating, in his sixth cause of action, that Nowicki, along with defendants Gonzalez, Morgan, and Bill, were informed of the violations committed by others against plaintiff but failed to take appropriate action to "stop the violations." Dkt. No. 42 at 26. When asked at his deposition why he is suing defendant Nowicki, plaintiff responded as follows:

> Because he was the Chief of Mental Health Services. He was the supervisor. I wrote him many complaints concerning the fact that I was being abused at this facility physically and mentally. My Mental Hygiene Legal Service lawyer also wrote him many complaints about what was happening to me, and he

> failed miserably in protecting me from the assaults that took place against me.

Dkt. No. 84-21 at 159. Although plaintiff admits that he never spoke with defendant Nowicki directly concerning his grievances, *id.,* the record includes defendant Nowicki's written responses to complaints sent to him by both plaintiff and plaintiff's attorney. Dkt. No. 94-4 at 3, 5, 7, 14, 16, 18, 20, 22, 24, 26. Although supervisory liability cannot be established by lone allegations that a supervisor failed to respond to a grievance, courts in this circuit have held that personal involvement may be found where a supervisor receives, reviews, and responds to a plaintiff's grievance. *See, e.g., Cole v. N.Y.S. Dep't of Corrs. Servs.,* No. 10-CV-1098, 2012 WL 4491825, at \*22 (N.D.N.Y. Aug. 31, 2012) (Dancks, M.J.), *report and recommendation adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.), (finding that the supervisor-defendant's memoranda responding to the plaintiff's complaints were sufficient to establish that defendant's personal involvement); *Bourgoin v. Weir,* No. 10-CV-0391, 2011 WL 4435695, at \*5 (D. Conn. Sept. 23, 2011) ("A supervisor's response to a prisoner's grievance or complaint that attempt[s] to defend or explain alleged constitutional violations is sufficient to establish the personal involvement of that supervisor."). Accordingly, I recommend defendants' motion be denied to the extent it requests dismissal of plaintiff's claims asserted against defendant Nowicki on the basis of lack of personal involvement.

## 2. Defendant Gonzalez

Plaintiff is suing defendant Gonzalez based on his alleged failure to protect him and for not contacting the New York State police after the alleged assaults. Dkt. No. 42 at 26; Dkt. No. 84-21 at 91. The record evidence does not include any evidence from which a reasonable factfinder could conclude that defendant Gonzalez was personally involved in failing to protect plaintiff from harm. The record includes three letters authored by plaintiff's attorney to defendant Gonzalez. [24] Dkt. No. 94-4 at 27, 32-33, 35. One of those letters predates the commencement of this lawsuit, *id.* at 27; one letter involves an allegation of physical abuse by a CNYPC staff member on November 27, 2014, *id.* at 35; and the other letter concerns allegations of mistreatment that occurred after the filing of plaintiff's amended complaint, *id.* at 32-33. In the letter predating the commencement of this action, plaintiff's attorney alleges "that on an unspecified date, TA

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 95 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

Piracha 'threatened' [plaintiff], while he was sitting in a sideroom." *Id.* Verbal threats, however, do not give rise to a cognizable constitutional claim. *See, e.g., Holland*, 2016 WL 3636249, at *10. Moreover, because plaintiff's claims in this matter do not stem from allegations of abuse in November 2014, I find that there is no record evidence from which a reasonable factfinder could conclude that defendant Gonzalez was personally involved in any of the constitutional violations alleged by plaintiff in his amended complaint. For that reason, I recommend that defendants' motion be granted to the extent it requests dismissal of plaintiff's claims asserted against defendant Gonzalez based on lack of personal involvement.

24    Defendant Gonzalez responded to each of the letters. Dkt. No. 94-4 at 31, 34, 36.

### 3. Defendants Morgan and Bill

**\*15** Defendants James Morgan and Charmaine Bill are similarly sued by plaintiff based on allegations that they failed to protect him after the incidents on February 20, 2012 and June 20, 2013 by not contacting the New York State police. Dkt. No. 42 at 8-9, 21; Dkt. No. 84-21 at 46, 146. Although defendants appear to argue that dismissal of plaintiff's claims asserted against defendants Morgan and Bill is appropriate on the basis of lack of personal involvement, they actually seek dismissal of the failure-to-protect claims asserted against those individuals based on their contention that officials cannot be responsible for failing to protect an individual unless they were presented with a reasonable opportunity to intervene to prevent the harm. Dkt. No. 84-1 at 18. This argument stems from the legal standard governing failure-to-protect claims arising in the context of a prison setting. *See Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (finding that a plaintiff asserting a failure to protect claim under the Eighth Amendment must prove that the defendant actually knew of and disregarded an excessive risk of harm to his health and safety).

It remains unclear in this circuit whether the standard applicable to failure-to-protect claims arising under the Eighth Amendment is applicable to similar claims asserted by civil detainees. *See, e.g., Lane v. Carpinello*, No. 07-CV-0751, 2009 WL 3074344, at *19 (N.D.N.Y. Sept. 24, 2009) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.); *accord, Yeldon v. Sawyer*, No. 10-CV-0266, 2012 WL 1995839, at *7 (N.D.N.Y. Apr. 26, 2012) (Treece, M.J.), *report and recommendation adopted*

*by* 2012 WL 1987134 (N.D.N.Y. June 4, 2012) (McAvoy, J.). As has been discussed above, the Supreme Court explained in *Youngberg* that civilly detained individuals are entitled to substantive due process under the Fourteenth Amendment, and that a defendant's conduct violates due process where it "substantial[ly] depart[s] from accepted professional judgment, practice, or standards in the care and treatment of [the individual] as to demonstrate that the defendant[ ] did not base [his] conduct on a professional judgment." *Youngberg*, 457 U.S. at 314 (quotation marks omitted). In the absence of any binding precedent from the Second Circuit, at least one court in this circuit has determined that the *Youngberg* standard does not apply to failure-to-protect claims asserted by civil detainees against "low-level staff members." *Vallen v. Carrol*, No. 02-CV-5666, 2005 WL 2296620, at *8 (S.D.N.Y. Sept. 20, 2005). Defendants Morgan and Bill, however, are identified as Treatment Team Leaders and, at the very least, are supervisory officials. Accordingly, I conclude that the court is bound by *Youngberg*.

Defendants have provided no evidence against which to judge whether refusing to contact the New York State police following two alleged assaults at the CNYPC deviates from accepted practice either at the CNYPC or more generally, and the court is therefore hampered in its ability to apply the *Youngberg* test in connection with plaintiff's claims asserted against defendants Morgan and Bill. In the event plaintiff's version of the events that preceded his encounters with defendants Morgan and Bill are credited, [25] a reasonable factfinder could conclude that a supervisory official at the CNYPC should have contacted the police. Accordingly, I recommend that defendants' motion be denied as to defendants Morgan and Bill to the extent it seeks dismissal of those individuals on the basis of personal involvement.

25    Specifically, plaintiff alleges that defendant Morgan spoke with plaintiff following the February 20, 2012, August 24, 2012, and September 22, 2012 incidents, where plaintiff alleges that he was assaulted by defendant Hellinger, Kuntz, and Box. Dkt. No. 42 at 8-9, 17, 19. Similarly, plaintiff alleges that defendant Bill responded to the use-of-force incident on June 20, 2013, during which defendants Santamassino and Paulson allegedly assaulted plaintiff. *Id.* at 21.

### 4. Defendant Farnum

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 96 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

**\*16** Plaintiff alleges that defendant Farnum failed to protect him during the alleged assault on August 20, 2012. Dkt. No. 42 at 11, 24; Dkt. No. 84-21 at 53-56. Citing only plaintiff's amended complaint, defendants contend that "[p]laintiff ... fails to allege that Dr. Farnum was actually present during the alleged assault." Dkt. No. 84-1 at 18. This argument, however, ignores plaintiff's deposition testimony, in which he specifically alleges that defendant Farnum ordered him out of his room and into the side room where he was allegedly assaulted, and that, prior to plaintiff exiting his room, he informed defendant Farnum that he was in fear of his safety based on the alleged threats made against him by defendants Sill and Searcy. Dkt. No. 84-21 at 53. In light of these specific allegations, I recommend defendants' motion be denied to the extent it seeks dismissal of defendant Farnum based on personal involvement.

### 5. Defendant Comstock

Defendant Cindy Comstock is identified by plaintiff as an OMH Nurse Administrator employed at the CNYPC. Dkt. No. 42 at 4. Plaintiff alleges that it was defendant Comstock that ordered him to be taken to the room at the CNYPC filled with urine and feces, where he was allegedly tortured for weeks. Dkt. No. 42 at 18-19; Dkt. No. 84-21 at 126. While these allegations could suffice to demonstrate Comstock's involvement, because I have recommended that plaintiff's conditions of confinement claims be dismissed, it is unnecessary to address the issue of personal involvement with respect to this defendant.

### 6. Defendant Piracha

According to plaintiff, he is suing defendant Piracha only for threatening him after the incident on August 20, 2012. Dkt. No. 84-21 at 90, 140, 165. Plaintiff acknowledges that Piracha never used force or threatened to use force against him, but only told him to take defendant Searcy's name out of his grievance. Id. at 90. As was noted above, it is well-established that allegations of threats, without any accompanying use of force or damage, are insufficient to support a claim for liability under section 1983. See, e.g., Holland, 2016 WL 3636249, at \*10. Accordingly, I recommend that plaintiff's claims against defendant Piracha be dismissed.

### 7. Defendant Kuntz

Although he identified defendant Kuntz as one of the SCTAs involved in the use-of-force incident on February 20, 2012, see, e.g., Dkt. No. 84-21 at 34, plaintiff testified at his deposition that he is not suing that individual in connection with the February 20, 2012 incident. Id. at 49. In addition, plaintiff testified that, with respect to the June 20, 2013 incident, defendant Kuntz did not use any force against him, but instead only verbally threatened him. Id. at 143-44. Because verbal threats are not sufficient to support a section 1983 cause of action, and because defendant Kuntz is not sued in connection with any other incidents, I recommend that defendants' motion be granted to the extent it seeks dismissal of plaintiff's claims asserted against defendant Kuntz on the basis of personal involvement.

### F. Retaliation

In his fourth cause of action, plaintiff alleges that defendants Hellinger, Searcy, Sill, Fical, Simpkins, Santamassino, and Box retaliated against him for claiming abuse and mistreatment and complaining about the conditions of his confinement.[26] Dkt. No. 42 at 25.

[26]    The amended complaint also appears to assert a retaliation claim against defendants Kuntz and Piracha. Dkt. No. 42 at 25. As was noted above, however, plaintiff clarified at his deposition that he is suing those individuals based only verbal threats rendered against him. Dkt. No. 84-21 at 90, 140, 143-44, 165.

As the Second Circuit has repeatedly cautioned, retaliation claims are easily incanted and courts should examine them "with skepticism and particular care." Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). To establish a claim under section 1983 for retaliatory conduct, a plaintiff must demonstrate that (1) he engaged in protected conduct; (2) the defendants took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action—in other words, the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); Ahlers v. Nowicki, No. 12-CV-0539, 2014 WL 1056935, at \*3 (N.D.N.Y. Mar. 18, 2014) (Hurd, J., adopting report and recommendation

Case 9:17-cv-00656-MAD-TWD  Document 110  Filed 06/02/20  Page 97 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

*by* Treece, M.J.). If the plaintiff carries this burden, then to avoid liability the defendants must show, by a preponderance of the evidence, that they would have taken action against the plaintiff "even in the absence of the protected conduct." *Mount Healthy*, 429 U.S. at 287. "[I]f taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

**\*17** When a claim of retaliation is alleged in only conclusory fashion, and there is no record evidence establishing the requisite nexus between protected activity and the adverse action complained of, dismissal is warranted. *Crenshaw v. Hartman*, 681 F. Supp. 2d 412, 416 (W.D.N.Y. 2010); *McQuilkin v. Cent. N.Y. Psychiatric Ctr.*, No. 08-CV-0975, 2010 WL 3765847, at \*15 (N.D.N.Y. Aug 27, 2010) (Peebles, M.J.), *report and recommendation adopted by*, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.). In addition, as was discussed earlier, personal involvement of a named defendant in any alleged constitutional deprivation, including retaliation, is a prerequisite to an award of damages against that individual under section 1983. *See, e.g., Wright*, 21 F.3d at 501; *Abascal v. Hilton*, No. 04-CV-1401, 2008 WL 268366, at \*10 (N.D.N.Y. Jan. 30, 2008) (Kahn, J., *adopting report and recommendation by* Lowe, M.J.).

In this case, plaintiff's allegations concerning the February 20, 2012 incident involving defendant Hellinger do not support a finding of unlawful retaliation. Plaintiff's amended complaint does not include any allegations of protected activity engaged in by the plaintiff prior to that incident that could have motivated the assault. Indeed, according to plaintiff, the earliest complaint authored by him was dated February 20, 2012. Dkt. No. 42 at 6-7.

With respect to the incident on August 20, 2012, plaintiff alleges that, immediately prior to being assaulted by defendants Fical, Searcy, Sill, and Simpkins, defendants Searcy and Sill "said they were going to teach [him] a lesson for being a snitch," and that plaintiff "knew they were referring to the February 20th incident where [he] was assaulted by Defendant Hellinger and [him] reporting it to risk management." Dkt. No. 84-21 at 52. While the amount of time that passed between the two incidents presents only modest evidence of the link between the two, defendants have submitted no evidence that rebuts plaintiff's testimony. Viewing the facts in light most favorable to plaintiff, a reasonable factfinder could conclude that the use of force on August 20, 2012, if it occurred, constituted an adverse

action taken in response to plaintiff's complaints regarding the February 20, 2012 incident. Accordingly, I recommend that defendants' motion be denied to the extent it seeks dismissal of plaintiff's retaliation claim related to the August 20, 2012 incident.

Plaintiff also claims that on August 24, 2012, defendant Hellinger punched him in the back of the head. Dkt. No. 42 at 17. Plaintiff does not make any allegations, however, linking that incident to specific complaints or other protected activity. Accordingly, I recommend that any retaliation claim arising from that incident be dismissed.

Plaintiff's claim concerning the September 22, 2012 incident is based on allegations that, on September 19, 2012, defendant Box threatened to break plaintiff's fingers if he wrote any additional complaints. Dkt. No. 42 at 18. Plaintiff then filed a complaint at the CNYPC regarding defendant Box's threats, and defendant Box allegedly assaulted him "just three days later" on September 22, 2012. *Id.* Given the close temporal proximity between the filing of the complaint and the alleged assault, and in light of the absence of any evidence from defendants that dispute plaintiff's allegations, I recommend defendants' motion be denied with respect to plaintiff's retaliation claim arising from this incident.

The last event forming the basis for plaintiff's retaliation claims surrounds the June 20, 2013 incident, involving defendants Santamassino and Paulson. Although plaintiff alleges that defendant Santamassino initiated the assault and referenced plaintiff's grievances immediately prior to the assault, there is no record evidence that defendant Paulson, who arrived after defendant Santamassino began assaulting plaintiff, was aware of any complaints filed by plaintiff or thereafter participated in the alleged assault in retaliation for plaintiff filing complaints. Accordingly, I recommend the retaliation claim asserted against defendant Paulson in connection with this incident be dismissed.

**\*18** In sum, I recommend plaintiff's retaliation claims arising from the August 20, 2012 and September 22, 2012 incidents remain in the action, but that the remaining portions of plaintiff's retaliation claim be dismissed. [27]

[27]   In the event the assigned district judge does not dismiss defendant Santamassino from this action based on plaintiff's failure to timely serve and join him in the action, I recommend that plaintiff's retaliation claim asserted agaomst jo,

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 98 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

survive defendants' motion for summary judgment and proceed to trial.

### G. Eleventh Amendment

According to his amended complaint, plaintiff has sued all of the defendants in both their individual and official capacities. Dkt. No. 42 at 1. Among the relief sought by the plaintiff are awards of monetary damages against those defendants. *Id.* at 27. In their motion, defendants seek dismissal of plaintiff's damages claims against them in their official capacities. Dkt. No. 84-1 at 23-24.

The Eleventh Amendment protects a state against suits brought in federal court by "private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974); *Cory v. White*, 457 U.S. 85, 90-91 (1982); *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993). This absolute immunity, which states enjoy under the Eleventh Amendment, extends to both state agencies and state officials sued for damages in their official capacities when the essence of the plaintiff's claim seeks recovery from the state as the real party in interest. *See, e.g., Daisernia v. State of N.Y.*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.) ("[A] suit which seeks a money judgment 'which must be paid from the state treasury is barred by the Eleventh Amendment,' even though it is nominally asserted against an individual official." (quoting *Edelman*, 415 U.S. at 663)); *see also Richards v. State of N.Y. App. Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (*citing, inter alia, Cory v. White*, 457 U.S. 85, 89-91, (1982)). "To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." *Ying Jing Gan*, 996 F.2d at 529; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.").

Plaintiff's damage claims in this action against the named-defendants in their official capacities are, in reality, claims against the State of New York, and therefore are subject to dismissal. *Daisernia*, 582 F. Supp. at 798-99. Accordingly, I recommend that, to the extent that any of the claims asserted in plaintiff's amended complaint are asserted against any of the named-defendants in their official capacities, those claims be dismissed with prejudice. [28]

[28] Because plaintiff is also requesting injunctive relief, to that extent his claims are properly asserted against the defendants in their official capacities. *See, e.g., King v. McIntyer*, No. 11-CV-1457, 2014 WL 689028, at *6 (N.D.N.Y. Feb. 20, 2014) (Hurd, J., *adopting report and recommendation by* Dancks, M.J.) (citing *Quern v. Jordan*, 440 U.S. 332, 338 (1979)).

### H. Qualified Immunity

**\*19** As an alternative ground for dismissal of plaintiff's claims, defendants assert their entitlement to qualified immunity from suit. Dkt. No. 84-1 at 24-25. This portion of defendants' motion does not single out or identify specific defendants as potentially qualifying for immunity, but instead appears to request dismissal of all of plaintiff's claims including the excessive force claims. *Id.*

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014); *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Id., see also Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.' " *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). In addressing the two relevant qualified immunity factors, the court must draw all inferences in favor of the non-moving party. *Tolan*, 134 S. Ct. at 1866.

**\*20** In the event the above recommendations are adopted, the following causes of action remain for an analysis regarding qualified immunity: (1) deliberate medical indifference under the Fourteenth Amendment asserted against defendants Pavlot and Simpkins; (2) retaliation under the First and Fourteenth Amendments asserted against (a) defendants Fical, Searcy, Sill, Simpkins regarding the August 20, 2012 incident, (b) defendant Box regarding the September 22, 2012 incident, and (c) defendant Santamassino (in the event the assigned district judge does not dismiss him from the action based on plaintiff's failure to timely serve and join the individual); (3) excessive force and deliberate medical indifference based on his supervisory capacity against defendant Nowicki. I am unable to conclude that these remaining individuals are entitled to qualified immunity at this juncture. Instead, as was discussed above, there are issues of fact that must be resolved with respect to both the question of whether plaintiff's constitutional rights were violated, and whether a reasonable person in the defendants' respective positions would have understood that their conduct violated plaintiff's constitutional rights.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff's complaint in this action asserts several claims against a host of defendants, the majority of which revolve around discrete incidents involving the use of force and the medical treatment provided to him for his bilateral shoulder condition. For the reasons set forth above, it is hereby respectfully

RECOMMENDED that plaintiff's claims asserted against defendant John Santamassino be dismissed, without prejudice, in the event that, no later than fourteen days following the issuance of this report and recommendation, plaintiff does not provide good cause for his failure to effectuate service upon defendant Santamassino; and it is further

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 84) be granted, in part, and the following claims be DISMISSED:

(1) Plaintiff's deliberate medical indifference claims asserted against defendants Kaskiw and Farnum;

(2) Plaintiff's conditions of confinement claims asserted against all defendants;

(3) All claims asserted against defendants Gonzalez, Comstock, Piracha, and Kuntz;

(4) Plaintiff's retaliation claim asserted against defendant Hellinger; and

(5) Plaintiff's damage claims asserted against all defendants sued in their official capacities; and it is further

RECOMMENDED that, in the event the above-recommendations are adopted, the following claims remain for trial:

(1) Plaintiff's excessive force and failure to protect claims asserted against defendants Hellinger, Pavlot, Morgan, and Nowicki related to the incident on February 20, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(2) Plaintiff's excessive force, failure to protect, and retaliation claims asserted against defendants Fical, Searcy, Sill, Simpkins, Farnum, and Nowicki related to the incident on August 20, 2012, for damages in their individual

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 100 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 8673144

capacities, and for injunctive relief in their individual and official capacities.

(3) Plaintiff's excessive force and failure to protect claims asserted against defendants Hellinger, Morgan, and Nowicki related to the incident on August 24, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(4) Plaintiff's excessive force and failure to protect claims asserted against defendants Box, Paulson, Morgan, and Nowicki related to the incident on September 22, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(5) Plaintiff's excessive force and failure to protect claims asserted against defendants Santamassino (if he is not otherwise dismissed from the action based on plaintiff's failure to timely serve and join the individual), Paulson, Bill, and Nowicki related to the incident on June 20, 2013, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(6) Plaintiff's deliberate medical indifference claims asserted against defendants Pavlot and Simpkins for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

**\*21**  (7) Plaintiff's retaliation claims asserted against defendants Searcy, Sill, Fical, and Simpkins related to the incident on August 20, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities.

(8) Plaintiff's retaliation claim asserted against defendant Box related to the incident on September 22, 2012, for damages in his individual capacity, and for injunctive relief in his individual and official capacity.

(9) Plaintiff's retaliation claim asserted against defendant Santamassino (if he is not otherwise dismissed from the action based on plaintiff's failure to timely serve and join the individual) related to the incident on June 20, 2013, for damages in his individual capacity, and for injunctive relief in his individual and official capacity; and it is further hereby

ORDERED that the clerk of the court is respectfully directed to modify the docket sheet to reflect the correct spelling of defendant Daniel Simpkins' last name; and it is further

ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

### All Citations

Not Reported in Fed. Supp., 2016 WL 8673144

---

End of Document          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 101 of 143

Haden v. Hellinger, Not Reported in Fed. Supp. (2016)

2016 WL 6248432

2016 WL 6248432
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert HADEN, Plaintiff,
v.
Karl HELLINGER et al., Defendants.

9:14-cv-318 (GLS/DEP)
|
Signed 10/26/2016

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Robert Haden, Pro se, #70751, CNY
PC, PO Box 300, Marcy, NY 13403.

FOR THE DEFENDANTS: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General, 615
Erie Boulevard West, Suite 102, OF COUNSEL: AIMEE
PAQUETTE, Assistant Attorney General, Syracuse, NY
13204-2465.

**<u>ORDER</u>**

Gary L. Sharpe, Senior District Judge

*1 The above-captioned matter comes to this court
following a Report and Recommendation by Magistrate
Judge David E. Peebles, duly filed on September 30, 2016.
(Dkt. No. 110.) Following fourteen days from the service
thereof, the Clerk has sent the file, including any and all
objections filed by the parties herein.

No objections having been filed, [1] and the court having
reviewed the Report and Recommendation for clear error, it
is hereby

[1]     Plaintiff acknowledges receipt of the Report and
        Recommendation, yet he filed no objections. (Dkt.
        No. 115 ¶ 2.)

**ORDERED** that the Report and Recommendation (Dkt. No.
110) is **ADOPTED** in its entirety; and it is further

**ORDERED** that, because plaintiff failed to provide
good cause within fourteen days following the issuance
of the Report and Recommendation for his failure to

effectuate service upon defendant Santamassino, plaintiff's
claims asserted against defendant John Santamassino are
**DISMISSED** without prejudice; and it is further

**ORDERED** that defendants' motion for partial summary
judgment (Dkt. No. 84) is **GRANTED IN PART** and
**DENIED IN PART** as follows:

> **GRANTED** as to the following claims, which are
> **DISMISSED**:
>
>> (1) Plaintiff's deliberate medical indifference claims
>> asserted against defendants Kaskiw and Farnum;
>>
>> (2) Plaintiff's conditions of confinement claims asserted
>> against all defendants;
>>
>> (3) All claims asserted against defendants Gonzalez,
>> Comstock, Piracha, and Kuntz;
>>
>> (4) Plaintiff's retaliation claim asserted against
>> defendant Hellinger; and
>>
>> (5) Plaintiff's damage claims asserted against all
>> defendants sued in their official capacities; and
>
> **DENIED** in all other respects; and it is further

**ORDERED** that the following claims remain for trial:

(1) Plaintiff's excessive force and failure to protect claims
asserted against defendants Hellinger, Pavlot, Morgan, and
Nowicki related to the incident on February 20, 2012, for
damages in their individual capacities, and for injunctive
relief in their individual and official capacities;

(2) Plaintiff's excessive force, failure to protect, and
retaliation claims asserted against defendants Fical, Searcy,
Sill, Simpkins, Farnum, and Nowicki related to the incident
on August 20, 2012, for damages in their individual
capacities, and for injunctive relief in their individual and
official capacities;

(3) Plaintiff's excessive force and failure to protect
claims asserted against defendants Hellinger, Morgan, and
Nowicki related to the incident on August 24, 2012, for
damages in their individual capacities, and for injunctive
relief in their individual and official capacities;

(4) Plaintiff's excessive force and failure to protect claims
asserted against defendants Box, Paulson, Morgan, and
Nowicki related to the incident on September 22, 2012, for

damages in their individual capacities, and for injunctive relief in their individual and official capacities;

(5) Plaintiff's excessive force and failure to protect claims asserted against defendants Paulson, Bill and Nowicki related to the incident of June 20, 2013, for damages in their individual capacities, and for injunctive relief in their individual and official capacities;

**\*2**  (6) Plaintiff's deliberate medical indifference claims asserted against defendants Pavlot and Simpkins for damages in their individual capacities, and for injunctive relief in their individual and official capacities;

(7) Plaintiff's retaliation claims asserted against defendants Searcy, Sill, Fical, and Simpkins related to the incident on August 20, 2012, for damages in their individual capacities, and for injunctive relief in their individual and official capacities; and

(8) Plaintiff's retaliation claim asserted against defendant Box related to the incident on September 22, 2012, for

damages in his individual capacity, and for injunctive relief in his individual and official capacity; and it is further

**ORDERED** that this matter is deemed trial ready, a trial scheduling order will be issued in due course and Plaintiff's request for counsel (Dkt. No. 115) will likewise be considered in due course; and it is further

**ORDERED** that the clerk of the court serve a copy of this Order upon the parties in accordance with this court's Local Rules.

**IT IS SO ORDERED.**

October 26, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6248432

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Brinson v. Kirby Forensic Psychiatric Center, Not Reported in Fed. Supp. (2018)

2018 WL 4680021

2018 WL 4680021
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Takeam BRINSON, Plaintiff,

v.

KIRBY FORENSIC PSYCHIATRIC
CENTER; Le-Ben Wan, Defendants.

16-CV-1625 (VSB)
|
Signed 09/28/2018

**Attorneys and Law Firms**

Takeam Brinson, Naponoch, New York, Counsel for Plaintiff.

Matthew J. Lawson, Michael E. Peeples, Owen T. Conroy, New York State, Office of the Attorney General, New York, New York, Counsel for Defendant Le-Ben Wan.

**OPINION & ORDER**

VERNON S. BRODERICK, United States District Judge

 **\*1** Plaintiff Takeam Brinson brings this action against Defendant Dr. Le-Ban Wan pursuant to 42 U.S.C. § 1983 for involuntary medication and use of excessive force. Before me is Defendant's motion for summary judgment. Because Plaintiff failed to exhaust his administrative remedies, and no genuine factual dispute exists such that a reasonable juror could find in favor of the Plaintiff, Defendant's motion is GRANTED. [1]

[1]     I am filing a redacted version of this Opinion & Order on the public docket and an unredacted version under seal. The redacted material consists of information the parties requested and received permission to file under seal.

**I. Background** [2]

[2]     Unless otherwise noted, the facts referenced in this section are undisputed.

Plaintiff was admitted to Kirby Forensic Psychiatric Center ("Kirby") on January 8, 2015 after he was found unfit to stand trial on charges of Assault in the First Degree as a Hate Crime and Criminal Possession of a Weapon in the Third

Degree. (Def.'s 56.1 ¶¶ 1–2.) [3] A mental health examination of Plaintiff was performed at Kirby, [Redacted] [4], [5]

[3]     "Def.'s 56.1" refers to Dr. Le-Ben Wan's Rule 56.1 Statement, filed October 17, 2017. (Doc. 46.) An unredacted version was filed under seal. To the extent I do not define terms that are capitalized in this Opinion & Order, it is because they appear as capitalized terms in the parties' submissions.

[4]     "Wan Decl." refers to the Declaration of Le-Ben Wan, M.D., Ph.D., filed October 17, 2017. (Doc. 49.) An unredacted version was filed under seal.

[5]     "Pl.'s Opp." refers to Plaintiff's Declaration in Opposition to Defendant's Motion for Summary Judgment, and the attached opposition and exhibits, filed December 1, 2017. (Doc. 56.) Because Plaintiff's Declaration is only partially paginated, the pages cited refer to the pages assigned by the Electronic Case Filing system.

Dr. Wan was Plaintiff's treating psychiatrist during the entirety of Plaintiff's hospitalization at Kirby. (Def.'s 56.1 ¶ 5.) On the morning of May 15, 2015, Dr. Wan ordered that Plaintiff be given emergency psychiatric medication on two separate occasions. (Id. ¶ 9.) These two events are at the center of this litigation.

A. *The First Administration of Emergency Medication*

Early in the morning on May 15, 2015, Plaintiff was engaged in a physical altercation with another Kirby patient. (Id. ¶ 10.) According to Plaintiff's deposition testimony, he went into the bathroom and was using the toilet when another inmate in the stall next to Plaintiff was fondling himself. (Lawson Decl. Ex. A, at 41:2-16, 45:5-10.) [6] Plaintiff asked the other inmate why he would do that right next to Plaintiff, to which the other inmate did not respond. (Id. at 45:19-24.) Plaintiff left the bathroom, and a few minutes later, the other inmate walked up to Plaintiff and punched him in the face. (Id. at 45:25-46:22.) Plaintiff jumped up and grabbed the other inmate's hands to stop him from swinging. (Id. at 46:23-47:4.) Plaintiff states he did not hit the other inmate during this alteration. (Id. at 47:5-6.)

[6]     "Lawson Decl." refers to the Declaration of Matthew J. Lawson in Support of Dr. Le-Ben Wan's

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 104 of 143

Brinson v. Kirby Forensic Psychiatric Center, Not Reported in Fed. Supp. (2018)

2018 WL 4680021

Motion for Summary Judgment, filed October 17, 2017. (Doc. 48.) An unredacted version was filed under seal.

**\*2** Plaintiff recounts that while the altercation was in progress, Dr. Wan ordered members of the Kirby staff to restrain Plaintiff, and staff members grabbed Plaintiff, dragged him to a back room, slammed him to the ground, and took his pants off. (*Id.* at 47:25-48:9.) While Kirby staff members held Plaintiff down, Dr. Wan administered three shots to Plaintiff. (*Id.* at 48:25-49:14, 50:8-22.)

Dr. Wan's version of the facts diverges from Plaintiff's version in various ways. Specifically, at approximately 8:40 a.m. on May 15, 2015, Dr. Wan and Medarbo Ebol, a registered nurse at Kirby, were notified by Kirby staff members that Plaintiff had a physical altercation with another patient and that Plaintiff and the other patient had thrown punches at each other. (Wan Decl. ¶ 10; Ebol Decl. ¶ 4.) [7] They were told that members of the Kirby staff intervened, separated the two men, and moved Plaintiff to a side room. (Wan Decl. ¶ 10; Ebol Decl. ¶ 4.)

[7]    "Ebol Decl." refers to the Declaration of Medardo Ebol, R.N., filed October 17, 2017. (Doc. 50.) An unredacted version was filed under seal.

Nurse Ebol then went to the side room and spoke with Plaintiff. (Wan Decl. ¶ 10; Ebol Decl. ¶ 4.) According to Nurse Ebol, Plaintiff stated that a dispute arose because the other patient had been standing too close to him in the bathroom. (Ebol Decl. ¶ 4.) Plaintiff also stated that after they exited the bathroom, the other patient tried to hit him, so he fought back. (*Id.*) Dr. Wan also entered the side room to evaluate Plaintiff. (Wan Decl. ¶ 10; Ebol Decl. ¶ 5.) Dr. Wan observed that Plaintiff exhibited paranoia, anxiety, and delusional behavior. (Wan Decl. ¶ 10.) Specifically, Plaintiff told Dr. Wan that another patient stood too close to him in the bathroom and was otherwise pursuing him, [Redacted] Dr. Wan observed that Plaintiff remained angry and agitated, and Dr. Wan concluded that Plaintiff presented a "very real risk" of fighting again unless given psychiatric medication. (*Id.*)

Dr. Wan offered to administer psychiatric medicine to Plaintiff, but Plaintiff refused to take it. (*Id.*) As a result, Dr. Wan ordered that Plaintiff be medicated involuntarily with injections of [Redacted]. (*Id.* ¶ 11.) He further ordered Kirby staff to manually restrain Plaintiff for a period of up to one minute in order to administer the medication, (*id.* ), but did not provide any other orders or instructions, (*id.* ¶ 13). Kirby

staff stood around Plaintiff and stabilized him by holding his arms and legs for less than one minute so that the medication could be administered. (*Id.* ¶ 12; Ebol Decl. ¶ 9.) Dr. Wan and Nurse Ebol deny Plaintiff's assertion that Kirby staff slammed Plaintiff to the ground in order to administer the medication. (Wan Decl. ¶ 11; Ebol Decl. ¶ 8.) Dr. Wan did not inject or physically touch Plaintiff at any point. (Wan Decl. ¶ 14.) Nurse Ebol administered the injections. (Ebol Decl. ¶ 10.)

After the Plaintiff was restrained and the medications were administered, Dr. Wan and Nurse Ebol conducted separate Post-Restraint Evaluations to determine whether he suffered any injuries or complained of any pain. (Def.'s 56.1 ¶ 32.) Both Dr. Wan and Nurse Ebol reported that Plaintiff had no visible injuries and did not complain of any pain. (*Id.* ¶¶ 33–35; Wan Decl. Ex. A; Ebol Decl. Ex. B.) Dr. Jay Pascual, a physician at Kirby, performed another evaluation of Plaintiff just over one hour later and similarly reported that he did not observe any injuries to Plaintiff, nor did Plaintiff complain of any pain. (Def.'s 56.1 ¶ 36; Pascual Decl. Ex. A.) [8]

[8]    "Pascual Decl." refers to the Declaration of Jay Pascual, M.D., filed October 17, 2017. (Doc. 52.) An unredacted version was filed under seal.

**B. *The Second Administration of Emergency Medication***

**\*3**  Plaintiff states that after he received the first three injections, he went back to the room where the fight occurred and fell asleep. (Lawson Decl. Ex. A, at 51:10-16.) A few minutes after he fell asleep, the same patient with whom he got into an altercation earlier started punching him. (*Id.* at 51:17:52:2.) Plaintiff again jumped up and grabbed the other patient's hands, (*id.* at 52:6-15), but did not try to hit the other patient, (*id.* at 53:3-5). Kirby staff then returned to the room, grabbed Plaintiff, dragged him into the back room, slammed him down, and bended up his arms. (*Id.* at 52:6-15, 54:9-16.) Dr. Wan then gave Plaintiff three more injections. (*Id.* at 52:6-15, 53:11-18.) After receiving the second round of injections, Plaintiff was moved to another dormitory, where he stayed for a few days. (*Id.* at 54:19-55:5.)

Dr. Wan's version of the facts again diverges from Plaintiff's version in various ways. Approximately two and a half hours after the initial incident, Dr. Wan and Nurse Ebol were told that Plaintiff had engaged in another physical altercation with the same patient, with both patients throwing punches at each other. (Wan Decl. ¶ 18; Ebol Decl. ¶ 13, Ex. A.) After Kirby

staff separated the patients and placed them into separate rooms, Dr. Wan and Nurse Ebol went to the back room to evaluate Plaintiff. (Wan Decl. ¶ 18; Ebol Decl. ¶ 13.) Dr. Wan observed that Plaintiff continued to exhibit symptoms of agitation and paranoia similar to the symptoms he exhibited after the first incident prior to being medicated. (Wan Decl. ¶ 18.) Dr. Wan believed additional psychiatric medication was required to prevent Plaintiff from lashing out again, but again Plaintiff refused to voluntarily take the medication. (*Id.*)

Dr. Wan again ordered that [Redacted] After attempting unsuccessfully to counsel Plaintiff, Dr. Wan once again directed Kirby staff to manually restrain Plaintiff for no longer than one minute. (*Id.*; *see also id.* Ex. C.) As with the initial injections, Kirby staff stood around Plaintiff and stabilized him by holding his arms and legs for less than one minute so that the medication could be administered. (*Id.* ¶ 12; Ebol Decl. ¶ 18.) Dr. Wan again denies Plaintiff's assertion that Kirby staff slammed Plaintiff to the ground to administer the medication, (Wan Decl. ¶ 20; Ebol Decl. ¶ 17), and he did not give the injections or physically touch Plaintiff at any point, (Wan Decl. ¶ 22; Ebol Decl. ¶ 19.) Nurse Ebol administered the two injections. (Ebol Decl. ¶ 19.)

Dr. Wan and Nurse Ebol again conducted separate Post-Restraint Evaluations to determine if Plaintiff suffered any injuries or complained of any pain. (Def.'s 56.1 ¶ 52.) They both determined that Plaintiff had no visible injuries and did not complain of any pain. (*Id.* ¶¶ 53–56; Wan Decl. Ex. C; Ebol Decl. Ex. C.) In the days following the incidents, Plaintiff continued to deny that he experienced any injuries or adverse consequences in connection with the administration of emergency medicine on May 15, 2015. (Def.'s 56.1 ¶¶ 57–60.)

According to Dr. Wan, Plaintiff's mental condition improved by the end of May 2015, and he became less overtly paranoid. (Wan Decl. ¶ 30.) Plaintiff claims that the medications he received left him impaired for weeks, unable to move his arms or think straight. (Pl.'s Opp. 4.) He was discharged from Kirby to the New York City Department of Correction on June 15, 2015. (Wan Decl. ¶ 30.)

### C. *Plaintiff's Administrative Remedies*

Upon admission, Kirby provides patients a Patient Orientation Handbook (the "Handbook"). (Def.'s 56.1 ¶ 61.) Kirby provided the Handbook to patients at Kirby in 2015,

(*id.* ¶ 62), and at that time the Handbook described multiple options for patients to make complaints about treatment at Kirby, (*id.* ¶ 63; Leitch Decl. Ex. A).[9] For example, the Handbook informed patients that they could make complaints at their ward's Therapeutic Community Meetings, at Patient Advisory Committee meetings, directly to their Treatment Team, to the Hospital's Ethics Committee, or to the Risk Manager. (Leitch Decl. ¶¶ 7–10; *id.* Ex. A, at 12, 18.) The Handbook listed the phone numbers of the Ethics Committee and the Risk Manager. (*Id.* ¶¶ 9–10; *id.* Ex. A, at 12, 18.) The Handbook also identified several external channels for lodging complaints, including a hotline to the Justice Center for the Protection of People with Special Needs and to the Joint Commission Office of Quality Monitoring. (*Id.* ¶¶ 19, 21.)

9      "Leitch Decl." refers to the Declaration of Kimberly Leitch, filed October 17, 2017. (Doc. 53.) An unredacted version was filed under seal.

**\*4** Regardless of the avenue a patient takes to report a complaint, Kirby employs the same procedure for addressing complaints. (*Id.* ¶¶ 11, 22.) Kirby's Risk Manager states that she would always be informed of any complaints of abuse or neglect filed through any of the avenues described above, (*id.* ¶¶ 13, 22), and she was never made aware of any complaints by Plaintiff, (*id.* ¶¶ 16, 23). Plaintiff suggests that he did not pursue any administrative remedies at Kirby because he was too impaired by the effects of the medications he received on May 15, 2015 to do so. (Pl.'s Opp. 4.)

### II. Procedural History

Plaintiff filed this action against Defendant and Kirby on March 3, 2016 while he was in pretrial detention at Rikers Island. (Doc. 1.) On April 18, 2016, I entered an order of service, as well as an order dismissing Kirby as a defendant in this action because Kirby is not a "person" within the meaning of § 1983. (Doc. 7.)

The case proceeded against Defendant Wan, who filed an Answer on August 4, 2016. (Doc. 20.) On December 15, 2016, after holding an initial pretrial conference, I entered a case management plan and scheduling order. (Doc. 24.) On June 22, 2017, I entered an order setting a briefing schedule on Defendant's anticipated motion to dismiss. (Doc. 32.) On August 8, 2017, Defendant submitted a letter requesting additional time to file his motion for summary judgment based, in part, on counsel's recent discovery of the exhaustion requirement of the Prison Litigation Reform

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 106 of 143

Brinson v. Kirby Forensic Psychiatric Center, Not Reported in Fed. Supp. (2018)

2018 WL 4680021

Act related to § 1983 claims asserted for treatment received at psychiatric institutions like Kirby. (Doc. 33.) Defendant's counsel indicated that, given that exhaustion of administrative remedies is an affirmative defense that must be pleaded in the answer, he would be moving to amend the Answer. (*Id.*) I granted the extension request on August 9, 2017. (Doc. 34.) Plaintiff filed a letter on August 18, 2017 requesting that I not permit Defendant to amend the answer because he would be prejudiced by the amendment. (Doc. 35.) On September 15, 2017, Defendant filed a motion to amend the Answer in order to add as an affirmative defense Plaintiff's alleged failure to exhaust administrative remedies. (Docs. 38, 39.)

On October 17, 2017, Defendant filed his motion for summary judgment, (Doc. 44), along with a supporting memorandum of law, (Doc. 45), Rule 56.1 statement, (Doc. 46), and declarations, (Docs. 48–53). In addition, Defendant filed a notice, pursuant to Local Civil Rule 56.2, to the pro se Plaintiff describing the purpose, procedures, and implications of Defendant's summary judgment motion. (Doc. 47.) On December 1, 2017, Plaintiff filed a declaration in opposition, along with an opposition brief and attached exhibits. (Doc. 56.) Defendant filed his reply on February 12, 2018. (Doc. 57.)

### III. Legal Standards

#### A. *Rule 15*

Courts should "freely give leave" to amend a pleading "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts may deny leave to amend in cases of, among other things, "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and/or] futility of amendment." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted). Absent a showing of bad faith or undue prejudice, "[m]ere delay ... does not provide a basis for the district court to deny the right to amend." *Id.* (internal quotation marks omitted).

#### B. *Rule 56*

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[ ]' ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

**\*5** On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

Finally, in considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and internal quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

2018 WL 4680021

## IV. Discussion

### A. *Motion to Amend Answer*

Defendant seeks leave to amend his Answer to add the affirmative defense of failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA"). (Doc. 39.) He also requests that I deem the Answer amended for purposes of his summary judgment motion. (*Id.*) Plaintiff opposes the motion, arguing that he has built his case around the Answer and would be prejudiced by an amendment. (Doc. 35.)

I find no reason not to permit Defendant to amend his Answer. Although Defendant filed his motion to amend just one month prior to the filing of his summary judgment motion, there is no indication that he unduly delayed in filing it. Numerous courts have granted leave to amend an answer to add an affirmative defense at or after the summary judgment stage. *See, e.g., Kelly v. A1 Tech.*, No. 09 Civ. 962(LAK)(MHD), 2010 WL 1541585, at *17–18 (S.D.N.Y. Apr. 12, 2010); *Spier v. Erber*, No. 89 Civ. 1657 (PKL), 1992 WL 230254, at *8–9 (S.D.N.Y. Sept. 1, 1992); *see also Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (permitting assertion of affirmative defense of collateral estoppel at summary judgment stage, even though it was not pleaded in the answer, because plaintiff had an opportunity to respond). In addition, there is no evidence that Defendant makes his motion in bad faith, or that Plaintiff will be unfairly prejudiced by allowing the amendment at this stage, since he had notice of the exhaustion affirmative defense and an opportunity to respond to it in his opposition to Defendant's summary judgment motion, and since Plaintiff has failed to take any discovery whatsoever in this action. Finally, I deem the Answer to be amended in connection with my consideration of Defendant's summary judgment motion. *See Spier*, 1992 WL 230254, at *8–9 (deeming answer to be amended for purposes of considering affirmative defense to decide a motion for summary judgment).

### B. *Exhaustion of Administrative Remedies*

#### 1. Applicable Law

**\*6** The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). The Supreme Court has held that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). The PLRA's restrictions apply only when the individual was a prisoner at the time of filing his complaint. *See Gibson v. City Municipality of New York*, 692 F.3d 198, 201 (2d Cir. 2012) (per curiam).

To fulfill the exhaustion requirement, a prisoner must exhaust "all 'available' remedies." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). The PLRA requires "proper exhaustion," which "means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issue on the merits)." *Id.* at 90, 93 (citation omitted). An administrative grievance procedure is considered unavailable when: (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 136 S. Ct. 1850, 1859–61 (2016).

Although prisoners "are not required to specially plead or demonstrate exhaustion in their complaints," *Jones v. Bock*, 549 U.S. at 216, and although many district courts will not assume that a prisoner has failed to exhaust his administrative remedies when that prisoner indicates he has taken certain steps but is silent as to the remaining steps, *see Groenow*, 2014 WL 941276, at *3 (citing case law), dismissal is appropriate on a motion to dismiss where failure to exhaust is clear on the face of the complaint, *see id.* at *4; *see also Locckenitt v. City of New York*, No. 11 Civ. 5651(PAC)(HBP), 2012 WL 3822701, at *3 (S.D.N.Y. July 30, 2012), *report and recommendation adopted*, No. 11 Civ. 5651(PAC)(HBP), 2012 WL 3822213 (S.D.N.Y. Sept. 4, 2012).

#### 2. Application

Defendant contends that Plaintiff failed to exhaust the administrative remedies available at Kirby prior to bringing suit, requiring summary judgment in Defendant's favor. I agree.

As an initial matter, the PLRA's exhaustion requirement applies to Plaintiff's claims. Plaintiff was a "prisoner" within

Case 9:17-cv-00656-MAD-TWD Document 110 Filed 06/02/20 Page 108 of 143

Brinson v. Kirby Forensic Psychiatric Center, Not Reported in Fed. Supp. (2018)

2018 WL 4680021

the meaning of the PLRA when his claims arose, while he was a patient at Kirby, and when he filed his complaint in this litigation, while he was detained pretrial at Rikers. *See Gibson*, 692 F.3d at 201 ("[A] person who has been charged with a crime and is being held prior to trial under a temporary order of observation at a mental health institution, pursuant to New York state law, is a 'prisoner' within the meaning of the [PLRA]."); *Baez v. Parks*, No. 02 Civ.5821 PKC DF, 2004 WL 1052779, at *5 (S.D.N.Y. May 11, 2004) ("[T]he PLRA's strict exhaustion requirement does indeed apply in actions brought by pretrial detainees.").

Plaintiff admits that he did not file a grievance about the events described in his Complaint, (Doc. 1, at 4), and the record demonstrates that he did not exhaust his administrative remedies. As detailed in the Handbook, [10] there were multiple channels for Plaintiff to file a complaint or grievance with respect to the incidents that took place on May 15, 2015. (*See* Leitch Decl. Ex. A.) Plaintiff could have lodged complaints in-person at his ward's Therapeutic Community Meetings, at the Patient Advisory Committee meetings, directly to his Treatment Team, to the Hospital's Ethics Committee, or to Kirby's Risk Manager. (Leitch Decl. ¶¶ 7–10; *id.* Ex. A, at 12, 18.) He could have also called the Ethics Committee or the Risk Manager at the phone numbers listed in the Handbook. (*Id.* ¶¶ 9–10; *id.* Ex. A, at 12, 18.) He also had at least two external channels for making a complaint, including hotlines to the Justice Center for the Protection of People with Special Needs and to the Joint Commission Office of Quality Monitoring, both of which were listed in the Handbook. (*Id.* ¶¶ 19, 21.) At least one court in this district has held that the grievance channels at Kirby described above are "administrative remedies" under the PLRA that a plaintiff must exhaust before filing a complaint. *See Henry v. Hall*, No. 12-cv-04534, at ECF No. 112 (S.D.N.Y. Feb. 19, 2016) (dismissing Kirby patient's § 1983 claims where plaintiff failed to exhaust administrative remedies). However, Plaintiff failed to pursue an administrative remedy through any of these avenues prior to filing his complaint. (Leitch Decl. ¶¶ 16, 23, 25.)

[10] The Handbook was provided to Kirby patients in 2015, (Def.'s 56.1 ¶ 62), and Plaintiff has presented no evidence that he did not receive the Handbook or was unaware of the grievance procedures outlined in the Handbook.

**\*7** Plaintiff does not argue that any of the exceptions to exhaustion described in *Ross* apply here. Rather, Plaintiff suggests that he did not pursue any administrative remedies at Kirby because he was too impaired by the effects of the medications he received on May 15, 2015. (Pl.'s Opp. 4.) Although Plaintiff attaches an academic article citing to a pre-*Ross* case in the 5th Circuit that held that a plaintiff's untimely administrative grievance satisfied the exhaustion requirement because an injury prevented the plaintiff from timely filing the grievance, *Days v. Johnson*, 322 F.3d 863, 867 (5th Cir. 2003), Plaintiff fails to provide any authority within this Circuit for that proposition. However, without deciding whether or not a plaintiff's personal circumstances may render an administrative remedy unavailable under the PLRA, I find that Plaintiff has failed to provide competent evidence that he was so impaired as to be unable to pursue any of the administrative remedies available to him. Defendant asserts that Plaintiff's mental condition improved by the end of May—within two weeks of the incidents in question—and he was deemed competent to proceed to trial by June 15, 2015. (Wan Decl. ¶ 30.) Plaintiff asserts in his opposition (and not in his sworn declaration) that the medication he received "left [him] impaired for weeks not being able to move [his] arms or think straight." (Pl.'s Opp. 4.) However, he does not provide any evidence of his impairment beyond his statement in his opposition. Given the lack of any evidence before me of Plaintiff's mental and/or physical impairment causing him to be unable to exhaust his administrative remedies, summary judgment in Defendant's favor is appropriate. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."); *see also Lewis v. Greentree Mortg. Serv.*, 51 F. App'x 68 (2d Cir. 2002) (summary order) (affirming summary judgment against pro se plaintiff where plaintiff "failed to present any evidence to support ... conclusory allegations").

## C. Involuntary Medication

Even if Plaintiff's failure to exhaust his administrative remedies were excused, he has failed to present sufficient evidence to overcome summary judgment on his involuntary medication claim.

### 1. Applicable Law

The Due Process Clause of the Fourteenth Amendment protects the interest of an individual confined by the state

Case 9:17-cv-00656-MAD-TWD  Document 110  Filed 06/02/20  Page 109 of 143

Brinson v. Kirby Forensic Psychiatric Center, Not Reported in Fed. Supp. (2018)

2018 WL 4680021

from unwanted administration of antipsychotics drugs. *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (holding that the respondent "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment"). However, in certain situations where a patient presents a danger to herself and others, the patient's liberty interest yields to the state's interest in protecting the patient and others. *See Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (holding that involuntary medication of plaintiff did not violate Due Process Clause where hospital "staff reasonably believed that [plaintiff] was a danger to herself or to others"); *Inesti v. Hogan*, No. 11 Civ. 2596(PAC) (AJP), 2013 WL 5677046, at \*11 (S.D.N.Y. Sept. 30, 2013) ("[I]t is well[ ]settled that a patient's liberty interest in not being involuntarily medicated is overridden in an emergency, where failure to medicate forcibly would result in a substantial likelihood of physical harm to that patient, other patients, or to staff members of the institution." (citation omitted) ); *see also Rivers v. Katz*, 495 N.E.2d 337, 343 (N.Y. 1986) ("Where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution, the State may be warranted, in the exercise of its police power, in administering antipsychotic medication over the patient's objections."); *Addington v. Texas*, 441 U.S. 418, 426 (1979) ("The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.").

### 2. Application

Dr. Wan argues that his orders to administer medication to Plaintiff on May 15, 2015 fit into the emergency exception to the general rule that the Fourteenth Amendment protects against forced medication. I agree.

Although there appears to be a dispute of fact as to how the altercation between Plaintiff and the other patient began and whether or not Plaintiff was actually the aggressor, there does not appear to be a dispute with regard to the facts on which Dr. Wan based his decisions to administer Plaintiff medication. Dr. Wan asserts that he was first notified at approximately 8:40 a.m. by Kirby staff that Plaintiff had engaged in a physical altercation with another patient and that

Plaintiff and the other patient had thrown punches at each other. (Wan Decl. ¶ 10.) When Dr. Wan went to the side room to evaluate Plaintiff, Defendant observed that Plaintiff exhibited paranoia, anxiety, and delusional behavior. (*Id.*) Plaintiff told Dr. Wan that another patient stood too close to him in the bathroom and was otherwise pursuing him, [Redacted] The doctor also observed that Plaintiff remained angry and agitated. (*Id.*) Based on his observations, Dr. Wan concluded that Plaintiff presented a "very real risk" of fighting again unless given psychiatric medication. (*Id.*) About two and a half hours later, Dr. Wan was notified by Kirby staff that Plaintiff had engaged in another fight with the same patient, with both patients throwing punches at each other. (*Id.* ¶ 18; Ebol Decl. ¶ 13, Ex. A.) When Dr. Wan went to the room to evaluate Plaintiff, he observed that Plaintiff continued to exhibit symptoms of agitation and paranoia similar to what he exhibited after the first incident. (Wan Decl. ¶ 18.) Based on his observations, Dr. Wan believed additional psychiatric medication was required to prevent Plaintiff from lashing out again. (*Id.*) Plaintiff does not appear to dispute these facts, nor does he present any evidence that Dr. Wan was operating with the understanding that Plaintiff was not an aggressor.

**\*8** Based on the undisputed facts as to what Dr. Wan knew at the time, he reasonably believed that medication was necessary in order to protect the safety of Plaintiff and others in the facility. As a medical professional, Dr. Wan's judgments in these circumstances are entitled to a "presumption of correctness." *Kulak v. City of New York*, 88 F.3d 63, 77 (2d Cir. 1996). Plaintiff has failed to set forth any evidence that would overcome that presumption. [11] As such, summary judgment is warranted on Plaintiff's involuntary medication claim. *See Anthony*, 339 F.3d at 142 (affirming grant of summary judgment on § 1983 claim where hospital staff "reasonably believed that [plaintiff] was a danger to herself or to others").

[11]     Plaintiff claims in his Declaration in opposition that he never suffered from schizophrenia or delusions. (Pl.'s Opp. 1–2.) He attaches a September 27, 2017 record from the Central New York Psychiatric Center that indicates the removal of Plaintiff's designation for "Serious Mental Illness." (*Id.* at 3.) However, given that this record is dated more than two years after the events relevant to this litigation, it does not create a genuine dispute as to whether Dr. Wan reasonably believed that Plaintiff suffered from schizophrenia or delusions on May 15, 2015. I also note that Plaintiff has not offered any evidence that the finding that he was unfit to stand trial was

2018 WL 4680021

improper, or that Dr. Wan's diagnosis was wrong at the time it was made.

### D. *Excessive Force*

As I held above, Dr. Wan is entitled to summary judgment on all of Plaintiff's claims, including his excessive force claim, because Plaintiff failed to exhaust his administrative remedies. However, even if Plaintiff could overcome this hurdle, I find that no genuine factual dispute exists and that no reasonable juror could find in favor of the Plaintiff on his excessive force claim.

### 1. Applicable Law

A successful § 1983 claim requires the plaintiff to establish that the individual defendant was personally involved in the alleged misconduct. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006). In addition, the plaintiff must show that "the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

The standard to determine whether a government actor applied excessive force is one of objective reasonableness, taking into account the "facts and circumstances of each particular case." *Id.* at 2473 (citation omitted). Whether or not the force applied was reasonable depends on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.*

### 2. Application

As an initial matter, Plaintiff has set forth no evidence that Dr. Wan was personally involved in the use of any force, let alone excessive force, against Plaintiff. Plaintiff testified at his deposition that it was Kirby staff who grabbed him, dragged him to a back room, slammed him to the ground, and took his pants off. (Lawson Decl. Ex. A, at 47:25-48:9.) Dr. Wan merely instructed Kirby staff to manually restrain Plaintiff for no longer than one minute in order to administer

the medication. (Wan Decl. ¶¶ 11, 19.) Dr. Wan provided no further orders or instructions. (*Id.* ¶¶ 13, 21.) Plaintiff does not dispute these facts. As a result, it cannot be said that Dr. Wan was personally involved in any use of force against Plaintiff. [12]

[12]    To the extent Plaintiff argues that Dr. Wan is subject to supervisory liability, Plaintiff has failed to set forth evidence supporting any of the facts required to establish supervisory liability. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.").

**\*9** Even if Plaintiff had established Dr. Wan personal involvement, he has not rebutted Defendant's evidence that the force used was rationally related to a legitimate governmental objective and that it was not excessive. The need to prevent Plaintiff from hurting himself or others was a legitimate governmental objective, and restraining Plaintiff in order to administer emergency medication was rationally related to achieving that objective. *See Musaidv. Manka*, No. 13-cv-7880 (PKC) (MHD), 2016 WL 540806, at *4 (S.D.N.Y. Feb. 9, 2016) (holding that "the use of force by [hospital] employees was based on a compelling governmental interest to ensure plaintiff was properly medicated" and that the patient's refusal to voluntarily take the medication required "forcefully restrain[ing] plaintiff to ensure that he took his medication"). Further, there is no evidence that the force used might have been excessive. Rather, during both incidents, Kirby staff restrained Plaintiff by holding his arms and legs to stabilize him for less than one minute. (Wan Decl. ¶¶ 12, 20; Ebol Decl. ¶¶ 9, 18.) Importantly, none of the substantial contemporaneous evidence, including Plaintiff's own reporting, indicates that Plaintiff suffered any injuries during either incident. (Def.'s 56.1 ¶¶ 32–36; Wan Decl. Exs. A, C; Ebol Decl. Exs. B, C; Pascual Decl. Ex. A.)

2018 WL 4680021

During his deposition, Plaintiff testified that he was "slammed ... to the ground" by Kirby staff, (Lawson Decl. Ex. A, at 48:6-7), and that he suffered injuries to his shoulder and leg, (*id.* at 62:8-12). However, that testimony is uncorroborated and is contradicted by the contemporaneous medical records. Moreover, it is at odds with the allegations in Plaintiff's complaint, which do not state that Plaintiff was slammed to the ground or physically injured, but rather allege that he was "held down" by Kirby staff and that he "was injured mentally and emotionally." (Doc. 1.) Given the lack of corroborating evidence and Plaintiff's inconsistent statements, I find that no reasonable person would credit Plaintiff's testimony. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (upholding grant of summary judgment where there was an absence of evidence corroborating plaintiff's version of events and plaintiff's only evidence was his own contradictory and incomplete testimony); *see also Musaid*, 2016 WL 540806, at *5 (granting summary judgment on excessive force claim where medical records contradicted plaintiff's claim that he suffered injuries); *Muhammad v. New York City*, No. 15 CV 5603-LTS-JCF, 2016 WL 4367970, at *3 (S.D.N.Y. Aug. 12, 2016) (granting summary judgment on excessive force claim where plaintiff relied solely on his own conclusory statements, unsupported by any evidence in the record). Summary judgment is therefore appropriate with regard to Plaintiff's excessive force claim.

### V. Conclusion

For the foregoing reasons, Defendant's motions for leave to amend the Answer and for summary judgment are GRANTED. The Clerk of Court is respectfully directed to enter judgment for Defendant and close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4680021

---

End of Document © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1267886
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Brenda SPENCER, Plaintiff,

v.

BELLEVUE HOSPITAL, et al., Defendants.

No. 11 Civ. 7149(CM).
|
April 12, 2012.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

McMAHON, District Judge.

### INTRODUCTION

**\*1** Brenda Spencer ("Spencer" or "Plaintiff") commenced this action pro se on October 11, 2011 against Bellevue Hospital ("Bellevue"), Dr. Terrence Leingang ("Dr.Leingang"), and nurse practitioner Thomas Palumbo ("Palumbo"), both employees of Bellevue. The complaint alleges that the three defendants (collectively, "Defendants") violated Spencer's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution by involuntarily committing her to Bellevue and by medicating her against her will. Along with the complaint, on October 11, 2011, Spencer moved for a preliminary injunction to release her from Bellevue and to discontinue the forced medication.

On November 9, 2011, Spencer filed an amended complaint (the "Amended Complaint") adding two defendants to this action. (Amend. Cmplt. at § I.B.) The first added defendant is Cheryl Langfeld of the Department of Social Services, (*id.*), but the Court has since dismissed all claims against Langfeld *sua sponte.* (Transcript from Show Cause Hearing ("Tr.") at 14–15; *see* Defendants' Letter to the Court, dated February 22, 2012, at 1 n. 1.) The second added defendant is Jane Doe, a Bellevue employee. (Amend.Cmplt.§ I.B.) Spencer alleges that, in November 2011 [1], she was harassed by Jane Doe, who loudly announced that she was from Bellevue and then identified Spencer by her name and medication "for all to hear." (Amend. Cmplt. at § III.C.) Based on this incident,

Spencer added a harassment claim pursuant to 42 U.S.C. § 1983 against Jane Doe. (Amend.Cmplt.§ II.B.)

[1]    In § III.A of her Amended Complaint, Plaintiff states that this harassment occurred on November 31, 2011. In § III.C, however, she claims that it occurred on November 1, 2011.

The Amended Complaint avers that Spencer was released from Bellevue on October 27, 2011. (Amend. Cmplt, at § III.C.) As a result, the Court denied Spencer's original application for discharge from Bellevue as moot. (*See* Judge McMahon's Endorsement, dated November 18, 2011, of Defendants' Letter to Court, dated November 17, 2011.) Spencer seeks monetary damages arising from her period of involuntary commitment. (Amend, Cmplt. at § V.)

### STATEMENT OF FACTS

The following facts are drawn from Plaintiff's Amended Complaint and documents incorporated therein or "relied heavily upon" for their terms and effect, *Rogers v. Blacksmith Brands, Inc.,* 11 Civ.1940, 2011 WL 6293764, at \*4 (S.D.N.Y. Dec.13, 2011) (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)): *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citing *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000)).

Spencer was involuntarily committed to Bellevue pursuant to an emergency commitment order that was entered by the New York State Supreme Court on August 19, 2011. (*See* Exhibit B to Defendants' Letter to Court, dated December 8, 2011 ("Defs. Letter 12/8/11").) On that same day, Spencer received a copy of a Notice of Status and Rights regarding her involuntary commitment. (*Id.*) The Notice stated that, within forty-eight hours of Spencer's admission, a Bellevue physician would examine her to determine whether she did, in fact, require immediate observation, care, and treatment at Bellevue. (*Id.*) If the physician found that she did require such care, then Spencer would be kept at Bellevue for a period of up to fifteen days from the date of her initial commitment. (*Id.*) During the fifteen day period, Spencer would be released, converted to involuntary status, or asked to remain at Bellevue as a voluntary patient. (*Id.*) The Notice also informed Spencer that she, or someone acting on her behalf, had the right to request a court hearing if they believed that she did not require care and treatment at Bellevue. (*Id.*)

2012 WL 1267886

**\*2** On August 20, 2011, a physician, after examining Spencer, confirmed that she required care and treatment at Bellevue. (*Id.*) On September 2, 2011, two additional physicians examined Spencer and determined that she should be converted to involuntary status. (*See* Defs. Letter 12/8/11 Ex. C.) A psychiatrist confirmed Spencer's need for involuntary care and treatment. (*Id.*) Following this determination, Spencer received a Notice of Status and Rights regarding her conversion to involuntary status. (*Id.*) Like the initial Notice given to Spencer upon her admission to Bellevue, this Notice informed her that she, or someone acting on her behalf, had the right to request a court hearing if they believed that she did not require care and treatment at Bellevue. (*Id.*)

Following Spencer's commitment, Dr. Esther Lange, Deputy Director of Psychiatry at Bellevue, petitioned the New York State Supreme Court for the authority to administer necessary medication to Spencer over Spencer's objection. (*See* Defs. Letter 12/8/11 Ex. A.) In a final order dated September 20, 2011, the New York State Supreme Court determined that Spencer lacked the capacity to make a reasoned decision with respect to her treatment and granted Dr. Lange's petition. (*Id.*) Specifically, the order granted Dr. Lange the authority to treat Spencer with the anti-psychotic medication Risperidone. (*Id.*) In addition, the order directed Dr. Lange to give Spencer the anti-depressant Prozac. (*Id.*)

In her Amended Complaint, Spencer alleges that she should not have been committed to Bellevue against her will. (Amend.Cmplt.§ V.) She claims that the commitment order was granted based on the false premise that she has no family. (*Id.*) She does not allege any medical misdiagnosis or other failures by the diagnosing physicians who approved her commitment under the New York statutory scheme.

In addition, the Amended Complaint states that, in late September and early October of 2011, Dr. Leingang ordered an unknown caregiver at Bellevue to give Spencer Risperidone. (Amend.Cmplt.§ III.A.) Spencer claims that Risperidone poses dangerous risks when taken in conjunction with high blood pressure medication and anti-depressants, both of which Spencer takes. (Amend. Cmplt. at § III.C; *see* Cmplt. Ex. A.) In support of this proposition, Spencer cites to literature on Risperidone listing a number of drugs that a doctor should know that a patient is taking if that doctor is prescribing Risperidone. (*See* Cmplt. Ex. B.) Spencer alleges that Dr. Leingang knew which other medications she was taking and was aware of the risks of taking Risperidone with

these medications, but prescribed Risperidone nonetheless. (Amend.Cmplt.§ V.) Thereafter, Spencer claims that, despite her objection, Palumbo increased her Risperidone dosage, even though he also knew about the risks of the drug. (Amend.Cmplt.§§ III.A–C, V.) As a result of taking Risperidone, Spencer states that she suffered from vomiting, shaking, and "twitch movements." (Amend.Cmplt.§ TV.) However, Spencer does not allege that Defendants failed to comply with New York's statutory provisions when they obtained a court order allowing them to medicate her against her will.

**\*3** In addition to these claims, Spencer alleges that she was harassed by a Jane Doe employee of Bellevue. (Amend. Cmplt § III.C) Spencer states that, in November 2011, after her discharge from Bellevue, Jane Doe loudly announced that she was from Bellevue and identified Spencer by her name and medication "for all to hear." (*Id.*) The Amended Complaint does not reveal where this event took place, or who, if anyone, was there to hear Jane Doe. Spencer asserts that this incident constitutes harassment. (Amend.Cmplt, §§ III.B–C, IV.)

Based on these allegations, Spencer claims that the Defendants violated her due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution, when they committed her to Bellevue against her will and forced her to take allegedly dangerous medication. (*Id.*) Spencer further claims that her rights were violated when Jane Doe announced personal information regarding her stay at Bellevue. (*Id.*)

Defendants now move to dismiss the Amended Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and/or failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [2] For the reasons discussed below, Defendants' motion is GRANTED under Rule 12(b)(1) and, in the alternative, under Rule 12(b)(6).

[2]     Spencer has opposed Defendants' motion by letter briefs to the Court, dated February 15,2012, and March 12, 2012. The latter opposition was filed in response to Defendants' February 22, 2012 letter reply in further support of their motion to dismiss. The Court need not consider Spencer's March 12, 2012 letter, because it is an unauthorized sur-reply. *See Lytle v. JPMorgan Chase,* 08 Civ, 9503, 2012 WL 393008, at \*24 (S.D.N.Y. Feb.8, 2012) (citing *Kapiti v. Kelly,* 07 Civ. 3782, 2008

WL 754686, at *1 n. 1 (S.D.N.Y. Mar.12, 2008) ("Allowing parties to submit surreplies is not a regular practice that courts follow, because such a procedure has the potential for placing a court in the position of refereeing an endless volley of briefs.")). Nevertheless, because Spencer is pro se, and because consideration of her sur-reply does not alter the Court's analysis, 1 will treat it as part of Spencer's opposition to Defendants' motion.

### DISCUSSION

#### A. Subject Matter Jurisdiction

Federal district courts such as this Court are "courts of limited jurisdiction." *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 552, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (internal quotations omitted). Without either a constitutional or statutory basis for jurisdiction, a federal district court lacks subject matter jurisdiction and may not preside over a case. *Id.; Durant, Nichols, Houston, Hodgson & CorteseCosta, P.C. v. Dupont,* 565 F.3d 56, 6263 (2d Cir.2009). "Subject-matter jurisdiction ... can never be forfeited or waived." *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs and Trainmen Gen. Comm. of Adjustment. Cent. Region,* ——U.S. ——, ——, 130 S.Ct. 584, 596, 175 L.Ed.2d 428 (2009).

Under the *RookerFeldman* doctrine, federal courts lack subject matter jurisdiction over actions that are essentially appeals from state court judgments. *Williams v. Calderoni,* 11 Civ. 3020, 2012 WL 691832, at *3 (S.D.N.Y. Mar.1, 2012) (citing *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 414–15, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)). "The *Rooker–Feldman* doctrine bars challenges in federal court to the substance of state-court decisions which are more properly raised on appeal, even where such challenges appear to raise questions of federal law on their face." *Allen v. Mattingly,* 10 Civ. 0667, 2011 WL 1261103, at *8 (E.D.N.Y. Mar.29, 2011) (citing *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 87 (2d Cir.2005)). Hence, "where the doctrine applies, the federal district court lacks subject matter jurisdiction and may not hear the case." *Williams,* 2012 WL 691832, at *3.

**\*4** Recently, however, the Supreme Court has strictly "confined" the *Rooker–Feldman* doctrine "to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). In this Circuit, courts interpret this language as imposing four conditions, each of which must be met for the *Rooker–Feldman* doctrine to bar the court from hearing the case:

> "(1) the party raising the claim must have lost in state court; (2) that party's injuries must be caused by the state court judgment; (3) that party's claims must invite the district court to review and reject the state court judgment; and (4) the state court judgment must have been rendered prior to the commencement of the federal court proceedings."

*Williams,* 2012 WL 691832, at *3–4 (citing *Allen,* 2011 WL 1261103, at *8). "Requirements (1) and (4) are 'procedural.' whereas requirements (2) and (3) are 'substantive.' " *Id.* (citing *Hoblock,* 422 F.3d at 85),

Here, the parties do not contest that requirements (1), (2), and (4) of the *Rooker–Feldman* doctrine are satisfied. Defendants argue that requirement (3) is also satisfied, because this case is essentially an appeal of the state court guardianship order, pursuant to which Spencer was involuntarily committed and medicated at Bellevue. Even when construing the Amended Complaint generously, I conclude that requirement (3) is also met.

Requirement (3) of the *Rooker–Feldman* doctrine is that the party's claims must invite the district court to review and reject a state court judgment. *Williams,* 2012 WL 691832, at *4 (citing *Allen,* 2011 WL 1261103, at *8). Spencer states that this action is not based on a state court judgment, but that she is seeking relief based on "federal U.S. Constitution laws violations." (Plaintiff's Letter Brief in Opposition to Defendants' Motion to Dismiss, dated February 15, 2012, at 3.) Specifically, Spencer argues that her involuntary commitment at Bellevue and the administration of medication against her will violated her due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. (*Id.* at 3–4.)

2012 WL 1267886

Spencer is correct that civil rights claims based in federal law generally are not barred by *Rooker–Feldman. See Williams,* 2012 WL 691832, at *5. However, the doctrine does bar such claims if they are merely a restatement of the argument that the state court ruled incorrectly, or "simply an attempt to end run what would otherwise be a *Rooker–Feldman* barred claim." *Id.* (internal quotations and citations omitted). Such claims do not "permit a party who lost in state court to avoid *Rooker–Feldman* and slip into federal court." *Id.* (citing *Allen,* 2011 WL 1261103, at *8; *Puletti v. Patel,* 05 Civ. 2293, 2006 WL 2010809 (E.D.N.Y. July 14, 2006)). A party "cannot manufacture federal jurisdiction by labeling her claim a civil rights action and by seeking monetary damages." *Id.* (quoting *Chambers v. Habitat Co.,* 68 Fed. Appx. 711, 71415 (7th Cir.2003)) (internal quotations omitted).

**\*5** Here, Defendants argue that Spencer's complaint advances "end-run" claims which should be barred from federal court jurisdiction under *Rooker–Feldman.* The alleged civil rights violations asserted by Spencer all arise from the initial guardianship order granted by the New York State Supreme Court, under which Spencer was committed to Bellevue. Therefore, although Spencer's claims "appear to raise questions of federal law on their face," *Allen,* 2011 WL 1261103, at *8, they are probably in actuality "challenges in federal court to the substance of state-court decisions which are more properly raised on appeal." *Id.*

Because Spencer is a pro se litigant, the Court reviews her claims with wide latitude. "A document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). A court must interpret pro se filings "to raise the strongest arguments that they suggest." *Harris v. Westchester Cnty. Med. Ctr.,* 08 Civ. 1128,2011 WL 2637429, at *3 (S.D.N.Y. July 6, 2011) (quoting *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 475 (2d Cir.2006)).

Despite the leeway that the Court grants Spencer's claims, she has not pleaded enough of a civil rights claim to survive dismissal pursuant to *Rooker–Feldman.* Spencer attempts to frame her complaint not as a challenge to the state court judgment, but as arising from violations of her civil rights, by way of her involuntary commitment and medication. The problem with this argument is that it was the New York State Supreme Court that ordered both Spencer's commitment and

the administration of medication. Numerous cases hold that a plaintiff may pursue a section 1983 claim arising from involuntary commitment and forced medication. *See, e.g., Rodriguez v. City of New York,* 72 F.3d 1051 (2d Cir.1995). However, "to the extent plaintiff is attempting to assert a Section 1983 claim against these defendants based upon her belief that the involuntary commitment orders ... were illegal, such claim is barred by the *Rooker–Feldman* doctrine." *Middleton v. United States,* 10 Civ. 6057, 2012 WL 394559, at *5 (E.D.N.Y. Feb.7, 2012).

Although Spencer framed her complaint as arising under the U.S. Constitution, she has not properly brought this suit pursuant to federal law, because the substance of her claims is simply an attack on the prior final orders of a court of coordinate jurisdiction. Accordingly, the Amended Complaint is dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

*B. Failure to State a Claim for Relief*
Alternatively, even if Plaintiff's claims should not be dismissed under Rule 12(b)(1), they are properly dismissed for failure to state a claim under Rule 12(b)(6).

**1. Legal Standard**
**\*6** In cases where subject matter jurisdiction exists, Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss under Rule 12(b)(6) ... a complaint must contain sufficient factual matter accepted as true, to state a claim to relief that is plausible on its face." *Mabry v. Neighborhood Defender Svc.,* 769 F.Supp.2d 381, 389 (S.D.N.Y.2011) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal,* 129 S.Ct. at 1949–50.

"In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court evaluates the sufficiency of the complaint under the 'two-pronged approach' suggested by the Supreme Court in *Iqbal." Williams,* 2012 WL 691832, at *4. First, "Threadbare recitals of the elements of a cause of action, supported by mere

2012 WL 1267886

conclusory statements." are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. *Iqbal,* 129 S.Ct. at 1949; *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir.2010).

Second, "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Iqbal* 129 S .Ct. at 1950. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.; see generally Rogers,* 2011 WL 6293764, at *3–4.

Broadly construing the allegations, Spencer seeks monetary damages pursuant to 42 U.S.C. § 1983 for (1) her involuntary commitment to Bellevue, (2) her forced medication, and (3) Jane Doe's loud statements regarding her medication. In order to state a claim under § 1983, a plaintiff must allege that the defendant, acting under color of law, deprived him of a right secured by the Constitution or the laws of the United States. 42 U.S.C. § 1983. "A § 1983 claim arising from involuntary civil commitment may be analyzed under the Fourteenth Amendment's Due Process Clause or the Fourth Amendment's prohibition of unreasonable seizures." *Eze v. City Univ. of New York at Brooklyn Coll.,* 2011 WL 6780652, at *3 (E.D.N.Y. Dec.27, 2011) (citations omitted); *see generally Ruhlmann v. Ulster Cnty. Dept. of Soc. Svcs.,* 234 F.Supp.2d 140 (N.D.N.Y.2002). A § 1983 claim arising from involuntary medication also implicates the Fourteenth Amendment's Due Process Clause. *See Jelich,* 2009 WL 3497495, at *3 (citing *Cruzan v. Director. Mo. Dep't of Health,* 497 U.S. 261, 278, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990)).

 *7 However, the facial validity of the court orders, pursuant to which Plaintiff was committed and medicated, precludes Plaintiff from establishing a violation of either Constitutional right.

### 2. Due Process

Involuntary commitment is a "massive curtailment of liberty" and, therefore, is not permissible without due process of law. *Vitek v. Jones,* 445 U.S. 480, 491–92, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). "Substantive due process prohibits states from involuntarily committing nondangerous mentally

ill individuals." *Bolmer v. Oliveira,* 594 F.3d 134, 142 (2d Cir.2010) (citing *O'Connor v. Donaldson,* 422 U.S. 563, 575–76, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). "Involuntary commitment is constitutional if the person is both mentally ill and a danger to himself or others." *Jelich,* 2009 WL 3497495, at *2 (citing *Rodriguez,* 72 F.3d at 1061).

New York's Mental Hygiene Law requires a showing that the patient poses a danger to himself or others prior to commitment and, therefore, has been held to be constitutional. *Id,* (citing *Proiect Release v. Prevost,* 722 F.2d 960, 971–74 (2d Cir.1983V *see also* N.Y. Mental Hyg. Law § 9.60). Pursuant to New York's Mental Hygiene Law, a patient may be involuntarily committed to a psychiatric facility on an emergency basis if he (1) has a mental illness for which "immediate observation, care, and treatment in a hospital is appropriate," and (2) "which is likely to result in serious harm" to himself or others. N.Y. Mental Hyg. Law § 9.39. The patient can be admitted for treatment "upon the certificates of two examining physicians, accompanied by an application for admission." *Id.* § 9.27. The application for admission, which must be executed within ten days prior to admission, can be submitted by, among others, "the director of the hospital ... in which the patient is hospitalized," or "a qualified psychiatrist who is ... treating such person for a mental illness in a facility licensed or operated by the [New York] office of mental health." *Id.* § 9.27(b)(6)(11). The director of the hospital cannot admit the patient until a third physician who is a member of the hospital staff confirms that the patient satisfies the criteria for hospitalization. *Id.* § 9.27(e). A patient has the right to contest her involuntary commitment through a court hearing scheduled within five days from the date that notice of the request is received by the court. *Id.* § 9.31; *Doe v. Harrison,* 01 Civ. 12741, 2003 WL 1535273, at *1 (S.D.N.Y. Mar.24, 2003).

If the defendant complied with the statutory requirements for involuntary commitment, then due process has been met and the plaintiff has no claim under 42 U.S.C. § 1983. *Jelich,* 2009 WL 3497495, at *2. Based on Spencer's assertions and the court documents integral to her complaint, it appears that Defendants adhered scrupulously to the procedural requirements to involuntarily hospitalize Spencer. They complied with New York law, which compliance is sufficient, by itself, to establish due process. Spencer was given the statutorily required notice and opportunity to be heard within a reasonable time following her initial confinement. Therefore, Spencer has failed to state a claim for deprivation of her liberty without due process, and, in the

absence of a constitutional violation, she has failed to state a claim under § 1983 regarding her involuntary commitment.

**\*8** Spencer further alleges that she was involuntarily medicated with anti-psychotic drugs. (Amend.Cmplt.§§ III.A–C, V.) Under the Fourteenth Amendment, a competent person has the right to refuse unwanted medical treatment. *See, e.g., Cruzan,* 497 U.S. at 278 ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."). Moreover, under New York law, an adult has the right to refuse medical treatment except "in narrow circumstances, including those where the patient presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." *Jelich,* 2009 WL 3497495, at \*3 (internal quotations and citations omitted). "The right to refuse medication is reflected in N.Y. Com.Codes R. & Regs. Tit. 14 § 527.8(c), which provides that a patient may only be treated against their will by court authorization or in emergency situations where the patient is presently dangerous and the proposed treatment is the most appropriate reasonably available means of reducing the dangerousness and that [s]uch treatment may continue only as long as necessary to prevent dangerous behavior," *Id.* (internal quotations and citations omitted).

Here, the administration of medication over Plaintiff's objection was authorized by court order, following an adjudication that Plaintiff was not competent to make decisions about her medical care. (*See* Defs. Letter 12/8/11 Ex. A.). Therefore, Spencer cannot seek damages based on her forced medication. *See Johnson v. Myers,* 10 Civ.1964,2011 WL 6131003, at \*5 (E.D.N.Y. Dec.6, 2011) (quoting *Porter v. Westchester Cnty. Med. Ctr.,* 252 A.D.2d 518, 675 N.Y.S.2d 364, 365 (2d Dep't 1998)) (citations omitted) ("A valid, binding, and enforceable court order obtained and issued in accordance with the Mental Hygiene Law precludes relitigation of the issues determined therein in a later action to recover damages."). Further, because Defendants complied with New York state law, Plaintiff was afforded all the process she was due. Therefore, she has not alleged a constitutional violation on which she can predicate her § 1983 claim.

This conclusion is consistent with other courts' findings. For example, in *Gonzales v. Carpenter,* 08 Civ. 629, 2011 WL 768990, at \*17 (N.D.N.Y. Jan.3, 2011), the court held that plaintiff was afforded due process with respect to his

involuntary medication, when medication was allowed only after plaintiff received notice and participated in a judicial hearing with assistance of counsel. Further, in granting the order for involuntary medication, the court (1) relied on psychiatric reports that plaintiff posed a danger to himself and others, (2) ruled that plaintiff lacked "the capacity to make a reasoned decision concerning his own treatment," and (3) found that the proposed treatment was "narrowly tailored to the needs of the plaintiff" and "in the plaintiff's best interest." *Id.* As a result, the court held that the plaintiff received proper procedural protection regarding his involuntary medication. *Id.*

**\*9** In the same way, here, the New York State Supreme Court granted a final order authorizing the medication of Spencer against her will after a judicial hearing at which Spencer was represented by counsel. (*See* Defs. Letter 12/8/11 Ex. A.) The court based its decision on the petition of Dr. Esther Langer, Deputy Director of Psychiatry at Bellevue, along with affirmations by two other physicians, including Dr. Leingang, who also testified at the hearing. (*Id.*) The court concluded that Spencer "lacks the capacity to make a reasoned decision with respect to her treatment" and that the administration of medication over Spencer's objection was "in the best interests" of Spencer. (*Id.*) Like the court found in *Gonzales,* Spencer received procedural protection that exceeded the requirements of due process. *See Gonzales,* 2011 WL 768990, at \*17 (citations omitted). Therefore, Spencer has suffered no deprivation of rights as a result of her involuntary medication.

### 3. Unreasonable Seizure

"Involuntary commitment claims also implicate the Fourth Amendment right against unreasonable search and seizure." *Jelich,* 2009 WL 3497495, at \*3 (citing *Drozdik,* 01 Civ. 3300, 2003 WL 366639, at \*5 (S.D.N.Y. Feb.20, 2003)). But, there is no Fourth Amendment violation for involuntary hospitalization "if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard." *Glass v. Mayas,* 984 F.2d 55, 58 (2d Cir.1993). Spencer has not alleged that Defendants failed to satisfy the requirements of the governing standard and, to the contrary, a state court has found that the legal standards have all been met. Thus, Plaintiff has not alleged a violation of her right to be free from unreasonable seizures, and so has failed to state a claim for relief under § 1983.

### 4. Jane Doe's Statement

2012 WL 1267886

The only remaining claim in Spencer's Amended Complaint is that Jane Doe loudly announced confidential information regarding Spencer's stay at Bellevue. (Amend.Cmplt.§§ III.C.) Based on this assertion, Spencer alleges violations of her rights pursuant to 42 U.S.C. § 1983. (Amend.Cmplt.§ II.B.) The Amended Complaint fails to offer any detail regarding the circumstances surrounding this alleged incident, and it also does not advance legal theories of relief beyond conclusory statements. It is, therefore, dismissible simply under *Twombly* and *Iqbal.*

The best this Court can do on Plaintiff's behalf is to construe her complaint as alleging a violation of her substantive due process right to privacy. But even assuming such a theory exists, Plaintiff's claim would fail, because the § 1983 standard for violations of substantive due process requires behavior that shocks the conscience of the Court. *See generally Cty. of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Plaintiff has not pleaded such conduct.

### CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is granted. Plaintiff's Amended Complaint is dismissed, with prejudice.

**\*10**  The Clerk of the Court is directed to close the case.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1267886

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Gonzales v. Carpenter, Not Reported in F.Supp.2d (2011)
2011 WL 768990

2011 WL 768990
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,
v.
D. CARPENTER, et al, Defendants.

No. 9:08–CV–629 (LEK/ATB).
|
Jan. 3, 2011.

**Attorneys and Law Firms**

Raymond Gonzales, pro se.

Richard Lombardo, Asst. Attorney General, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation by Senior U.S. District Judge Lawrence E. Kahn, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff's amended complaint ("AC," Dkt. No. 110) seeks monetary damages, under 42 U.S.C. § 1983, for various alleged violations of his constitutional rights arising from his confinement by the New York State Department of Correctional Services ("DOCS") and the Office of Mental Health ("OMH"), between July 2007 and February 2008. Presently before this court is defendants' motion to dismiss the amended complaint for failure to state a claim, pursuant to FED. R. CIV. P. 12(b) (6). (Dkt. No. 120). Plaintiff has filed a memorandum of law, affidavit, and voluminous documentary exhibits in opposition to the defendants' motion. (Dkt. No. 129). This court recommends granting defendants' motion and dismissing the amended complaint in its entirety, for the following reasons.

**I. Facts and Contentions** [1]

[1]  On June 16, 2008, plaintiff commenced this civil rights action by filing a complaint (Dkt. No. 1) against 29 defendants. By order dated June 20, 2008 (Dkt. No. 4), Judge Kahn dismissed six of those defendants. On April 24, 2009, the

New York State Attorney General's Office filed a motion to dismiss the complaint on behalf of 20 of the remaining defendants. (Dkt. No. 76). By order dated August 28, 2009, Judge Kahn granted plaintiffs request to dismiss this action with prejudice as against two of the remaining defendants (not represented by the Attorney General). (Dkt. No. 104). On January 22, 2010, plaintiff filed a motion for leave to file an amended complaint. (Dkt. No. 106). By order dated March 31, 2010, Judge Kahn granted plaintiff's motion to amend and denied the pending motion to dismiss the original complaint as moot. (Dkt. No. 109). The current motion to dismiss was filed by the Attorney General's Office on June 23, 2010, on behalf of all 14 defendants named in the amended complaint. On July 9, 2010, plaintiff filed a letter requesting permission to again amend his complaint, rather than respond to the defendant's motion to dismiss. (Dkt. No. 122). By text order dated July 12, 2010, this court denied plaintiff's motion to amend his complaint again, and provided him with an extension of time to file his opposition to the motion to dismiss.

Plaintiff's current claims arise from events, between July 24, 2007 and February 13, 2008, relating to his transfers among and between the Special Housing Unit ("SHU") at Upstate Correctional Facility ("Upstate"), the SHU and the OMH satellite unit at Great Meadow Correctional Facility ("Great Meadow"), and the Central New York Psychiatric Center ("CNYPC"), which was operated by OMH. [2] The amended complaint names 14 defendants from DOCS and OMH. The DOCS defendants are Brian Kourofsky, a sergeant assigned to the SHU at Upstate; David Rock, the Superintendent at Great Meadow; David Carpenter, Deputy Superintendent for Programs and, for a time, the Acting Superintendent at Great Meadow; John Baisley, a lieutenant assigned to Great Meadow; Mark Cleveland, James Rando, and Richard Reynolds, sergeants assigned to the SHU at Great Meadow; and Gary DeFranco, a correction officer at Great Meadow. The OMH defendants are Hasan Rahman, Kalyana Battu, and Jose Gonzalez, psychiatrists assigned to Great Meadow; Pamela Roberts, a psychiatrist's assistant assigned to Great Meadow; Donald Sawyer, Executive Director at CNYPC; and Rajeshwar Kartan, a psychiatrist assigned to CNYPC.

[2]     Plaintiff was also briefly confined at Downstate Correctional Facility ("Downstate"), although his stay there does not figure into his various claims.

The defendant's memorandum of law fairly and cogently sets forth the factual allegations of plaintiff's lengthy, and not entirely comprehensible, amended complaint. (Defs.' Memo. of Law at 2–13, Dkt. No. 120–1 at 4–15). This court will briefly summarize and supplement the pertinent facts here, and will provide relevant details, as necessary, in the analysis of plaintiff's claims below.

From at least 2001, plaintiff was confined in various DOCS facilities in the Northern and Western Districts of New York. Between 2001 and 2009, plaintiff filed eight civil rights actions in federal court and two cases in the New York Court of Claims relating to various complaints arising from his confinement. (AC ¶¶ 20–29). Two of the more recent civil rights complaints included allegations regarding plaintiff's confinement at Upstate in 2006 and early 2007, although Brian Kourofsky—the only defendant from Upstate in this action-was not named as a defendant in the prior actions. (9:06–CV–1424, 2/22/2010 Decision and Order of Hood, DJ, Dkt. No. 95 at 1–5 [3]; 9:07–CV–406, Complaint ¶¶ 27–168, Dkt. No. 1). In July 2007, while he was confined at Upstate, and thereafter, to the extent allowed, plaintiff was working on perfecting an appeal of a state conviction involving an alleged assault on a DOCS employee at Attica Correctional Facility ("Attica"), in Wyoming County, in the Western District of New York. (AC ¶¶ 60–61).

[3]     Judge Hood's decision is reported as *Gonzales v. Wright,* 9:06–CV–1424 (JMH), 2010 WL 681323, at *1–2 (N.D.N.Y. Feb. 23, 2010).

**\*2**   Throughout the amended complaint, plaintiff consistently and vehemently denies that he suffered from mental illness or needed mental health treatment. However, beginning in July 2007, DOCS began a series of steps which subjected plaintiff to unwanted evaluations and treatment for mental illness. In support of a certification stating that plaintiff was suffering from a mental illness requiring involuntary treatment, psychiatrist Hasan Rahman concluded that plaintiff was suffering from chronic delusional disorder. Defendant Rahman noted that:

> [Gonzales] has been ... putting underwear on top of his head with the belief that chemicals or poisons [are] coming through the roof and [he is] smearing feces ... in SHU as well as in OBS. He is having many tickets for bizarre and unhygenic behaviors.

(AC, Ex. H, Dkt. No. 110–2 at 20). [4]

[4]     Sealed Ex. 8 to defense attorney Lombardo's declaration (Dkt. No. 120–2) describes, in more detail, some of the behaviors of plaintiff at Upstate which caused the defendant psychiatrists to conclude that plaintiff was suffering from serious mental illness and required treatment. At least one of plaintiff's prior civil rights complaints alleged that DOCS employees at Upstate subjected him to "infections harmful chemical substances" by placing the substances in the ventilation system and burned him with laser beams shot through the lights in his cell. (9:06–CV–1424, Dkt. No. 95 at 2–3 & n. 3, 2010 WL 681323, at *1).

Plaintiff was confined in the OMH mental health satellite unit at Great Meadow, and examined by various of the defendant psychiatrists, between July 24 and August 1, 2007 and, later, between September 24th and October 1st of the same year. [5] On or about October 1, 2007, plaintiff was transferred to CNYPC. Eventually, OMH took plaintiff to court and obtained orders involuntarily committing him to CNYPC for up to six months (AC, Ex. M, Dkt. No. 110–2 at 30), and allowing plaintiff's treating psychiatrists to involuntarily medicate him (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff was released from CNYPC and returned to a DOCS facility on February 13, 2008.

[5]     Plaintiff was discharged from the Great Meadow OMH satellite unit and returned to the Upstate SHU on August 1, 2007. On August 24, 2007, plaintiff was transferred to Downstate Correctional Facility, and then sent back to the SHU at Great Meadow on August 30, 2007. On September 24, 2007, plaintiff was returned to the satellite unit at Great Meadow.

Liberally construed, the amended complaint claims that plaintiff's constitutional rights were violated in connection with his confinement by DOCS and OMH between July 2007 and February 2008 in the following ways. Plaintiff alleges that his transfers to the OMH satellite unit at Great Meadow,

his involuntary confinement and treatment at CNYPC, and various other alleged adverse actions were taken against him, as part of a conspiracy to retaliate for the exercise of his First Amendment rights—his right to pursue civil rights and other actions against DOCS, as well as his appeal of his conviction involving the alleged assault on a DOCS employee at Attica. Plaintiff claims that his transfers and other actions taken by DOCS were also carried out pursuant to a conspiracy to deny him access to courts, in particular, by interfering with his ability to perfect the appeal of his criminal conviction. Plaintiff also contends that his classification as mentally ill, and the conditions of his confinement and the involuntary treatment he suffered at the satellite unit at Great Meadow and CNYPC violated his rights under N.Y. Correction Law § 402, as well as his Fourteenth Amendment right to due process and his Eighth Amendment right not to be subjected to cruel and unusual conditions of confinement, or deliberate indifference to his medical and basic needs.

Defendants argue that plaintiff's various claims are frivolous, irrational, and incredible, and fail to state viable causes of action under Section 1983. This court agrees that plaintiff's conclusory claims of retaliation are insufficient to establish a plausible link between activity protected by the first amendment—*e.g.,* filing civil rights complaints against DOCS—and any adverse actions taken against him. The documents attached to the motion papers of both sides establish that the actions of the defendants were not the cause of any concrete harm to plaintiff in connection with the pursuit of his criminal appeal, thereby undermining plaintiff's claim that defendants unconstitutionally interfered with his right of access to courts. The transfers and involuntary treatment and medication of plaintiff for perceived mental illness were not carried out in such a way that violated plaintiff's due process rights; and, even if procedures under N.Y. Correc. Law § 402 were not properly followed, that would not support a constitutional claim under Section 1983. Finally, plaintiff fails to state a plausible claim that the conditions of his confinement or the conduct of any of the named defendants against him constituted deliberate indifference to his serious medical needs or cruel and unusual punishment.[6] Accordingly, this court will recommend that defendants' motion to dismiss be granted and the amended complaint dismissed in its entirety.

[6]     The defendants also advance arguments that particular defendants were not personally involved in alleged constitutional violations and, hence, cannot be liable for damages. As discussed briefly below, to the limited extent it is necessary to address the personal involvement arguments, they further support dismissal of plaintiff's amended complaint. Defendants also assert that they should be protected by qualified immunity, which the court will address briefly at the end of this report-recommendation.

## II. *Motion to Dismiss*

**\*3** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). In this case, plaintiff attached a significant number of documents to his amended complaint that this court has considered in making its recommendation. In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. See *Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).[7]

**7**    In support of the motion to dismiss, the defense attorney filed a supporting declaration, which included a limited number of supporting documents, one of which was filed under seal (Ex. 8). (Dkt. No. 120–2). All of the documents submitted by the defendants, with the exception of Ex. 8, were also attached to plaintiff's affidavit in opposition to the defense motion. Ex. 8 includes the papers supporting the petition to allow CNYPC to administer medication to plaintiff over his objection. Plaintiff attached the petition to his amended complaint (Ex. P, Dkt. No. 110–2 at 37–39), but not the supporting papers referenced in the petition. (Lombardo Decl. ¶¶ 9–11).

A court should dismiss an *in forma pauperis ("IFP")* case [8] at any time if the court determines, *inter alia,* that the action is frivolous. 28 U.S.C. § 1915(e)(2)(B)(I). In determining whether a case is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). "[T]he *in forma pauperis* statute, unlike Rule 12(b)(6), 'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.' " *Denton v. Hernandez,* 504 U.S. 25, 32 (1992) (quoting *Neitzke,* 490 U.S. at 327). Dismissal of an IFP action is proper, for example, when the allegations are the product of delusion or fantasy. *Id.* (quoting *Neitzke,* 490 U.S. at 328); *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

**8**    Plaintiff was granted IFP status in the instant case. (Dkt. No. 4).

### III. Retaliation

#### A. Legal Standards

**\*4**    While "[a] prisoner has no liberty interest in remaining at a particular correctional facility, prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights .... " *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). [9] In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002);

*Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

**9**    It is well-established that convicted prisoners have no right to choose the prison in which they are housed. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, a plaintiff must set forth non-conclusory allegations to state a viable claim of retaliation. *Id.* [10]

**10**    Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, inter alia, *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)).

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *overruled on other grounds sub nom. Ashcroft v. Iqbal,* —— U.S. ——,

129 S.Ct. 1937 (2009); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). "A complaint containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.).

### B. Application

Plaintiff appears to allege that all 14 defendants, who worked at three different New York state facilities, conspired to retaliate against him for filing prior civil law suits, and for pursuing an appeal of his conviction for assaulting a DOCS employee at Attica. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126), were all the result of a retaliatory conspiracy.

**\*5** The plaintiff's prior legal actions (AC ¶¶ 20–29) were constitutionally protected activity for a prisoner. And this court will assume, for the purposes of this motion, that the various transfers and involuntary treatment and medication of plaintiff constituted "adverse action" against him. *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (the allegation that defendants transferred inmate plaintiff to a psychiatric facility must be construed as describing an adverse action), *abrogated on other grounds sub nom. Porter v. Nussle,* 534 U.S. 516, 532 (2002). However, the plaintiff's conclusory allegations of retaliation do not establish a plausible claim that there was any causal connection between his protected activity and any alleged adverse actions taken against him. With one exception, discussed further below, the amended complaint does not set forth any specific factual allegations that support plaintiff's claim that he was the subject of intentional retaliation by any of the defendants. Plaintiff's conclusory and frivolous charges of pervasive and collusive retaliation against him do not support a plausible inference that the defendants retaliated against him, for filing various lawsuits and pursuing a criminal appeal, by transferring him to facilities where he received involuntary mental health treatment and medication.

There is no indication that any of the defendants named in this action were involved in any of plaintiff's prior litigation. (AC ¶¶ 20–29). Plaintiff's appeal for an assault conviction, and most of his civil rights complaint against DOCS involved

facilities other than Upstate, Great Meadow, and CNYPC, where the named defendants in this action were assigned.

Four of plaintiff's prior civil rights actions involved alleged prior incidents at Upstate, where only one of the named defendants in this action (Sgt.Kourofsy) worked. [11] The only allegation against defendant Kourofsky in the amended complaint in this action was that he advised plaintiff, on July 24, 2007, that, as a result of orders from "Albany," plaintiff was being transferred from Upstate to Great Meadow. (AC ¶¶ 31–41). The first alleged retaliatory adverse action about which plaintiff complains involves his confinement and mental health treatment in the OMH satellite unit at Great Meadow. Plaintiff alleges nothing to support a plausible inference that a correctional sergeant, with no connection to the DOCS or OMH medical staff, could have caused the inmate's transfer for a mental health evaluation, [12] even if Sgt. Kourofsky knew of plaintiff's various prior lawsuits and was inclined to retaliate against him (which plaintiff also does not allege in the amended complaint). [13] Nor does the amended complaint set forth any factual allegations which would suggest that Sgt. Kourofsky at Upstate would have had any control over the conditions of plaintiff's confinement at Great Meadow [14] or any influence over the treatment provided to plaintiff at the OMH satellite unit. [15] Accordingly, defendant Kourofsky could not have been personally involved in how plaintiff was treated at Great Meadow, and could not be liable under Section 1983, even if plaintiff's constitutional rights were violated at that facility. [16]

[11]  One of those cases dated back to 2001 (AC ¶ 20; Dkt. No. 9:01–CV–1811, Dkt. No. 47) and one was a suit against federal agents (AC ¶ 26; 9:07–CV–458, Dkt. No. 1).

[12]  *See, e.g., McQuilkin v. Central New York Psychiatric Center,* 9:08–CV–975 (TJM/DEP), 2010 WL 3765847, at \*15 (N.D.N.Y. Aug. 27, 2010) (Report–Recommendation) (plaintiff's claim that he was transferred to CNYPC in retaliation for serving a notice of summons on the prison superintendent fails because the record reflects that the transfer decision was made by OHM care providers following an evaluation of plaintiff's mental status), adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).

2011 WL 768990

13    Perhaps to bolster the conclusory claims of retaliation in his amended complaint, plaintiff makes additional allegations with respect to defendant Kourofsky in his papers opposing defendants' motion. Plaintiff claims that Sgt. Kourofsky "ordered" at least two searches of plaintiff's cell in the Fall of 2006, during which officers damaged the legal papers relating to plaintiff's appeal. (Pltf.'s Aff. ¶¶ 21, 25, Dkt. No. 129–2). The supporting documents that plaintiff provides concerning these cell searches, do not mention Sgt. Kourofsky, nor do they reference any legal papers. (Ex. G, Dkt. No. 129–3 at 22; Ex. J, Dkt. No. 129–3 at 29). Moreover, in a prior complaint in which plaintiff alleges a retaliatory cell search at Upstate, during the same time period, that damaged the papers relating to plaintiff's criminal appeal, plaintiff does not implicate Sgt. Kourofsky. (9:06–CV–1424, Dkt. No. 1 ¶¶ 126, 134–42; Dkt. No. 95 at 3–4, 27–28, 2010 WL 681323, at *1, 13). In any event, even if plausible, these allegations are not part of the amended complaint in this case and do not provide any support for an inference that Sgt. Kourofsky caused plaintiff's transfer for a psychiatric evaluation in July 2007.

14    See, e.g., Green v. Bauvi, 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

15    Smith v. Woods, 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at *9 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate treatment of an inmate/patient and could not be liable for the doctor's medical decisions). See also Cuoco v. Moritsugu, 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable, because they lack the authority to intervene in medical decisions).

16    See, e.g., Wright v. Smith, 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir.2003).

*6    The only factual allegation in the amended complaint that supports an inference that any defendant harbored a retaliatory motive against plaintiff involves defendant Rando, a sergeant assigned to the Great Meadow SHU. After he was transferred back to Great Meadow (on August 30, 2007), plaintiff was visited (on September 4th) by attorneys assigned to assist him in several civil rights suits he filed in the Western District of New York (involving facilities other than Great Meadow and Upstate, which are in the Northern District of New York). (AC ¶ 68). Plaintiff alleges that, on September 11, 2007, he asked Sgt. Rando about obtaining his legal papers, and defendant Rando said that plaintiff would not get his papers because he had five lawsuits filed. (AC ¶ 69). Notwithstanding this alleged "retaliatory" comment, plaintiff received his legal papers a week later (on September 18th), from defendant Cleveland. (AC ¶ 70).

Cases in this circuit have held that the theft, confiscation, or destruction of an inmate's legal documents can constitute "adverse action" for the purposes of a retaliation claim. See, e.g., Smith v. City of New York, 03 Civ. 7576, 2005 WL 1026551, at *3 (S .D.N.Y. May 3, 2005); Smith v. Maypes–Rhynders, 07 Civ. 11241, 2009 WL 874439, at *5 (S.D.N.Y. Mar. 31, 2009). However, a mere delay in the transfer of plaintiff's legal papers, even if motivated by retaliation, would appear to be the type of de minimis action that would not be considered "adverse." See, e.g., Rivera v. Pataki, No. 04 Civ. 1286, 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (several temporary incidents of actively preventing plaintiff from mailing his legal documents were not sufficiently serious to constitute "adverse action"). Moreover, it seems implausible that a DOCS employee at the Great Meadow SHU would be motivated to retaliate against an inmate who had been confined there for less than two weeks on the basis of law suits that did not involve defendant Rando, or anyone else at Great Meadow.

The fact that defendant Rando allegedly told plaintiff he would not get his legal papers back, but they were, in fact, delivered a week later by another sergeant, undercuts the inference that Sgt. Rando was the cause of the delay in plaintiff's receipt of his documents. See, e.g., Key v. Toussaint, 660 F.Supp.2d 518, 526 (S.D.N.Y.2009) (the fact that the inmate plaintiff's property was ultimately returned to him further suggests that the defendants did not intentionally lose or steal his personal property, notwithstanding the vague threats one defendant made to plaintiff). While plaintiff

2011 WL 768990

alleges that his legal papers were not delivered to him until 19 days after his return to Great Meadow, he was transferred from Upstate to Downstate to Great Meadow over the course of six days, which might be expected to cause delays in the transfer of papers and personal possessions. While the timing of defendant Rando's alleged remarks during the period while plaintiff's papers were delayed provides some support for an inference of retaliation, this court finds the plaintiff's allegations do not state a plausible claim against defendant Rando. *See, e.g., McQuilkin v. CNYPC,* 2010 WL 3765847, at *15 (the service of a summons on the prison superintendent, followed in short order by the seizure of the plaintiff's personal property, was an insufficient basis upon which a reasonable factfinder could find retaliation); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N .Y.2000) (although the temporal proximity of a protected activity and the alleged adverse action provides circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment) (citing *Ayers v. Stewart,* 101 F.3d 687 (Table), No. 96–2013, 1996 WL 346049, at *1 (2d Cir. June 25, 1996).

**\*7** Nothing else in the amended complaint provides any factual support for plaintiff's claim that all of the defendants conspired to retaliate against him by, *inter alia,* falsely labeling him as mentally ill and subjecting him to involuntary and unneeded mental health treatment and medication. As discussed further below, the records submitted by plaintiff, and the adjudication of issues relating to his mental health in two state court proceedings, demonstrate that many of the allegations in the amended complaint reflect plaintiff's delusions and paranoia, notwithstanding his vehement denials of mental illness. Plaintiff's claims in this and prior civil rights complaints indicate that he suffers from "a victimization fantasy." *Gonzales v. Wright,* 2010 WL 681323, at * 12 (as courts in the Second Circuit have consistently recognized, "it is utterly unjust to haul people into federal court to defend against, and disprove, delusions") (collecting cases). In that context, the court finds that all of plaintiff's allegations of retaliation, even if, in a few instances they might arguably survive under the standards of Rule 12(b)(6), are the results of plaintiff's delusions and fantasy, and are clearly without factual basis, and subject to dismissal as frivolous under 28 U.S.C. § 1915(e)(2)(B)(I). *Denton v. Hernandez,* 504 U.S. at 32 (citing *Neitzke,* 490 U.S. at 327–28).

## IV. Access to the Courts

### A. Legal Standards

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, the plaintiff must establish that deliberate and malicious interference impeded his access to the courts, and that, as a result of that interference, the inmate suffered actual injury. *See Lewis v. Casey,* 518 U.S. 343, 349, 351 (1996); *Cancel v. Goord,* 00–CV–2042, 2001 WL 303713, at *4 (S.D.N.Y. March 29, 2001). *Lewis* also requires a showing of prejudice to an existing meritorious action involving a direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 353, 355. "Mere 'delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

### B. Application

Plaintiff alleges that all 14 defendants, from three different facilities, conspired to deprive him of access to the courts in connection with his appeal of his conviction for assaulting a DOCS employee at Attica, and his various civil rights actions. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 49, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126, 128, 133), were all the result of the conspiracy to violate his First Amendment right of access to courts. As with the alleged conspiracy to retaliate against plaintiff, the conclusory allegations of a pervasive illegal agreement to deny him access to the courts are insufficient to state a valid cause of action for conspiracy under Section 1983. In any event, under the facts that plaintiff has asserted in opposition to this motion, he cannot establish a plausible claim that any of the named defendants actually prejudiced him by impeding his ability to pursue his criminal appeal or his civil rights actions.

**\*8** Plaintiff alleges that the defendants' purported conspiracy actually prejudiced him only with respect to his efforts to perfect his criminal appeal between July 24, 2007, when he was first transferred to Great Meadow, to February 13, 2008, when he was released from CNYPC. The motion papers of

2011 WL 768990

both the defendants and the plaintiff extensively describe and document the protracted period during which plaintiff was attempting to perfect this appeal. (Lombardo Dec., Dkt. No. 120–2; Pltf.'s Aff., Dkt. No. 129–2). For the purposes of deciding the instant motion as to the allegations in the amended complaint, it is not necessary to review the entire procedural history of plaintiff's appeal.

On May 21, 2007, the Supreme Court, Appellate Division, Fourth Department, granted plaintiff the last of several extensions, **until August 20, 2007,** to perfect his *pro se* appeal from his conviction involving the alleged assault of a DOCS employee. (Pltf.'s Aff ¶ 42; Ex. Q, Dkt. No. 129–3 at 48). By that time, plaintiff had drafted an appellate brief, assembled the record of the trial court proceedings needed for the appendix, and submitted these papers to the Clerk of the Appellate Division. (Pltf.'s Aff. ¶ 33). However, on January 26, 2007, the Clerk rejected this submission and returned plaintiff's papers because he failed to submit either a stipulation of all parties regarding the contents of the record, or an order of the trial court settling the contents of the record. (Pltf.'s Aff. ¶ 36; Ex. M, Dkt. No. 129–3 at 39).

Plaintiff was confined at the Great Meadow OMH satellite unit for the first time from July 24, 2007 until August 1st, when he was returned to Upstate. On August 14th, plaintiff requested another extension from the Appellate Division, because, despite numerous prior requests, he had not yet received a stipulation or order settling the record from the District Attorney or trial judge. (Pltf.'s Aff. ¶ 54). [17] Shortly thereafter, on August 17th, plaintiff received the executed, certified stipulation necessary to complete his appellate papers, and began preparations to perfect his appeal. (Pltf.'s Aff. ¶ ¶ 56, 57; Ex. Y, Dkt. No. 129–3 at 64–65). Plaintiff's affidavit does not explain why, despite the fact that he had all of the necessary papers in his cell at Upstate, he did not submit the documents necessary to perfect his appeal by the August 20, 2007 deadline.

[17]   In his affidavit in opposition to plaintiff's motion, plaintiff alleges that, on August 4, 2007, defendant Kourofsky ordered a search of his cell, during which two officers "did spread some liquid and stain a lot of pages of several copies of the briefs of his appeal." (Pltf.'s Aff. ¶ 52). These allegations were not made in the amended complaint, and plaintiff does not allege, even in his later affidavit, that the alleged cell search was the cause of his

failure to submit his appeal by the August 20th deadline.

On August 24, 2007, plaintiff was transferred to Downstate, and then was sent to Great Meadow on August 30th. (Pltf.'s Aff. ¶ 60). On September 18th, while in the SHU at Great Meadow, plaintiff received a notice from the Appellate Division that his request for a further extension of his appeal was denied; however, plaintiff was given leave to renew his motion upon a showing that his appeal had merit. (Pltf.'s Ex. ¶ 62; Ex. Z, Dkt. No. 129–3 at 67). On September 18, 2007, plaintiff received his transferred legal papers while still in the Great Meadow SHU. (Pltf.'s Aff. ¶ 65). Plaintiff claims that he was working on an application to renew his motion to perfect his appeal on September 24th, when he was removed to the satellite unit at Great Meadow, where he was not allowed to have his papers. From there, plaintiff was transferred to CNYPC, and was held there until February 13, 2008. Plaintiff alleges that he was unable to get access to his legal papers or work to perfect his appeal during the period he was confined at CNYPC. (Pltf.'s Aff. ¶¶ 66–68).

**\*9**   On April 18, 2008, a month after his release from CNYPC, plaintiff submitted another application to the Appellate Division in an apparent effort to get permission to belatedly perfect his appeal. On May 14, 2008, the Appellate Division denied his application, again "with leave to renew upon a showing of sufficient facts to demonstrate a meritorious appeal." (Pltf.'s Aff, Ex. 1, Dkt. No. 129–3 at 70). Plaintiff complains, in his affidavit, that he was unable to make any further submission to the Appellate Division because his legal papers were not returned to him. (Pltf.'s Aff. ¶ 68). However, the attachments to plaintiff's affidavit in opposition to defendant's motion includes a copy of his appellate brief (Ex. W, Dkt. No. 129–4 at 1–47), his proposed appendix (Ex. X, Dkt. No. 129–6 at 1–80), and the executed stipulation as to the contents of the record (Ex. Y, Dkt. No. 129–3 at 64–65).

The facts acknowledged by plaintiff and the documents that he has submitted in opposition to defendants' motion, establish that the conduct of the defendants, in transferring him to Great Meadow and them committing him to CNYPC, was not the cause of his failure to perfect his appeal. The District Attorney and the trial judge in plaintiff's criminal case (neither of whom are defendants here) delayed in providing the requested stipulation as to the contents of the record, thereby preventing plaintiff from perfecting his appeal before August 17, 2007. Plaintiff provides no explanation as to why he did not submit, to the Appellate Division,

the necessary paperwork, all of which he had at the Great Meadow SHU between August 17th and August 24th, when he was transferred to the satellite unit. In any event, after plaintiff was released from CNYPC in February 2008, he was in the same position with respect to his appeal as he was after August 20, 2007—he could renew his motion to perfect his appeal upon a showing that his appeal had merit. Plaintiff's stated excuse for not renewing his motion and making a showing of merit—that his legal papers were not returned to him after his release from CNYPC—is clearly baseless given that he has attached those very papers to his affidavit in opposition to the instant motion.

This court finds that plaintiff's failure to perfect his appeal was not caused by any action of the defendants in this action; plaintiff either concluded that he could not establish that his appeal had merit or he failed, without excuse, to take available steps to perfect his appeal. Either way, based on the authority cited above, plaintiff's claim that the defendants maliciously impeded him in pursuing a meritorious action, in violation of his First Amendment right of access to courts, must fail.

**V. Confinement at the OHM Satellite Unit at Great Meadow**

Plaintiff asserts that he was unlawfully confined to the OMH satellite unit at Great Meadow for two periods in 2007 by defendant Kourofsky, a corrections sergeant at Upstate; defendants Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, and DeFranco, on the administrative or corrections staff at Great Meadow; defendant Roberts, an OMH psychiatrist's assistant at Great Meadow; and defendants Rahman, Battu, and Gonzalez, OMH psychiatrists assigned to Great Meadow. While the amended complaint is not entirely clear about which of plaintiff's constitutional rights were allegedly infringed by his confinement in the satellite unit, this court will consider possible due process and Eighth Amendment violations.

 *10  The court concludes that the short-term confinement of plaintiff in a prison mental health clinic for observation did not implicate a liberty interest triggering due process protection. Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment. Accordingly, this court recommends dismissal of the claims involving plaintiff's confinement at the Great Meadow satellite unit.

**A. Due Process**

Plaintiff was confined in the satellite unit at Great Meadow, for psychiatric observation and treatment, from July 24 through August 1, 2007, and again, from September 24th through October 1st, when he was moved to CNYPC. The amended complaint contains very few factual allegations about the conditions of plaintiff's confinement in the satellite unit. Plaintiff complains that he was "confined in the satellite unit naked only with a gown for person crazy [sic]," (AC ¶ 43) and that he was asked a lot of "stupid" questions by the defendant psychiatrists (AC ¶¶ 44, 48, 90). Although plaintiff alleges that at least one of the psychiatrists at the Great Meadow satellite unit prescribed him unwanted medication (AC ¶ 52), he does not claim he was actually involuntarily medicated at Great Meadow, and the psychiatrist's report indicates that plaintiff resisted treatment and refused all medication. (AC, Ex. H, Dkt. No. 110–2 at 20).

Plaintiff has consistently claimed that he was not mentally ill, and did not require or want mental health treatment. The psychiatrists who observed plaintiff at the satellite unit all ultimately concluded that plaintiff was in need of involuntary care and treatment in an inpatient hospital for the mentally ill, and that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself and others. (AC, Ex. H & I, Dkt. No. 110–2 at 18–22). As discussed below, the conclusion that plaintiff was mentally ill and required treatment and medication was subsequently validated by several other psychiatrists and two state court judges.

To establish a claim based on a violation of due process, a plaintiff must establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process. *See, e.g., Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). A state prisoner generally has no liberty interest in being housed in a particular facility. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.1988). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the

length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*11** It is clear that a prisoner's transfer to a mental hospital is "qualitatively different" from the punishment characteristically suffered by a person convicted of crime, and implicates a liberty interest protected by the Due Process Clause. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Vitek v. Jones,* 445 U.S. 480, 493–94 (1980)). However, this court does not equate plaintiff's relatively brief period of observation and treatment in the Great Meadow satellite unit with a transfer to a mental hospital. *See, e.g., Cabassa v. Gummerson,* 9:01–CV–1039, 2008 WL 4416411, at \*11 (N.D.N.Y. Sept. 24, 2008) (distinguishing confinement in a prison infirmary for, *inter alia,* mental health problems, and commitment to a "mental hospital," and finding that a total confinement of 101 days in the infirmary plus 60 days in segregated housing did not implicate a liberty interest). This court concludes that temporary confinement of an inmate with clear mental health problems for a total of less than 30 days [18] for observation and evaluation in the psychiatric unit within a prison does not implicate a liberty interest. *See, e.g., Gay v. Turner,* 994 F.2d 425, 427 (8th Cir.1993) (five temporary transfers to the mental health unit for evaluation did not implicate Due Process Clause); *Jefferson v. Helling,* 324 Fed. Appx. 612, 613 (9th Cir.2009) (plaintiff's emergency transfer to, and short-term detention in a prison's mental health unit did not entitle inmate to a prior hearing); *Anderson v. Banks,* 06–CV–0625 (GLS/ DRH), 2008 WL 3285917, at \*7–8 (N.D.N.Y. Aug. 7, 2008) (transfer of inmate to mental health unit for monitoring and observation for three days was justified and did not constitute an undue hardship given plaintiff's mental health history and current symptoms); *Nwaokocha v. Sadowshi,* 369 F.Supp.2d 362, 373–74 (E.D.N.Y.2005) (finding that, where a prisoner is mentally ill and displaying "significant warning signs" of an altered mental state, "time of segregation on a justified suicide watch" falls within the purview of discretionary confinement decisions made by the corrections department and normally expected by a prisoner, implicating no liberty interest). The conclusion that due process protection would not apply to plaintiff's temporary confinements in the OMH satellite unit is reinforced by the observation of the court in *Nwaokocha,* which was echoed by Judges Homer and Sharpe in *Anderson v. Banks:*

[18] In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in

segregated housing was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual conditions. *Palmer v. Richards,* 364 F.3d 60, 65–66 (2d Cir.2004). (collecting cases). While this authority is not dispositive in the context of confinement in a prison mental health unit, it supports the conclusion that plaintiff's confinement was, in the absence of any allegations of unusual conditions of confinement, sufficiently short to avoid due process scrutiny.

Given the emotional and psychological challenge that prison imposes on mentally ill inmates, and the sometimes severe effects that can result-including, but not limited to, inmate suicides and harm to others-it is important that prison officials are encouraged to attend to mental health considerations rather than be penalized for having done so. *Nwaokocha,* 369 F.Supp. at 374 (citations omitted); *Anderson v. Banks,* 2008 WL 3285917, at \*2, 7 n. 7.

**B. Eighth Amendment**

**1. Conditions of Confinement**

**\*12** The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

Conditions of confinement are not cruel and unusual for Eight Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted). Plaintiff's complaints about the conditions of confinement in the Great Meadow satellite unit were limited to his objection that he was clothed only in a hospital gown, like a "crazy" person. (AC ¶ 43). Being required to wear a hospital gown for a mental health evaluation hardly constitutes cruel

and unusual conditions of confinement that would violate plaintiff's Eighth Amendment rights. *See, e.g., Salahuddin v. Dalsheim,* 94 CIV. 8730, 1996 WL 384898, at *14 (S.D.N.Y. July 9, 1996) (an inmate who claimed that he was deprived "of his belt, shoe laces, and personal property for seven days, subjected to 24–hour observation, placed with mentally ill inmates, denied a change of 'Greens,' and otherwise subjected to the regulations governing inmates in the [Mental Health Unit]" did not establish an objectively serious deprivation).[19] *Cf. Borges v. McGinnis,* 03–CV–6375, 2007 WL 1232227, at *4–6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation)

[19]   Unlike the plaintiff in this case, Salahuddin did not have a mental health designation which would have supported his confinement in the mental health unit. *Salahuddin,* 1996 WL 384898, at *3.

**2. Allegedly Inadequate Medical Care**

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id* .

***13** The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 Fed. Appx. 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279– 80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange,* 248 Fed. Appx. at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

In this case, plaintiff clearly disagreed with the medical judgment of the OMH psychiatrists that he required mental health observation, treatment, and medication. However, a difference of opinion between a prisoner and prison doctors regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Even if the defendants had been negligent in diagnosing or treating plaintiff's mental health conditions, that would not constitute "deliberate indifference." *Farmer v. Brennan,* 511 U.S. at 835. Because plaintiff's claims amount to mere disagreement regarding treatment, or perhaps, allegations of medical malpractice, they are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (1992) (table); *Kellam v. Hunt,* 9:04–CV–1225 (LEK/GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept. 20, 2007) (disagreements over medications, diagnostic techniques, forms of treatment, and the timing of their intervention implicate medical judgments and not the constitutional standards for medical care).[20]

[20]   It should be noted that, even if plaintiff's treatment in the satellite unit constituted a constitutional violation, only the psychiatrists, who determined the duration of his confinement and the course of his treatment, would be personally involved and liable under Section 1983. See notes 12 & 14– 16 above. *See also Brock v. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (prison superintendent

with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not "deliberately indifferent"); *Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at \*4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Accordingly, defendants Kourofsky, Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, DeFranco, and Roberts would be entitled to dismissal on plaintiff's claims regarding his confinement and treatment in the satellite unit even his constitutional rights had been violated.

### 3. Excessive Force

**\*14** The amended complaint alleges that, on September 24, 2007, defendants Cleveland, Rando, Reynolds, and DeFranco forcibly removed plaintiff from his SHU cell at Great Meadow when he admittedly refused to come out to be evaluated by defendant Battu, an OMH psychiatrist. (AC ¶ 88). Plaintiff does not claim that he was the victim of excessive force, or that he was injured, and his factual allegations are insufficient to state a cause of action under the Eighth Amendment.

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,

violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7).

Plaintiff's allegation that the defendants knocked him down, grabbed him, and placed him in handcuffs in order to remove him from his cell (AC ¶ 88) are not sufficient to satisfy the objective prong of the Eighth Amendment analysis. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (allegations that an inmate was "bumped, grabbed, elbowed, and pushed ..." by correction officers are "not sufficiently serious or harmful to reach constitutional dimensions ..."). Moreover, the amended complaint do not provide any factual support for a claim that the defendant correction officers did not make a good faith effort to maintain and restore discipline in the face of plaintiff's refusal to obey direct orders. When an inmate refuses to comply with an order to exit his cell, reasonable force may be used to enforce the directive. *See, e.g., Harris v. Ashlaw,* 9:07–CV–0358 (LEK/DEP), 2007 WL 4324106, at \*7 (N.D.N.Y. Dec. 5, 2007) (citing *Brown v. Busch,* 954 F.Supp. 588, 594–97 (W.D.N.Y.1997) (prison officials did not use excessive force against inmate who had refused to comply with a direct order, where officials forced inmate back into his cell by allegedly pushing, shoving, and striking him)); *James v. Coughlin,* 13 F.Supp.2d 403, 408–10 (W.D.N.Y.1998) (alleged conduct of corrections officer in pushing inmate back into his cell when inmate refused to comply with order to remain silent and became loud, boisterous, and disorderly did not involve a violation of eighth amendment).

## VI. Involuntary Confinement and Medication at CNYPC

**\*15** Plaintiff alleges that he was involuntarily confined and treated at CNYPC between October 1, 2007 and February 13, 2008 (AC ¶¶ 107, 148), in violation of various rights under the U.S. Constitution and N.Y. Correc. Law § 402. [21] Although it is not entirely clear from the amended complaint, it appears the intended defendants for this claim are defendants Rock and Carpenter, the Superintendent and Acting Superintendent of Great Meadow; defendants Roberts, Rahman, Battu, and Gonzalez—on the OMH mental health staff at Great Meadow;

and defendants Sawyer and Kartan of CNYPC.[22] Plaintiff alleged that he experienced a significant change in his living conditions and was housed together with mentally ill prisoners, which placed his life in danger. (AC ¶¶ 108–109). The amended complaint does not provide any further factual allegations regarding how plaintiff's life was placed in danger at CNYPC.

[21]   Under Section 402, the superintendent of a correctional facility, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill, must apply to the court for designation of two examining physicians. The two physicians, after conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correc. Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate, as well as any known relative. N.Y. Correc. Law § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. N.Y. Correc. Law § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months so that the inmate may be transferred into an OMH facility. *Id.*

[22]   Defendants argue that certain of the defendants would not be liable under Section 1983, even if plaintiff's constitutional rights were violated in connection with his commitment to, and treatment at CNYPC, because they were not personally involved in those actions. (Defs.' Memo. of Law at 21). In the context of a motion to dismiss, at least defendant Rock would be entitled to dismissal on this basis, under the authority cited in notes 12 and 15, above.

N.Y. Correc. Law § 402(9) authorizes the admission of an inmate to a mental hospital on an emergency basis, pending the filing of a commitment petition, upon the certification of two physicians that the inmate suffers from a mental illness which is likely to result in serious harm to himself or others. Such certifications were made by defendant Rahman on October 1, 2007 (AC, Ex. H, Dkt. No. 110–2 at 19–20) and defendant Battu on September 28, 2007 (AC, Ex. I, Dkt. No.

110–2 at 22). On October 1, 2007, defendant Carpenter, as Acting Superintendent of Great Meadow, applied to the New York Supreme Court, Oneida County to cause an examination of the plaintiff by two physicians. (AC, Ex. G, Dkt. No. 110–2 at 17). By order dated October 4, 2007 (AC, Ex. F, Dkt. No. 110–2 at 15), Supreme Court Justice Robert F. Julian designated two psychiatrists, Drs. Sangani and Kamath to examine the plaintiff. On October 14, 2007, Drs. Sangani and Kamath signed a certificate, stating that the plaintiff was mentally ill and in need of care and treatment. (AC, Ex. L, Dkt. No. 110–2 at 28).

On October 15, 2007, defendants Sawyer and Carpenter filed a notice and petition, pursuant to N.Y. Correc. Law § 402(3), seeking an order committing the plaintiff to CNYPC. (AC, Exs. J & K, Dkt. No. 110–2 at 24, 26). Plaintiff received the notice on October 24th (AC ¶ 129), and a lawyer from Mental Hygiene Legal Services was appointed to represent him in connection with the court hearing. (AC ¶ 134). At the hearing on the application to commit him, plaintiff made statements and submitted documents (AC ¶ 137), and defendant Kartan testified in support of the application (AC ¶ 138). Following the hearing, on October 24, 2007, Justice Anthony F. Shaheen committed plaintiff to the custody of CNYPC for a period not to exceed six months. (AC ¶ 139; Ex. M, Dkt. No. 110–2 at 30).

On October 16, 2007, defendant Kartan notified plaintiff that he intended to seek court authorization to medicate plaintiff over his objections. (AC ¶ 140; Ex. N, Dkt. No. 110–2 at 32). On November 27th, plaintiff was provided with a notice and a copy of a petition dated November 13th, advising him of a court hearing at which CNYPC would seek permission to involuntarily medicate plaintiff. (AC ¶ 141; Exs. O & P, Dkt. No. 110–2 at 34–35, 37–39; Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2). Plaintiff was provided with legal representation from Mental Hygiene Legal Services in connection with the hearing, on December 6th, to determine whether he would be involuntarily medicated. (AC ¶¶ 142–43). Following the hearing, Supreme Court Justice John W. Grow entered an order finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and authorizing CNYPC to administer medication to him, over his objection. (AC, Ex. Q, Dkt. No. 110–2 at 41–42).

**\*16** Plaintiff alleges that the various mental health professionals, who attested to his mental illness and his need for treatment and medication, provided false diagnoses, as

2011 WL 768990

part of a conspiracy with other defendants. (AC ¶¶ 126, 130, 133,138, 144). Plaintiff originally named Drs. Sangani and Kamath as defendants, but requested that they be dismissed from the action, with prejudice. (Dkt.Nos.103, 104). By order dated June 20, 2008, Senior District Judge Lawrence E. Kahn held that any testimony provided by defendant Kartan in state court proceedings supporting the commitment and involuntary medication of plaintiff would be absolutely privileged under New York state law, and could not support a claim under section 1983. (Dkt. No. 4 at 4–5).

While it is not entirely clear which constitutional rights plaintiff alleges were violated by his involuntary commitment and treatment to CNYPC, this court will consider possible claims under the Due Process Clause and the Eighth Amendment. The court concludes that, although plaintiff was entitled to due process protection in connection with his commitment to CNYPC and involuntary medication, he received more-than-adequate process under New York state procedures. Even if the applicable state procedures were not followed to the letter, this would not support a federal constitutional due process claim. This court further finds that the conditions of plaintiff's confinement at CNYPC and his treatment and medication did not violate his Eighth Amendment rights. Accordingly, the court concludes that plaintiff's claims relating to his commitment and treatment at CNYPC do not state viable causes of action under section 1983 and should be dismissed.

### A. Due Process and N.Y. Correction Law § 402

A prisoner's transfer to a mental hospital, and the corresponding loss of liberty and "stigmatizing consequences," trigger Due Process protection. *Vitek v. Jones,* 445 U.S. at 491–92, 493–94. "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 07 Civ. 2935, 2007 WL 4115936, at *5 (S.D.N.Y. Nov. 16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul–Matiyn v. Pataki,* 9:06–CV–1503 (DNH/DRH), 2008 WL 974409, at *10 (N.D.N.Y. Apr. 8, 2008) (citing *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997)). [23]

23 The discussion of the applicable due process standards draws heavily on Magistrate Judge Peeble's analysis in *McQuilkin v. CNYPC,* 2010 WL 3765847, at *19–20.

Similarly, involuntary medication with psychotropic drugs "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," thereby creating a protected liberty interest. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Washington v. Harper,* 494 U.S. 210, 221–222 (1980). A state may treat a prisoner with anti-psychotic drugs against his will if an administrative determination concludes he is "dangerous to himself or to others and the treatment is in the inmates' medical interest." *Washington v. Harper,* 494 U.S. at 225–227. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication—but such a hearing need not be judicial in nature." *Project Release v. Prevost,* 722 F.2d 960, 981 (2d Cir.1983)). Moreover, due process does not require a guarantee that a physician's assessments in their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

**\*17** As outlined above, the amended complaint and supporting documents establish that plaintiff was committed to CNYPC only after notice and a judicial hearing, with the assistance of counsel, pursuant to N.Y. Correc. Law § 402. The order committing plaintiff to CNYPC for care and treatment was based on the finding of at least two examining psychiatrists that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself or others. (AC, Ex. L, Dkt. No. 110–2 at 28). It is clear, from the face of the complaint and the attached exhibits, that plaintiff received adequate procedural due process in connection with his commitment to CNYPC. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20.

In connection with his involuntary medication, plaintiff again received notice, and participated in a judicial hearing, with assistance of counsel. The court, which ordered that medication be administered to plaintiff over his objection, relied on psychiatric reports that plaintiff posed a danger to himself and others (Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2), ruled that plaintiff lacked "the capacity to make a reasoned decision concerning his own treatment," and found that "the proposed treatment is appropriate, narrowly tailored to the needs of the patient, and is in the patient's best interests ..." (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff received procedural protection under New York law

2011 WL 768990

that exceeded what was required by the Due Process Clause. *Sheridan v. Dubow,* 92 Civ. 6024, 1993 WL 336946, at *3 (S.D.N.Y. Sept. 3, 1993) (in New York State, a patient who refuses to consent to the administration of anti-psychotic drugs is entitled to a *de novo* judicial determination where the patient is afforded representation by counsel, exceeding the federal due process requirements of *Washington v. Harper* ) (citing *Rivers v. Katz,* 67 N.Y.2d 485, 496 (1983)).

To the extent that plaintiff argues that defendants failed to follow the procedures outlined in the Section 402 or other New York statutes, his challenge to his commitment and involuntary medication would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *See, e.g., Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D .N.Y.2009) ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.") (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York provisions with regard to his confinement and treatment, that failure would not provide the basis of a cognizable section 1983 claim. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20 n. 20.

Plaintiff argues that the state judges and the defendants responsible for his commitment to CNYPC and involuntary medication were wrong and/or malicious; he claims he was not mentally ill and did not require mental health treatment and medication. Defendants argue, persuasively, that plaintiff is precluded from a factual challenge to the basis for his commitment and involuntary medication, determined in a prior state court proceedings, in which he had a full and fair opportunity to try to establish that he was not mentally ill or in need of treatment. (Defs.' Memo. of Law at 21) (citing *Kulak v. City of New York,* 88 F.3d 63, 71–72 (2d Cir.1996) (issue preclusion bars Section 1983 claim based upon involuntary commitment where state court, in a habeas proceeding, had previously held that plaintiffs confinement to mental hospital was lawful). [24] *See also Harvey v. Sawyer,* 09–CV–598 (FJS/DRH), 2010 WL 3323665, at *4–5 (N.D.N.Y. July 22, 2010) (Report–Recommendation) (plaintiff was collaterally estopped from pursuing Eighth Amendment or Due Process claims relating to his confinement and involuntary medication at CNYPC because he had a full and fair opportunity to participate in prior court hearings which resulted in the confinement and involuntary medication, and which determined, *inter alia,* that he was mentally ill, in need of

treatment for his own health and safety, and incompetent to make decisions about his own care), adopted, 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010).

[24]     Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, the federal court must afford a prior state court judgment the same preclusive effect that the judgment would be given in the courts of the state in which it was decided. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996) (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982)). Pursuant to New York law, the doctrine of collateral estoppel applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and the issue has been necessarily decided in the prior action, is decisive of the present action, and the litigant had a full and fair opportunity in the prior action to contest the decision. *Id.* (citing *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71 (1969))

*18 Magistrate Judge Peebles and District Judge McAvoy, in this district, have held the *Rooker–Feldman* doctrine [25] precludes an inmate plaintiff from basing a 1983 action on injuries allegedly resulting from confinement in a mental hospital and involuntary medication that resulted from prior state court rulings. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *18–19 (Report–Recommendation) adopted, 2010 WL 3765715. In any event, plaintiff received adequate due process under federal constitutional standards in connection with his commitment and involuntary medication, and his claims that he was not mentally ill or in need of treatment are clearly the result of delusions. For all of these reasons, plaintiff's challenge to his commitment and treatment, based on the Due Process Clause and N.Y. Correc. Law § 402, are frivolous, fail to state a claim, and should be dismissed.

[25]     "Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482 (1983). "To do so would be an exercise of appellate jurisdiction ..." which only the Supreme Court possesses over state court judgments. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923). In order for the

Rooker–Feldman doctrine to apply, plaintiff must have lost in the state court; he must complain of injuries caused by the state court judgment; he must invite the federal court to review and reverse the judgment; and the state court judgment must have been rendered prior to the filing of the federal district court proceeding. *Hoblock v. Albany County Bd. of Elections,* 422 F.3d at 85.

**B. Eighth Amendment**
Based on the authority cited in Sections V.B. 1. and 2., any Eighth Amendment challenge to plaintiff's confinement and treatment at CNYPC should be dismissed. Plaintiff's only complaint about the conditions of confinement at CNYPC was that he was confined with mentally ill prisoners, which, he claims, without any supporting factual allegations, endangered him. Plaintiff fails to state a plausible claim that the conditions at CNYPC subjected him to a substantial risk of serious harm. With respect to his medical treatment, plaintiff relies solely on his disagreement with the medical judgment of the mental health professionals about his diagnosis and treatment. Such disagreement, or even a claim that the defendants committed medical malpractice, would not support a constitutional claim based on inadequate care. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *17.

**VII. Qualified Immunity**
The defendants have asserted that they are entitled to qualified immunity in connection with plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights. [26]

26  In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This is so because qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Stachell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982). Dismissal for failure to state a claim is thus generally appropriate only where the complaint itself sets up on its face the qualified immunity defense. *See, e.g., Green v. Maraio,* 722 F.2d at 1019. There may well be some defendants who would be entitled to qualified immunity based solely on the allegations in the complaint and supporting documents—*e.g.* the defendants without medical qualifications who deferred to the decisions of treating physicians with respect to plaintiff's mental health treatment. See, e.g., *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (non-doctors, whose failure to intercede in the medical treatment of an inmate was, even if wrongful, not objectively unreasonable, were entitled to summary judgment on qualified immunity grounds).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 120) be **GRANTED,** and that plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY.**

**\*19** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 768990

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 767546
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond GONZALES, Plaintiff,

v.

D. CARPENTER, et. al, Defendants.

No. 9:08–CV–629 (LEK/ATB).
|
Feb. 25, 2011.

**Attorneys and Law Firms**

Raymond Gonzalez, Marcy, NY, pro se.

Richard Lombardo, New York State Attorney General, Albany, NY, for Defendants.

***DECISION and ORDER***

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on January 3, 2011 by the Honorable Andrew T. Baxter, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report–Rec. (Dkt. No. 132). On February 23, 2011, after receiving multiple extensions of time by which to respond to the Report and Recommendation, Plaintiff Raymond Gonzales filed his objections ("Objections") to the Magistrate Judge's findings. Dkt. No. 137.

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a *de novo* review of the record and has determined that the Report–Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 132) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt. No. 120) is **GRANTED** and Plaintiff's Amended Complaint (Dkt. No. 106–1) is **DISMISSED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 767546

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 136 of 143

Williams v. Adams, Not Reported in Fed. Supp. (2019)

2019 WL 350215

2019 WL 350215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Thomas WILLIAMS, Plaintiff,

v.

R. ADAMS, et al., Defendants.

9:18-CV-1041 (BKS/TWD)
|
Signed 01/29/2019

**Attorneys and Law Firms**

THOMAS WILLIAMS, Pro Se, 96-A-3375, Fishkill
Correctional Facility, P.O. Box 1245, Beacon, NY 12508.

**DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**I. INTRODUCTION**

 *1  Pro se plaintiff Thomas Williams ("plaintiff"), a prison
inmate in the custody of the New York State Department
of Corrections and Community Supervision ("DOCCS"),
commenced this action on or about August 31, 2018, with
the filing of a complaint, accompanied by an application to
proceed in the action in forma pauperis ("IFP"). Dkt. No. 1
("Compl."); Dkt. No. 2 ("IFP Appl."). Following its review
of plaintiff's IFP Application, the Court issued a Decision and
Order dated November 5, 2018, determining that plaintiff had
acquired "three strikes" for purposes of 28 U.S.C. § 1915(g)
prior to commencing this action and that the complaint failed
to allege any facts that would support a finding that plaintiff
was in imminent danger at the time of filing. Dkt. No. 5
("Nov. Order"). Accordingly, the Court denied plaintiff's IFP
Application and directed him to pay the full statutory filing
fee of $400 if he wished to proceed in the action. Nov. Order at
7. On or about December 6, 2018, the Court received the full
filing fee from plaintiff. Dkt. No. 8. The Clerk of the Court has
now forwarded to the Court plaintiff's complaint for review.

**II. DISCUSSION**

**A. Standard of Review**

In accordance with 28 U.S.C. § 1915A ("Section 1915A"), a
court must review any "complaint in a civil action in which a
prisoner seeks redress from a governmental entity or officer

or employee of a governmental entity" and must "identify
cognizable claims or dismiss the complaint, or any portion
of the complaint, if the complaint ... is frivolous, malicious,
or fails to state a claim upon which relief may be granted;
or ... seeks monetary relief from a defendant who is immune
from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin,
171 F.3d 115, 116 (2d Cir. 1999)* (per curiam) (holding that
Section 1915A applies "to all civil complaints brought by
prisoners against governmental officials or entities regardless
of whether the prisoner has paid the filing fee"); *Abbas v.
Dixon, 480 F.3d 636, 639 (2d Cir. 2007)* (finding that both
28 U.S.C. §§ 1915(e)(2)(B) and 1915A provide a basis for
screening prisoner's complaints).

In reviewing a pro se litigant's complaint, the Court has a
duty to liberally construe the pleadings, *Nance v. Kelly, 912
F.2d 605, 606 (2d Cir. 1990)* (per curiam), and should exercise
"extreme caution ... in ordering sua sponte dismissal of a
pro se complaint *before* the adverse party has been served
and both parties (but particularly the plaintiff) have had an
opportunity to respond." *Anderson v. Coughlin, 700 F.2d 37,
41 (2d Cir. 1983)* (emphasis in original). Therefore, a court
should not dismiss a complaint if the plaintiff has stated
"enough facts to state a claim to relief that is plausible on its
face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)*.
"A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged." *Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* (citing
*Twombly, 550 U.S. at 556*). Although the Court should
construe the factual allegations in the light most favorable
to the plaintiff, "the tenet that a court must accept as true
all of the allegations contained in a complaint is inapplicable
to legal conclusions." *Iqbal, 556 U.S. at 678*. "Threadbare
recitals of the elements of a cause of action, supported by
mere conclusory statements, do not suffice." *Id.* "[W]here
the well-pleaded facts do not permit the court to infer more
than the mere possibility of misconduct, the complaint has
alleged–but it has not 'show[n]'–'that the pleader is entitled
to relief.' " *Id. at 679* (quoting Fed. R. Civ. P. 8(a)(2) ).
Rule 8 of the Federal Rules of Civil Procedure "demands
more than an unadorned, the-defendant-unlawfully-harmed-
me accusation." *Id. at 678* (citing *Twombly, 550 U.S. at 555*).
Thus, a pleading that only "tenders naked assertions devoid
of further factual enhancement" will not suffice. *Id.* (internal
quotation marks and alterations omitted).

**B. Summary of the Complaint**

Williams v. Adams, Not Reported in Fed. Supp. (2019)

2019 WL 350215

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 137 of 143

**\*2** The following facts are as alleged in plaintiff's complaint.

Between 2005 and 2007, plaintiff was confined in Clinton Correctional Facility ("Clinton C.F."), a prison operated by DOCCS, and under the care of defendant Medical Director Vivian Johnson. Compl. at 4. Similarly, between 2009 and 2010, defendant Doctor R. Adams was plaintiff's medical provider during a separate period of confinement in Clinton C.F. *Id.* As a result of acting as plaintiff's medical providers during those time periods, defendants Johnson and Adams became aware of plaintiff's medical conditions, which are described as follows:

> [L]ife long chronic neck and lower back spinal conditions that required use of backbrace; hammer toes, wide feet and flat feet that required customized medical boots; and pain medication 'Ultram' helping serious, daily, pain and suffering.

*Id.* (errors in original).

On or about October 13, 2015, plaintiff returned to Clinton C.F. Compl. at 5. Defendant Adams was assigned as plaintiff's medical care provider. *Id.* Plaintiff informed defendant Adams in appointments in November 2015 and February 2016 that his customized back brace and medical boots were stolen in June 2015. *Id.* at 5-6. Plaintiff notified defendant Adams during those appointments that he experienced "daily, serious" pain in his back and needed an ankle brace for an old Achilles tendon injury "that causes soreness and weakness in plaintiff's right ankle." *Id.* Plaintiff requested that defendant Adams prescribe Ultram (morphine) for his pain. *Id.* At the November appointment, defendant Adams told plaintiff that he could not prescribe plaintiff anti-inflammatory medications because plaintiff is allergic to them, and that he would not prescribe Ultram "or any other medication" to plaintiff. *Id.* at 5. At the February appointment, defendant Adams promised plaintiff that he would consult with defendant Johnson about prescribing plaintiff morphine pain medication. *Id.* at 6. During both appointments, defendant Adams denied plaintiff's requests for back and ankle braces and medical boots. *Id.* at 5-6.

On November 30, 2016, plaintiff had a third appointment with defendant Adams. Compl. at 7. Plaintiff requested replacement of his customized back brace and medical boots, a right ankle brace, and "pain medication." *Id.* Plaintiff informed defendant Adams that he was experiencing pain from his back and foot conditions and showed defendant Adams the "blisters, corns and calluses developing o[n] plaintiff's feet from being forced to wear State issued non medical boots." *Id.* Defendant Adams told plaintiff that he was going to request x-rays and for plaintiff to be seen by a specialist for his "feet, neck and back." *Id.* Defendant Adams also "took plaintiff's defective, old, customized medical boots" so he could "take pictures of [them]." [1] *Id.* at 8. The boots were returned to plaintiff on December 5, 2016. *Id.*

[1]    The complaint explains that plaintiff's customized boots were stolen in June 2015 and that they were thereafter replaced by "defective customized medical boots." Compl. at 7. The complaint does not explain why the second pair of medical boots were defective. *Id.*

**\*3** On November 23, 2016, plaintiff was again seen by defendant Adams. Compl. at 8. At that appointment, defendant Adams told plaintiff that the x-rays showed that plaintiff has "severe degenerative disc disease in plaintiff's neck," "a herniated disc in plaintiff's lower back," and "hammer toes deformities on both feet." *Id.* Defendant Adams ordered an MRI of plaintiff's back and told plaintiff that his foot condition required customized medical boots. *Id.*

Plaintiff arrived at the Clinton C.F. clinic on January 25, 2017, and was given a "pair of regular State boots with a different outter [sic] sole." Compl. at 8. Plaintiff was told by the nurse that defendant Adams ordered the boots for plaintiff and directed that "plaintiff ... try them on." *Id.* at 9. The boots caused plaintiff pain because they were "to[o] tight and narrow, had no arch support insoles, [did not] support plaintiff's weak right old achilles tendon injury and had no boot high toe for plaintiff's hammer toes to have space." *Id.* Accordingly, plaintiff refused the boots. *Id.*

On May 19, 2017, plaintiff complained to defendant Adams again about his pain and asked for pain medication and customized medical boots. Compl. at 9-10. Defendant Adams told plaintiff he would request that plaintiff receive "the orthopedic medical boots plaintiff [was] suppose[d] to receive." *Id.* at 10.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 138 of 143
Williams v. Adams, Not Reported in Fed. Supp. (2019)
2019 WL 350215

Defendant Adams prescribed plaintiff physical therapy, and plaintiff attended sessions between February 6, 2017 and June 6, 2017. Compl. at 9. Physical therapy provided plaintiff pain relief for "less than a half hour after [each session]." *Id.* Upon completion of physical therapy in June 2017, plaintiff received a permit for a Tens-Unit device, but it "was not effective in reducing plaintiff's serious, daily[ ] pains alone." *Id.* at 9, 11.

On unknown dates, defendant Adams (1) referred plaintiff to an orthopedic specialist for approval of customized medical boots, (2) prescribed plaintiff Motrin for his pain, (3) informed plaintiff that narcotic pain medication is not prescribed in New York State prisons, and (4) denied plaintiff's request for back and ankle braces. Compl. at 11. At some point in time, plaintiff stopped taking Motrin because it was ineffective. *Id.* Plaintiff then received a prescription for Cymbalta. *Id.* It was also ineffective in treating his pain and caused him to suffer allergic reactions. *Id.* Plaintiff stopped taking Cymbalta on August 29, 2017.

Plaintiff learned on September 4, 2017, during a "sickhall" visit, that defendant Adams "never put plaintiff in to be seen by an outside foot specialist," and that the reason plaintiff was denied medical boots was because defendant Adams "failed to give adequate information to support plaintiff's need for [them]." Compl. at 12.

Plaintiff was transferred to Bare Hill Correctional Facility on September 11, 2017, and his medical provider at that facility ordered plaintiff back and ankle braces in November 2017, and plaintiff received "new, customized replacement medical boots on or about July 5, 2018." Compl. at 12-13.

In her capacity as Medical Director, defendant Johnson was complicit in defendant Adams' inadequate medical treatment of plaintiff while he was confined in Clinton C.F. between October 2015 and September 2017. Compl. at 14-16. Defendant Carl Koenigsmann, the Chief Medical Officer for DOCCS, adopted an unwritten policy in or about May 2015, discontinuing the practice of recommending and prescribing narcotic pain medications to DOCCS inmates. *Id.* at 17. Defendant Koenigsmann also contributed to defendant Adams' inadequate medical treatment by failing to properly train, manage, and supervise him. *Id.*

**\*4** Plaintiff's complaint asserts Eighth Amendment deliberate medical indifference claims against defendants Adams, Johnson, and Koenigsmann. Compl. at 18-20.

## C. Analysis

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights[ but] provides ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). To state a cognizable claim under Section 1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal right,' and (2) 'that person who has deprived [the plaintiff] of that right acted under color of state law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ) (alteration omitted); *accord, Byng v. Delta Recovery Servs. LLC*, 568 F. App'x 65, 65-66 (2d Cir. 2014).

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's

Williams v. Adams, Not Reported in Fed. Supp. (2019)

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 139 of 143

2019 WL 350215

daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

**\*5** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

### 1. Defendant Adams

Because the Court assumes, for purposes of this Decision and Order, that the complaint sufficiently alleges facts that satisfy the objective element of a deliberate medical indifference claim, the Court has confined its analysis to the subjective element.

According to the complaint, between November 2015 and November 2016, defendant Adams learned from plaintiff at two separate appointments that he was suffering from chronic back, neck, ankle, and foot conditions that left him in serious chronic pain. Compl. at 5-7. Defendant Adams responded to

plaintiff's complaints at an appointment on February 3, 2016, by indicating to plaintiff that he would consult with defendant Johnson about prescribing plaintiff morphine medication. *Id.* at 6. According to plaintiff, defendant Adams never consulted with defendant Johnson. *Id.* Otherwise, during the one-year period between November 2015 and November 2016, defendant Adams took no action to address plaintiff's conditions or complaints, despite his role as plaintiff's primary care provider. *Id.* at 5-7. In light of the Court's obligation to liberally construe a pro se litigant's pleadings, defendant Adams will be required to respond to plaintiff's medical indifference claim for his treatment of plaintiff between November 2015 and November 2016.

The Court reaches a different conclusion with respect to the medical indifference claim arising between November 2016 and September 2017. According to plaintiff's complaint, during that period of time, defendant Adams took a number of steps to treat plaintiff's conditions and symptoms. In particular, defendant Adams (1) ordered x-rays of plaintiff's back, feet, and neck; (2) ordered an MRI of plaintiff's lower back; (3) special-ordered a pair of (non-customized) boots for plaintiff; (4) prescribed four months of physical therapy; (5) prescribed plaintiff 400 milligrams of Motrin for his pain, and then Cymbalta when plaintiff stopped taking the Motrin; and (6) told plaintiff that he would refer him to an orthopedic specialist for customized medical boots.[2] *Id.* at 7-9, 11. In addition, both in February 2016 and November 2016, defendant Adams promised to discuss with defendant Johnson the possibility of prescribing plaintiff morphine for his pain. *Id.* at 6, 8. Presumably defendant Adams' ability to prescribe morphine pain medications was hampered by the prison and/or DOCCS policy (to which the complaint refers) regarding a restriction against prescribing inmates narcotic pain medications. Even assuming these allegations are true, however, defendant Adams' consistent treatment of plaintiff – through diagnostic examinations, prescription of non-narcotic pain medications, physical therapy, and consultations with other medical providers – reflects constitutionally adequate care in the context of a prison facility. Moreover, there are no allegations in the complaint that the failure to prescribe plaintiff's preferred choice of pain medication was in reckless disregard to plaintiff's health and safety, especially in light of the other treatment defendant Adams provided between November 2016 and September 2017.

2       Although it is alleged that plaintiff later learned that defendant Adams never took the necessary steps for plaintiff to be seen by a specialist, there are no

Case 9:17-cv-00656-MAD-TWD   Document 110   Filed 06/02/20   Page 140 of 143

Williams v. Adams, Not Reported in Fed. Supp. (2019)

2019 WL 350215

allegations supporting an inference that the failure to do so amounted to deliberate indifference (rather than, for instance, negligence). Compl. at 12.

**\*6** In summary, even liberally construed, the allegations in the complaint concerning the period between November 2016 and September 2017 amount to a mere disagreement with the course of treatment administered by defendant Adams, which is not sufficient to state a plausible deliberate medical indifference. *See, e.g., Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)* ("[M]ere disagreement over the proper treatment does not created a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see also Hill, 657 F.3d at 123*(finding that plaintiff's complaint failed to state a deliberate medical indifference claim where it alleged that defendants prescribed plaintiff Motrin instead of a stronger pain medication and declined to order a nerve conduction study as requested by the plaintiff). Accordingly, plaintiff's deliberate medical indifference claim asserted against defendant Adams with respect to the period of treatment between November 2016 and September 2017 is dismissed for failure to state a claim on which relief may be granted pursuant to Section 1915A(b)(1).

### 2. Defendants Johnson and Koenigsmann

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)* (citing *Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)*; *McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)* ). As the Supreme Court has noted, a defendant may only be held accountable for his actions under Section 1983. *See Iqbal, 556 U.S. at 683* ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986)*. With respect to individuals sued based on their supervisory capacities (like defendants Johnson and Koenigsmann in this action) it is well settled that "vicarious liability is inapplicable to ... [Section] 1983 suits." *Iqbal 556 U.S. at 676.*

The complaint alleges that defendant Johnson learned of the allegedly inadequate medical treatment plaintiff was being provided at Clinton C.F. and did not take any action to resolve the problem, and that defendant Koenigsmann enacted the policy on which defendant Adams relied in denying plaintiff narcotic pain medication. Prior to the Supreme Court's decision in Iqbal, the Second Circuit held that supervisory personnel may be considered "personally involved" under five different circumstances. *Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)*. In particular, supervisors can be found personally involved if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon, 58 F.3d at 873* (citing *Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)* ).

In *Iqbal*, however, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal, 556 U.S. at 676*. The Court noted that "[t]he factors necessary to establish a Bivens violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion, or national origin in violation of the First and Fifth Amendments. *Id.* at 668-69. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.* at 677.

**\*7** In this Circuit, "*Iqbal* has engendered conflict ... about the continued vitality of the supervisory liability test set forth in Colon," *Reynolds v. Barrett*, 685 F.3d 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict. *See, e.g., Hogan v. Fischer, 738 F.3d 509, 519 n.3 (2d Cir. 2013)* ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, ... 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.' " (quoting *Grullon v. New Haven, 720 F.3d 133, 139 (2d Cir. 2013)* ) ).

Recently, this Court had occasion to consider the impact of *Iqbal* on the supervisor liability/personal involvement test

Case 9:17-cv-00656-MAD-TWD    Document 110    Filed 06/02/20    Page 141 of 143

Williams v. Adams, Not Reported in Fed. Supp. (2019)

2019 WL 350215

set forth in *Colon*. *Montanez v. City of Syracuse*, No. 16-CV-0550, 2019 WL 315058 (N.D.N.Y. Jan. 25, 2019). In that case, the Court concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Id.* at 18 (citing *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) ) (quoting *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010) ); *see also Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). Because the constitutional claim asserted in this case (Eighth Amendment deliberate medical indifference) does not require a showing of discriminatory intent and is based, instead, on whether defendants acted with deliberate indifference to the plaintiff's health and safety, the Court will apply the *Colon* factors.

### a. Defendant Johnson

Plaintiff alleges that he wrote defendant Johnson three letters during his confinement in Clinton C.F. in July 2016, October 2016, and May 2017. Compl. at 15-16. In each of the letters, plaintiff complained of the medical treatment he was receiving from defendant Adams. *Id.* Defendant Johnson did not respond to any of the letters. *Id.* According to plaintiff, defendant Johnson contributed to defendant Adams' deliberate medical indifference by failing to respond to his letters. *Id.* Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Johnson was personally involved in denying plaintiff constitutionally adequate medical treatment under the second *Colon* factor.

In this Circuit, "[a] supervisor may be liable in an action brought under [section] 1983 if he exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) (internal quotation marks and emphasis omitted); *Toliver v. City of N.Y.*, 530 F. App'x 90, 93 (2d Cir. 2013) (remanding to allow the plaintiff to file an amended complaint that included allegations of ongoing injuries "and that supervisory personnel were, as he claims, aware that particular officers were harassing and assaulting inmates"). In the context of a medical indifference claim, the Second Circuit has recognized that

individual defendants who hold supervisory positions may be held liable where they learned of ongoing constitutionally deficient treatment being provided to a plaintiff and took no action to remedy the violation. *See McKenna v. Wright*, 386 F.3d 432, 437-38 (2d Cir. 2004) (determining that the complaint included sufficient allegations against the defendant-supervisor where the plaintiff alleged the defendant rejected his grievance complaining of inadequate medical treatment and the defendant was responsible for the prison's medical program); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (reversing the district court's summary judgment determination in favor of the DOCCS Commissioner because the record contained a dispute of material fact concerning whether the plaintiff sent a letter to the commissioner complaining of the ongoing inadequate medical treatment being provided to him at the prison in which he was confined). Regardless of the specific ongoing constitutional violation alleged, to find that the supervisor was personally involved under the second *Colon* factor, a complaint must allege sufficient facts to place the supervisor on notice of the continuing constitutional violation and that the supervisor had the authority and ability to remedy the violation. *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (concluding that, at the pleading stage, a plaintiff is "entitled to have the court draw the reasonable inference–if his ... complaint contain[s] factual allegations indicating that [a l]etter was sent to [the defendant] at an appropriate address and by appropriate means–that [the defendant] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff complained]"); *McKenna*, 386 F.3d at 437-38 (noting that the defendant-supervisor was responsible for the prison's medical program); *Richardson*, 347 F.3d at 435 (noting that whether the defendant-supervisor was personally involved under the second *Colon* factor depended on the contents of the plaintiff's letter because the contents would reflect what the defendant-supervisor knew); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of it.").

**\*8** In this case, the allegations in plaintiff's complaint against defendant Johnson do not plausibly suggest that she was sufficiently on notice of a constitutional violation. According to the complaint, plaintiff wrote to defendant Johnson on July 25, 2016, "[c]omplaining about the deliberate denial/ and or delay of adequate medical care and treatment

2019 WL 350215

by [defendant] Adams, for plaintiff's daily, serious, neck and lower spinal pains; replacement of stolen 'customized backbrace; customized medical boots; hammer toes, flat feet, corns and calluses serious pains; right ankle achilles tendon soreness and weakness; right anklebrace and pain medication." Compl. at 15 (errors in original). Plaintiff wrote defendant Johnson again on October 18, 2016, "about the same medical issues and needs," and then a third letter on May 22, 2017, "[c]omplaining about [defendant] Adams['] continous, deliberate, denial in providing plaintiff the needed medical care and treatment plaintiff's medical conditions warranted." *Id.* at 16. Even assuming defendant Johnson received plaintiff's letters and read them, the contents of the letters, as alleged in plaintiff's complaint, do not give rise to a plausible inference that defendant Johnson was on notice that plaintiff was receiving constitutionally inadequate medical treatment. As described in plaintiff's complaint, [3] the letters describe only plaintiff's specific requests and then conclusively accuse defendant Adams of "deliberate ... [in]adequate medical care and treatment." *Id.* at 15. And, as described above, plaintiff's disagreement with defendant Adams' course of treatment does not create a constitutional claim. Without more, the Court finds that the complaint fails to allege sufficient facts to plausibly allege defendant Johnson's personal involvement in any deliberate medical indifference claim. For that reason, that claim is dismissed as asserted against defendant Johnson for failure to state a claim upon which relief may be granted pursuant to Section 1915A(b)(1).

[3]   The Court notes that plaintiff only described the contents of the letters in his complaint and did not attach the letters to the complaint or otherwise provide them as exhibits.

**b. Defendant Koenigsmann**

With respect to defendant Koenigsmann, plaintiff alleges that he created an unwritten DOCCS policy and/or custom discontinuing the prescription of narcotic pain medications to prison inmates. Compl. at 17. Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Koenigsmann was personally involved under the third *Colon* factor.

Although the complaint alleges that defendant Adams indicated to plaintiff that there was a policy in place in which

inmates were being denied narcotic pain medication, the complaint otherwise alleges no facts whatsoever concerning the details or scope of the policy. Plaintiff's allegations that defendant Adams promised to consult with defendant Johnson about the possibility of prescribing plaintiff narcotic pain medication suggests that whatever policy was in effect (if any) had contours and exceptions, and that it was not (as plaintiff suggests) a blanket policy that refused all inmates narcotics under all circumstances. Accordingly, plaintiff's complaint does not sufficiently allege facts plausibly suggesting that defendant Koenigsmann enacted an unconstitutional policy or that the policy, as alleged, was carried out in a manner in which defendant Koenigsmann knew or should have known violated plaintiff's constitutional rights.

Plaintiff's additional allegation that defendant Koenigsmann is responsible for the alleged inadequate medical treatment provided by defendant Adams because he failed to "train, manage and supervise [defendant] Adams," Compl. at 19, is vague and conclusory and does not support a cognizable constitutional claim.

For all of these reasons, plaintiff's deliberate medical indifference claim asserted against defendant Koenigsmann is dismissed for failure to state a claim pursuant to Section 1915A(b)(1).

**III. SERVICE OF PROCESS**

As indicated above, the only claim that survives the Court's initial review is plaintiff's Eighth Amendment medical indifference claim asserted against defendant Adams concerning defendant Adams' treatment of plaintiff between November 2015 and November 2016. Because plaintiff paid the filing fee in this action (following the denial of his application for in forma pauperis status), plaintiff is responsible for serving the summons and complaint on defendant Adams. In light of the fact that plaintiff is incarcerated and proceeding pro se, and in order to advance the disposition of this action, plaintiff may request an order from the Court directing service by the United States Marshal, **provided** that plaintiff pays the service fee to the United States Marshal in full **in advance** by money order or certified check. [4] For service by mail, the fee is $8.00 per summons and complaint. Plaintiff is advised that, if initial service is unsuccessful, he will be required to pay the United States Marshal any additional fee, also in advance, for subsequent

2019 WL 350215

service attempts according to the fee schedule set by the United States Marshal.

4      Payment in cash or by personal check is not acceptable.

## IV. CONCLUSION
**\*9  WHEREFORE**, it is

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is **accepted for filing** to the extent it asserts an Eighth Amendment deliberate medical indifference claim against defendant Adams concerning the medical treatment defendant Adams provided to plaintiff at Clinton C.F. between November 2015 and November 2016; and it is further

**ORDERED** that the remainder of plaintiff's Eighth Amendment deliberate medical indifference claims asserted against defendant Adams, Johnson, and Koenigsmann are **DISMISSED without prejudice** for failure to state a claim on which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1); 5 and it is further

5      Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant that plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading

requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

**ORDERED** that plaintiff is afforded an opportunity to request an order from the Court directing service by the United States Marshal and provide payment of the service fee ($8.00) to the United States Marshal in full by money order or certified check; and it is further

**ORDERED** that, upon plaintiff's submission of a request for assistance with service of process, the Clerk shall return the file to the Court for consideration; and it is further

**ORDERED** that, if plaintiff does not submit a request for assistance with service of process **within 14 days** of the filing date of this Decision and Order, the Clerk shall issue a summons and forward it to plaintiff, who shall be responsible for effecting service of process on defendant Adams. Upon issuance of the summons, the Clerk shall send a copy of the summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that the Clerk of the Court serve on plaintiff a copy of this Decision and Order, along with a copy of any unreported cases cited to in this Decision and Order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 350215

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2020 Thomson Reuters. No claim to original U.S. Government Works.  8